Nos. 25-3134, 25-3194

# United States Court of Appeals for the Seventh Circuit

UNITED STATES OF AMERICA and STATE OF ILLINOIS ex rel. TRACY SCHUTTE and MICHAEL YARBERRY, Relators,

*Plaintiffs-Appellants, Cross-Appellees,*

v.

SUPERVALU, INC., SUPERVALU HOLDINGS, INC., FF ACQUISITIONS, LLC, FOODARAMA, LLC, SHOPPERS FOOD WAREHOUSE CORP., SUPERVALU PHARMACIES, INC., ALBERTSON'S, LLC, JEWEL OSCO SOUTHWEST, LLC, NEW ALBERTSON'S, INC., AMERICAN DRUG STORES, LLC, ACME MARKETS, INC., SHAW'S SUPERMARKET, INC., STAR MARKETS COMPANY, INC., JEWEL FOOD STORES INC., AB ACQUISITION LLC,

*Defendants-Appellees, Cross-Appellants.*

On Appeal From the U.S. District Court
for the Central District of Illinois
No. 3:11-cv-03290

## OPENING BRIEF AND REQUIRED SHORT APPENDIX FOR PLAINTIFFS-APPELLANTS

Timothy Keller (IL Bar 6225309)
Dale J. Aschemann (IL Bar 6269347)
Roderick Throgmorton (IL Bar 6339752)
Aschemann Keller LLC
300 North Monroe Street
Marion, Illinois 62959-2326
(618) 998-9988
tkeller@quitamlaw.org
dale@aschlaw.org
rthrogmorton@quitamlaw.org

Tejinder Singh
*Counsel of Record*
Sparacino PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
(202) 629-3530
tejinder@sparacinopllc.com

*Additional Counsel on Inside Cover*

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
17 Derecho Way
Hot Springs Village, AR 71909
(210) 325-3887
gglaw@satx.rr.com

Gary M. Grossenbacher
Texas Bar No. 24008972
402 Vale Street
Rollingwood, Texas 78746
(512) 699-5436
gmgtex@austin.rr.com

James A. Tate
Julie Webster Popham
HELMER, MARTINS, TATE & GARRETT CO., L.P.A
1745 Madison Rd.
Cincinnati, Ohio 45206
(513) 421-2400
jtate@fcalawfirm.com
jpopham@fcalawfirm.com

Jason M. Idell
IDELL PLLC
6800 Westgate Blvd. Ste 132 #301
Austin, Texas 78745
(512) 689-3081
jason@idellpllc.com

G. Patrick Murphy
Murphy & Murphy LLC
Citadel Bldg.
504 Tower Square Plaza, Suite 300
Marion, IL 62959
(618) 248-3236
murphymurphyllc.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC;
Murphy & Murphy LLC; Helmer, Martins, Tate & Garrett Co., LPA; Goode, Casseb, Riklin, Choate & Watson;
Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: s/Tejinder Singh Date: February 4, 2026

Attorney's Printed Name: Tejinder Singh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 1920 L Street, NW. Suite 835. Washington, DC 20036

Phone Number: 202.629.5350 Fax Number:

E-Mail Address: tejinder@sparacinopllc.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC; Murphy & Murphy LLC; Helmer, Martins Tate & Garrett Co, LPA; Goode, Casseb, Riklin, Choate & Watson; Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/Timothy Keller Date: February 4, 2026

Attorney's Printed Name: Timothy Keller

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: 300 N. Monroe St., Marion, Illinois 62595

Phone Number: (618) 998-9988 Fax Number: (618) 993-2565

E-Mail Address: tkeller@quitamlaw.org

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC; Murphy & Murphy LLC; Helmer, Martins Tate & Garrett Co, LPA; Goode, Casseb, Riklin, Choate & Watson; Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/Dale Aschemann Date: February 4, 2026

Attorney's Printed Name: Dale Aschemann

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: 300 N. Monroe St., Marion, Illinois 62595

Phone Number: (618) 998-9988 Fax Number: (618) 993-2565

E-Mail Address: dale@aschlaw.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC; Murphy & Murphy LLC; Helmer, Martins Tate & Garrett Co, LPA; Goode, Casseb, Riklin, Choate & Watson; Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/Roderick Throgmorton Date: February 4, 2026

Attorney's Printed Name: Roderick Throgmorton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: 300 N. Monroe St., Marion, Illinois 62595

Phone Number: (618) 998-9988 Fax Number: (618) 993-2565

E-Mail Address: rthrogmorton@quitamlaw.org

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC;
Murphy and Murphy LLC; Helmer, Martins, Tate & Garrett Co., LPA; Goode, Casseb, Riklin, Choate & Watson;
Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: s/James A. Tate Date: 2/4/2026

Attorney's Printed Name: James A. Tate

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** _____ **No** ☑

Address: 1745 Madison Road
Cincinnati, OH 45206

Phone Number: 513-421-2400 Fax Number: 513-421-7902

E-Mail Address: jtate@fcalawfirm.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC;
Murphy and Murphy LLC; Helmer, Martins, Tate & Garrett Co., LPA; Goode, Casseb, Riklin, Choate & Watson;
Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: s/Julie W. Popham Date: 2/4/2026

Attorney's Printed Name: Julie W. Popham

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** _____ **No** ✔

Address: 1745 Madison Road
Cincinnati, OH 45206

Phone Number: 513-421-2400 Fax Number: 513-421-7902

E-Mail Address: jpopham@fcalawfirm.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Aschemann Keller LLC; Helmer, Martins, Tate & Garrett, LPA; Idell PLLC; Law Office of Gary Grossenbacher;
Sparacino PLLC; Goldstein & Russell P.C.; Law Office of Glenn Grossenbacher; Murphy & Murphy LLC;
Goode Casseb Riklin Choate & Watson

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/ Jason Idell Date: February 4, 2026

Attorney's Printed Name: Jason Idell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: 6800 Westgate Blvd. Ste 132-301
Austin, TX 78745

Phone Number: 512.689.3081 Fax Number:

E-Mail Address: jason@idellpllc.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC; Murphy & Murphy LLC; Helmer, Martins Tate & Garrett Co, LPA; Goode, Casseb, Riklin, Choate & Watson; Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/Gary Grossenbacher Date: February 4, 2026

Attorney's Printed Name: Gary Grossenbacher

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒ X

Address: 402 Vale St.
Rollingwood, TX 78746

Phone Number: (512) 699-5436 Fax Number:

E-Mail Address: gmgtex@austin.rr.com

Save As Clear Form



**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC; Murphy & Murphy LLC; Helmer, Martins Tate & Garrett Co, LPA; Goode, Casseb, Riklin, Choate & Watson; Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/Glenn Grossenbacher Date: February 4, 2026

Attorney's Printed Name: Glenn Grossenbacher

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: 17 Derecho Way

Hot Springs Village, AR 71909

Phone Number: (210) 325-3887 Fax Number:

E-Mail Address: gglaw@satx.rr.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134, 25-3194

Short Caption: Tracy Schutte v. SuperValu, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Tracy Schutte and Michael Yarberry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aschemann Keller LLC; Law Office of Gary Grossenbacher; Law Office of Glenn Grossenbacher; Idell PLLC; Murphy & Murphy LLC; Helmer, Martins Tate & Garrett Co, LPA; Goode, Casseb, Riklin, Choate & Watson; Sparacino PLLC; Goldstein & Russell, P.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: s/G. Patrick Murphy Date: February 4, 2026

Attorney's Printed Name: G. Patrick Murphy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Citadel Bldg. 504 Tower Square Plaza, Suite 300
Marion, IL. 62959

Phone Number: (618) 248-3236 Fax Number:

E-Mail Address: efile@murphymurphyllc.com

# TABLE OF CONTENTS


Table of Authorities ........ iii

Opening Brief for Plaintiffs-Appellants ........ 1

Jurisdictional Statement ........ 1

Statement of the Issues ........ 2

Statement of the Case ........ 3

- I. Legal Background ........ 3
  - A. The False Claims Acts ........ 3
  - B. The Government Healthcare Programs ........ 5
- II. Factual Background ........ 9
- III. Procedural History ........ 15
  - A. The District Court's 2019 Summary Judgment Order as to Falsity ........ 15
  - B. The District Court's 2024 Summary Judgment Order as to Materiality ........ 18
  - C. The 2025 Jury Trial ........ 18
  - D. Post-Trial Motions ........ 30

Summary of Argument ........ 32

Argument ........ 34

- I. Defendants Knowingly Presented False Claims to Illinois Medicaid and Federal Healthcare Programs in Violation of the Federal and State False Claims Acts. ........ 34
  - A. The District Court Correctly Held That Defendants' Claims Were False as a Matter of Law. ........ 35
  - B. The District Court Correctly Held That Defendants' Misrepresentations Were Material as a Matter of Law. ........ 41
  - C. The Jury Correctly Found That Defendants Acted Knowingly. ........ 45

II. The District Court Erred by Refusing to Award Penalties for Each Violation of the False Claims Acts. .......... 51

III. The Jury's Damages Verdict Should Be Vacated in Light of Trial Errors and the Evidence Presented at Trial .......... 61

Conclusion .......... 71

Certificate of Compliance with Type-Volume Limitation

Certificate of Compliance Under Rule 30(d)

Required Short Appendix

Final Judgment entered March 12, 2025 .......... SA1

# TABLE OF AUTHORITIES*

## Cases

*Astellas US Holding, Inc. v. Fed. Ins. Co.*,
66 F.4th 1055 (7th Cir. 2023) ........................................................ 46

*BCS Servs., Inc. v. BG Invs., Inc.*,
728 F.3d 633 (7th Cir. 2013) .......................................................... 64

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) ........................................................................ 64

*Brooks v. City of Kankakee*,
7 F.4th 649 (7th Cir. 2021) ............................................................ 63

*Com. Contractors, Inc. v. United States*,
154 F.3d 1357 (Fed. Cir. 1998) ...................................................... 56

*Cook County v. United States ex rel. Chandler*,
538 U.S. 119 (2003) ........................................................................ 35

*Guzman v. City of Chicago*,
689 F.3d 740 (7th Cir. 2012) .......................................................... 68

*Hendrix ex rel. United States v. J-M Mfg. Co.*,
76 F.4th 1164 (9th Cir. 2023) .................................................. 55, 65

*Matter of Taxman Clothing Co., Inc.*,
905 F.2d 166 (7th Cir. 1990) .......................................................... 58

*Ruckh v. Salus Rehab., LLC*,
963 F.3d 1089 (11th Cir. 2020) ...................................................... 44

*Schmitz v. Canadian Pac. Ry. Co.*,
454 F.3d 678 (7th Cir. 2006) .......................................................... 67

*Thompson v. City of Chicago*,
722 F.3d 963 (7th Cir. 2013) .......................................................... 64

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 409 (4th Cir. 2013) .......................................................... 55

* Unless otherwise stated, all citations are cleaned up, emphases are added, and internal citations are omitted.

*United States ex rel. Calderon v. Carrington Mortgage Servs.*,
70 F.4th 968 (7th Cir. 2023) .......... 53

*United States ex rel. Campbell v. KIC Dev., LLC*,
2019 WL 6884485 (W.D. Tex. Dec. 10, 2019) .......... 44

*United States ex rel. Cimino v. Int'l Bus. Machines Corp.*,
3 F.4th 412 (D.C. Cir. 2021) .......... 57

*United States ex rel. Compton v. Midwest Specialties, Inc.*,
142 F.3d 296 (6th Cir. 1998) .......... 65

*United States ex rel. Fahner v. Alaska*,
591 F. Supp. 794 (N.D. Ill. 1984) .......... 58

*United States ex rel. Garbe v. Kmart*,
824 F.3d 632 (7th Cir. 2016) .......... 5, 8, 36, 37, 39, 41

*United States ex rel. Grant v. Zorn*,
107 F.4th 782 (8th Cir. 2024) .......... 65

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .......... 56

*United States ex rel. Hartigan v. Palumbo Bros.*,
797 F. Supp. 624 (N.D. Ill. 1992) .......... 52

*United States ex rel. Heath v. Wisconsin Bell, Inc.*,
92 F.4th 654 (7th Cir.), *aff'd*, 604 U.S. 140 (2025) .......... 34, 35, 41, 42

*United States ex rel. Lamers v. City of Green Bay*,
998 F. Supp. 971 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999)
.......... 52

*United States ex rel. Main v. Oakland City Univ.*,
426 F.3d 914 (7th Cir. 2005) .......... 52

*United States ex rel. Proctor v. Safeway, Inc.*,
30 F.4th 649 (7th Cir. 2022), *vacated on other grounds*, 598 U.S. 739
(2023) .......... 5

*United States ex rel. Schutte v. SuperValu Inc.*,
2023 WL 4819720 (7th Cir. July 27, 2023) .......... 46

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 742 (2023) .......... 6

*United States ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*, 2019 WL 1086363 (N.D. Okla. Mar. 7, 2019) .......................................45

*United States ex rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816 (7th Cir. 2025) ............................ 35, 42, 43, 45, 49, 50, 69

*United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007) ............................................... 52, 58

*United States ex rel. Ubl v. IIF Data Sols.*, 2007 WL 2220586 (E.D. Va. Aug. 1, 2007) ..........................................45

*United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008)...........................................................44

*United States v. Corp. Mgmt., Inc.*, 78 F.4th 727 (5th Cir. 2023) ..............................................................44

*United States v. Hughes*, 585 F.2d 284 (7th Cir. 1978)........................................................... 51, 52

*United States v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212 (D.N.J. 2021) ......................................................44

*United States v. Killough*, 848 F.2d 1523 (11th Cir. 1988)..................................................... 55, 65

*United States v. Molina Healthcare of Ill.*, Inc., 17 F.4th 732 (7th Cir. 2021) ..............................................................35

*United States v. Rogan*, 2006 WL 8427270 (N.D. Ill. Oct. 2, 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).................................................................................... 52, 65

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ......................................................55

*United States v. Tieger*, 234 F.2d 589 (3d Cir. 1956) .............................................................56

*United States v. Williams*, 2003 WL 21384640 (N.D. Ill. June 12, 2003) .......................................52

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) ................................................................ 35, 43, 44

*Varljen v. Cleveland Gear Co.*,
250 F.3d 426 (6th Cir. 2001) .......... 56

*Wisconsin Bell, Inc. v. United States ex rel. Heath*,
604 U.S. 140 (2025) .......... 34

**Statutes**

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

31 U.S.C. § 3729(a)(1) .......... 2, 3, 32, 57

31 U.S.C. § 3729(a)(1)(A) .......... 3, 32, 53, 54, 57

31 U.S.C. § 3729(b)(1) .......... 3

31 U.S.C. § 3729(b)(2) .......... 3

31 U.S.C. § 3729(b)(4) .......... 41

31 U.S.C. § 3730 .......... 1

31 U.S.C. § 3730(b) .......... 4

31 U.S.C. § 3730(b)(4)(B) .......... 4

31 U.S.C. § 3730(c) .......... 4

31 U.S.C. § 3730(d) .......... 4

31 U.S.C. § 3732(a) .......... 1

31 U.S.C. § 3732(b) .......... 1

225 ILCS 85/3(w) .......... 59

740 ILCS 175/3(a)(1) .......... 4

740 ILCS 175/3(a)(1)(A) .......... 4

740 ILCS 175/3(b)(2)(a) .......... 4

740 ILCS 175/4 .......... 1

740 ILCS 175/4(b) .......... 4

740 ILCS 175/4(d) .......... 4

## Regulations

Ill. Admin. Code tit. 89, § 140.447 .......... 59

## Other Authorities

Illinois Pattern Civil Jury Instruction 1.02 .......... 69
S. Rep. No. 99-345 (1986) .......... 54, 55

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

Plaintiffs Tracy Schutte and Michael Yarberry respectfully appeal from the district court's decisions in favor of defendants SuperValu Inc., et al. (collectively SuperValu).

## JURISDICTIONAL STATEMENT

This case arises under the False Claims Act, 31 U.S.C. § 3730, and its Illinois state counterpart, 740 ILCS 175/4. The district court had subject-matter jurisdiction over the federal claims under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and jurisdiction over the state claims under 31 U.S.C. § 3732(b). The district court entered final judgment in defendants' favor on March 12, 2025. SA2. Post-trial motions were filed on April 1, 2025 and April 29, 2025, and denied on October 31, 2025. A250. Plaintiffs noticed this appeal on November 26, 2025. A276. Defendants cross-appealed on December 4. A280. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The False Claims Act provides, in relevant part, that:

> [A]ny person who … knowingly presents … a false or fraudulent claim for payment or approval … is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1). Here, the jury found that the defendant pharmacies knowingly presented false claims to federal programs and the state of Illinois. A153-54 (Verdict Form). But it also found that plaintiffs failed to prove that these claims caused damages to the government. A153-54. The district court then held that without proof of damages, defendants were not liable for civil penalties, either—and accordingly entered judgment in defendants' favor without requiring the jury to count the number of false claims, or assessing penalties. SA2. The issues on appeal are:

1. Whether defendants are liable for a civil penalty for each false claim they knowingly presented, even absent damages?
2. Whether the jury's finding that plaintiffs did not establish damages should be vacated in light of the evidence and the district court's erroneous trial rulings?

# STATEMENT OF THE CASE

## I. Legal Background

### A. The False Claims Acts

The False Claims Act imposes civil liability on any person who "knowingly presents … a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). In relevant part, a "claim" is "any request or demand, whether under a contract or otherwise," presented either to the government or one of its agents or contractors to administer a government program using government money. *Id*. § 3729(b)(2). To act "knowingly" under the statute, it suffices if the defendant has "actual knowledge," "acts in deliberate ignorance," or "acts in reckless disregard" of the truth or falsity of information. *Id*. § 3729(b)(1). No "specific intent to defraud" is required. *Id*.

False Claims Act violations carry two independent remedies. First the defendant is liable "for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990." 31 U.S.C. § 3729(a)(1). Second, the defendant is liable for "3 times the amount of damages which the Government sustains because of the act of that person." *Id*.

The False Claims Act authorizes qui tam plaintiffs to sue on behalf of themselves and the United States. 31 U.S.C. § 3730(b). When a private person brings such an action, the United States may intervene and take over the action—or may decline to do so, "in which case the person bringing the action shall have the right to conduct the action," subject to ongoing supervision by the government. *Id.* § 3730(b)(4)(B); *see also id.* § 3730(c) (enumerating some of the government's supervisory powers). Successful actions entitle the plaintiff to a share of the proceeds not to exceed 30 percent, plus reasonable attorneys' fees and costs. *Id.* § 3730(d).

2. The Illinois False Claims Act, 740 ILCS 175, functions similarly to the federal statute. The operative liability language is the same, *see* 740 ILCS 175/3(a)(1)(A), except that claims must be presented to the state's employees, officers, agents, or contractors, as opposed to federal ones, *see id.* 175/3(b)(2)(a). Remedies function similarly, too, except that damages are pegged to the damages sustained by the state, as opposed to the federal government—and the statute provides explicitly that "penalties in this Section are intended to be remedial rather than punitive." *Id.* 175/3(a)(1). The statute authorizes qui tam actions on similar terms as the federal statute, with similar rewards for success. *Id.* 175/4(b), (d).

### B. The Government Healthcare Programs

This case arises out of false claims for reimbursement for prescription drugs, which the defendant pharmacies presented to Illinois Medicaid, Medicare Part D, the Federal Employee Health Benefit Program, and TRICARE. A367 ¶8. These programs all required pharmacies to charge the government no more than their "usual and customary" prices for generic drugs. A368 ¶¶13, 16-17; A588-89; A554. As this Court explained in *United States ex rel. Garbe v. Kmart*, 824 F.3d 632 (7th Cir. 2016), "[u]nless state regulations provide otherwise, the 'usual and customary price' is defined as 'cash price offered to the general public,'" and includes discounts that "were offered to the general public." *Id.* at 643; *see also United States ex rel. Proctor v. Safeway, Inc.*, 30 F.4th 649, 653 (7th Cir. 2022) (recognizing that after *Garbe*, "it is now settled in this circuit that pharmacies should report [discount-program prices] as U&C"), *vacated on other grounds*, 598 U.S. 739 (2023).

The policy behind this requirement is simple: If an ordinary person walking in off the street could buy a drug from a pharmacy for some low price, the government should not be required to pay more to provide the same drug to its beneficiaries. A591. To implement the policy, pharmacies

were required to report—on every claim for payment to a government program—the usual and customary price for the relevant prescription, and to charge the lesser of a contractually negotiated price or the usual and customary price. A368 ¶¶13, 16-17; A588-89; A615; A554.

Although the usual and customary price requirement was common across programs, the reimbursement and funding mechanisms for each program differ in important ways.

Medicaid is a health insurance program operated by the states primarily for the benefit of low-income individuals. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 742, 744 (2023) (citing 42 U.S.C. §1396 et seq.). The program is jointly funded by the states and the federal government. *Id.* The amount of federal funding varies by state based on the state's per capita income, with poorer states receiving more federal assistance. A598. During the relevant time period, the federal government funded just over half of Illinois Medicaid's expenses, and the state paid the remainder. A599; A912. For reimbursement of pharmacy expenses, the state would contract with pharmacies, and pharmacies that dispensed drugs to Illinois Medicaid beneficiaries "were submitting claims directly to Illinois Medicaid … according to the approved claims

processing standards." A599. This funding structure means that whenever an inflated claim for payment is presented to Illinois Medicaid, it is paid directly out of federal and state funds. A598-99.

Medicare Part D is funded principally by a combination of the federal government (which covers at least 72% of the benefit expenses) as well as beneficiaries (through premiums, copayments, and similar). A602-03; A722. The government funds the program by paying per-beneficiary payments (analogous to insurance premiums) to private intermediaries (insurance companies), who act as plan sponsors pursuant to contracts with the government. A712; A737; A608-10; A553. The plan sponsors, in turn, employ pharmacy benefit managers (PBMs), who contract with pharmacies to process and pay claims on the plan sponsors' behalf. *Id*. Thus, pharmacies present Medicare claims to PBMs, who act as agents for the government—and the money the PBM pays to the pharmacy is paid out of the funds the government previously provided to the plan sponsors. *Id*. Because of the presence of private intermediaries, it is possible that the cost of inflated claims for payment will not immediately be passed on to the government. But most of the money a pharmacy receives from a PBM administering Medicare Part D comes, originally,

from the federal government. A712; A721-22; A773-75; A553; A566; *Garbe*, 824 F.3d at 639. Moreover, as with any other insurance, overcharging the PBMs inflates the costs of providing insurance, which increases the amount the federal government pays to support the program down the road. *See* A724.

The Federal Employee Health Benefit Program insures federal employees and their dependents. A368 ¶12; A580; R.176-1 at 22 (SuperValu Undisputed Material Fact ("UMF") No. 55).[1] It is funded by the federal government and beneficiaries, and uses private insurance carriers and PBMs to administer the claims process. A368 ¶13; A773-75. As with Medicare Part D, payments made by this program come principally from the government, and overcharging this benefit program results in increased costs later on. A747-48.

TRICARE is a health insurance program operated by the Department of Defense. A368 ¶11; R.176-1 at 21 (SuperValu UMF No. 52). It is fully federally funded (A896) and used the PBM Express Scripts to administer prescription benefits (A974).

[1] Citations to the underlying record reference ECF page numbers.

## II. Factual Background

The factual story begins in September 2006, when Walmart upended the retail pharmacy market by allowing cash-paying customers to pay only $4 for a one-month supply of 300 different generic drugs. A505; A593; R.176-1 at 16 (SuperValu's UMF No. 27); A546. Walmart's competitors, including defendants—which are companies in the SuperValu family of grocery stores and pharmacies—were stuck trying to find a way to compete with Walmart's low prices without giving up too much in profits. A593-94; A637-39; A490-491; R.195 at 18 (admitting R.169, UMF 26). The problem arose because if companies simply copied Walmart by offering generic drugs for $4, then $4 would become their "usual and customary" price, and they would have to pass that discount on to the government's beneficiaries as well. A626; A490-91; A593-94; R.195 at 11 (admitting R.169, UMF 31). SuperValu calculated that if it followed Walmart's lead, that "would result in tens of millions of lost profits." A12. Its vice president predicted that if even some SuperValu pharmacies matched Walmart's $4 prices on the same list of drugs, SuperValu would lose $40-$45 million in profits annually. A624-25; A490. He increased this estimate to $70 million after Walmart expanded its discount program in June

2008. A629-30; A491. SuperValu didn't want that; instead, it wanted to compete with Walmart for cash-paying customers while maintaining high prices for insured customers including government beneficiaries.

Rather than mimic Walmart exactly, SuperValu took a stealthy approach in an attempt to have its cake and eat it, too. A794-97; A558; R.194 at 9 (admitting R.164, UMF 22). Thus, SuperValu kept its retail prices for drugs high and claimed that those prices were its usual and customary prices for purposes of charging government healthcare programs. R.194 at 11 (admitting R.164, UMF 30). But SuperValu also offered to match the price of any competitor (including Walmart) for any drug for any cash-paying member of the general public. A682 ("our price match policy was any competitor on any product that was verifiable on any given day"); A765-66; A506; R.194 at 8-9 (admitting R.164, UMFs 10, 13 & 18). The upshot is that SuperValu offered the public the same price as Walmart for the same drugs—but pretended that those prices were a special discount, and not its usual and customary price. A765-66; A506; R.194 at 9 (admitting R.164, UMF No. 22).

During the relevant time period (2006 to 2016), SuperValu matched competitor prices millions of times—which, for certain popular generic

drugs, accounted for the majority of the cash sales—but did not pass the same savings on to government health care programs. A303; A688-89, A697-99 & A567-569. For example, for simvastatin, a popular anti-cholesterol drug, SuperValu charged the cash-paying public $4, and charged Illinois Medicaid $33.69, claiming that the higher price was their usual and customary price. A347-48; A666 (SuperValu executive confirms that "anyone who walked into a SuperValu Pharmacy could get a price match on simvastatin 20 milligrams at $4"). During certain time periods, SuperValu sold five times as many simvastatin prescriptions at the discounted price of $4 as it did at the much higher prices reported to the government, which ranged from $33.69 to $150.69. A662-69, 679-80 (showing 1,105 price overrides out of 1,404 cash sales for 20 mg simvastatin, and 1,024 overrides out of 1,327 cash sales for 40 mg tablets); A915 (showing inflated charges to the government); A698-99. For 44 of SuperValu's top 50 drugs, the company was matching prices for a majority of cash sales. A688-89, A697-99 & A567-569.

SuperValu's price-matching ramped up significantly over the relevant period. In 2007, price overrides (including price matching) accounted for 8.75% of all cash sales. R.194 at 13 (admitting R.164, UMF

No. 15); A555. By 2011, that number had risen to 39.36% of cash sales. *Id.* Overrides were occurring as frequently as 18,000 times per week across defendants' stores. R.194 at 13-14 (admitting R.164, UMF No. 17 (citing A492-93, A509 (sealed versions cited in R.164)); A555. The ramp-up occurred because SuperValu advertised its price-matching and also automated the process by using software to automatically input price-matched prices for cash customers' refills. R.194 at 9-10 (admitting R.164, UMF 23 (advertising), UMF 25 (automatic input) (citing A289-95, A516-517, A527 (sealed versions cited in R.164)). But at no point did SuperValu report its price-matched prices as usual and customary. *E.g.*, A642.

Evidence showed that SuperValu knew—or at least was aware of a significant risk—that its price-matched prices were its usual and customary prices. It received a memorandum from the Centers for Medicare and Medicaid Services in 2006 stating that when a pharmacy offers a lower price to its customers throughout the benefit year, that price would be the pharmacy's usual and customary price. A761-62; A514 n.1. PBMs and insurers—including Humana, Medco, Coventry, First Health, and Prime Therapeutics—similarly contacted SuperValu to communicate that discounts it offered to the general public would have

to be incorporated into usual and customary prices. A788-90 & A483-84 (Coventry/First Health); A696-97 & A512 (Medco); A753-54 & A546 (Humana); A814-18 & A564 (Prime Therapeutics). For example, SuperValu executive Maxine Johnson circulated an internal e-mail saying that "PBMs have asked us how we are responding [to Walmart]. They have stated if we did this, no matter how we package the situation, they would consider the $4 our usual and customary price on those products." A755 & A548-49.

SuperValu responded by taking what its executives described internally as a "stealthy" approach to price matching. A795 & A558. Specifically, the executives understood that if price-matching became "more 'rule' or routine," it would "affect the integrity of our U&C price," which would have a "very broad" "financial implication" for SuperValu's business. *Id.* Accordingly, SuperValu tried to make it look like price-matching was "something we do as an 'exception' for customer service reasons," *id.*, even as it did so in millions of transactions—and even as its official policy was that SuperValu would "not lose a prescription because of price." A766 & A506.

To make the program as stealthy as possible, SuperValu matched prices only on cash transactions—obscuring those transactions from PBMs and government programs, which do not audit or review cash transactions. A642; A653-54; A786-87; A802-05 & A511. Thus, if a government beneficiary requested a price match, SuperValu's pharmacists could only provide the price-match if the customer paid out of pocket. Multiple witnesses testified that SuperValu never revealed the extent of its price-matching to the PBMs during audits. A804-05; A842-44; A850-51; A977-78. After SuperValu received a subpoena for records in 2012 (flowing from this lawsuit) (A706; A518), it instructed pharmacies to discard competitor price lists as well as marketing signs indicating that SuperValu matches prices. A675 & A552. Thereafter, SuperValu continued matching prices, but nominally required customers to ask for price-matching before it would be offered (except for refills, which did not require consumer requests, but were done essentially automatically by SuperValu's computer system). A649-50. The price-matching program ended after this case was unsealed in 2016. A854.[2]

[2] Albertson's, a subsidiary of SuperValu that split off in 2013, stopped price matching that year. A854.

## III. Procedural History

This case has a lengthy procedural history commencing in 2011 and proceeding through post-trial motions in 2025. This brief focuses on the key stages for purposes of this appeal. These are: (1) a 2019 summary judgment order in plaintiffs' favor on the element of falsity (A7-27); (2) a 2024 summary judgment order in plaintiffs' favor on the element of materiality (A28-54); (3) the trial where a jury found that defendants acted with scienter, but did not find that plaintiffs carried their burden with respect to damages (A153-56); and (4) the order denying post-trial motions (A250-75).

### A. The District Court's 2019 Summary Judgment Order as to Falsity

On August 5, 2019, the district court granted plaintiffs' motion for summary judgment on the element of falsity. A27. The summary judgment record showed that:

(1) the PBM industry definition of usual and customary price is generally understood to be the cash price charged to the general public; A16;

(2) for customers paying without insurance (described as "cash" customers), SuperValu offered to match the price of any competitor, overriding its list prices; A24;

(3) between October 2006 and June 2012, the price matching program was advertised, and pharmacists frequently mentioned price-matching on their own, per corporate policy stating that "[t]he company will not lose a prescription because of price," which also instructed pharmacists to "Mention … price match guarantee"; A9, A12-14;

(4) price-overrides ramped up from 8.75% of cash sales in 2007 to 39.36% of cash sales of all drugs in 2011—and 88.31% of these overrides were the result of competitor price-matching; A11;

(5) this meant that price match overrides occurred as frequently as 18,000 times per week; A11;

(6) the price-match policy was set at the corporate level, not at the individual pharmacy level—as was the usual and customary price reported to the government healthcare programs; A15;

(7) starting in October 2008, SuperValu automatically matched prices when customers refilled prescriptions, even without a customer request; A13-14;

(8) SuperValu did not pass the benefits of price-matching on to government health care programs—and would not itself submit price-matched transactions to third party insurance, even if customers requested it; A12;

(9) After SuperValu received a subpoena in connection with this case, it stopped advertising the program and changed the language of some of its policies—but continued offering price-matching until 2016. A14; A16; A23-24.

The district court held that under this Court's decision in *Garbe*, "Defendants' price match program was an offer to the general public that determined the Defendants' usual and customary price." A24. Noting that the defendants "offered these prices throughout the benefit year over the years," the court concluded that "the lower price constitutes the usual and customary price during those years." A25. The court accordingly found "that Defendants' lower matched prices, offered to the general public and widely and consistently available, are the usual and customary prices for

their drugs." A27. Because the undisputed evidence showed that SuperValu did not offer or even report its discounted prices to the government, the court granted summary judgment to plaintiffs on the element of falsity.

### B. The District Court's 2024 Summary Judgment Order as to Materiality

In 2024, the district court granted plaintiffs' motion for summary judgment as to materiality.[3] The court acknowledged that "[m]ateriality is a demanding standard," which was satisfied because, under *Garbe*, "a misstatement regarding the collection of more money than actually owed was sufficient to establish materiality." A53. Therefore, SuperValu's false reporting of inflated usual and customary prices had a natural tendency to cause SuperValu to receive more money than it would have received had it reported those prices truthfully. A53.

### C. The 2025 Jury Trial

With falsity and materiality established as a matter of law, scienter, the number of false claims, and damages remained for trial. That trial began in February 2025, and ran for approximately a month. At the

[3] The court simultaneously denied plaintiffs' motion for summary judgment as to scienter, and defendants' motion for summary judgment.

conclusion of the trial, the jury found that the defendants had "knowingly presented, or caused to be presented, false or fraudulent claims for payment" to both federal programs and to the state of Illinois. A153-54. The jury also found, however, that the plaintiffs did not "prove by a preponderance of the evidence that Defendants' false claim(s) caused" either the United States or Illinois to suffer damages. A153-54. The district court then entered judgment for defendants. SA2. Both the evidence presented at trial and the district court's rulings shaping the trial are important here.

*1. The Evidence of Scienter and Damages*

On appeal, this Court will generally defer to the jury's verdict. Accordingly, we describe the evidence in the light most favorable to the verdict (finding scienter, but not damages).

To establish scienter, plaintiffs presented internal communications showing that SuperValu adopted a "stealthy" approach to price matching, quietly offering matches to every member of the general public, but trying not to draw attention from government payors who would demand the same benefits for taxpayers. A795; A564. SuperValu also never disclosed the extent of its price matching to the government, and obscured the

program in response to government investigations. A786-87, A802; A511; A12. SuperValu did all this despite notice from multiple sources that widespread discounts would constitute its usual and customary price. *See* PBM notices, *supra* pp.12-13. Plaintiffs also presented expert testimony from Dr. Kenneth Schafermeyer, Ph.D.—professor emeritus at the St. Louis University of Health Sciences and Pharmacy and former practicing pharmacist—who testified that a pharmacy in SuperValu's position would understand that it was required to report its price-match discounts as usual and customary prices. A617.

The evidence quantifying false claims and damages was largely expert-driven. Plaintiffs presented three experts whose testimony bore on the question: Ian Dew, a data analyst who reviewed SuperValu's claims data to determine the number and amount of false claims, as well as the potential effect on the government, for each affected government program (A861-62, A871-73); John Bertko, an actuary who co-chaired the Medicare trustee technical advisory panel from 2010 to 2012 (A710, A713), who opined based on reports generated by the trustees as to the percentage of overpayments made to SuperValu that comprised federal government

dollars; and Dr. Schafermeyer, who reviewed and corroborated the methodologies employed by Mr. Bertko and Mr. Dew.

Mr. Dew testified that SuperValu presented 1,297,037 claims to Illinois Medicaid that were overpaid because SuperValu reported inflated usual and customary prices. A912. Mr. Dew calculated the amount of overpayment by comparing claim-by-claim the amount the government actually paid with the usual and customary price (defined as the cash price offered to the general public, including price-matching). A873. For any claim where the actual usual and customary price was lower than the amount the government paid, Mr. Dew re-ran the claim and calculated how much the government programs would have saved. A881-82 (describing methodology). Mr. Dew explained that because Medicaid funds come entirely from the government, "the full amount of the overpayment" on each claim inures to the government, which can be attributed in part to the state, and in part to the federal government. *Id.* at 267. In this case, the amount of Illinois Medicaid overpayment attributable to the state was $3,678,649, and to the federal government was $3,701,862. A912; A556.

Plaintiffs' experts also testified about the purely federal programs. For these programs, Mr. Bertko first performed an analysis, based on federal government reports (the same reports he reviewed while employed by the government, which this Court relied upon in *Garbe*) to determine what percentage of funds paid to a pharmacy by a particular program came from the federal government, as opposed to other sources (*e.g.*, beneficiary premiums and copayments), during the relevant time period. *E.g.*, A566, A714-16. Based on this analysis, Mr. Bertko concluded that for Medicare Part D, "[a]t least 72 percent are Federal funds and probably more," an opinion expressed with "[a] high degree of confidence." A722; *see also* A746-48 (confirming this figure on redirect). Mr. Bertko further opined that overpayments as a result of a false claim would harm Medicare in two ways. First, "[i]n the year of the overpayment, the government pays more in for the overstated claims than it should have. And then secondly, there is an effect down the road because that overpayment is generally baked into the projections of actuaries of planned sponsors for the next year." A724.

Mr. Bertko testified similarly as regarding the Federal Employee Health Benefits Program, estimating that "70 percent" was "a

conservative estimate of the federal contribution" to that program's payments—again with a "high degree of confidence." A725-26; *see* A747-48 (confirming on redirect).

Mr. Dew then testified about the amount of overpayments to the federal programs based on a review of SuperValu's claims data, and the effect on the government of these overpayments. A871-76, A881-82. Once he determined the amount of overpayment, Mr. Dew then applied a discount factor drawn from Mr. Bertko's testimony for the relevant program to assess the effect on the government. A894-98. Thus, because Mr. Bertko concluded that at least 72% of the dollars paid by Medicare Part D came from the government, Mr. Dew discounted Medicare overpayments to 72% of the total amount—and discounted Federal Employee Health Benefit Program payments to 70%. A895-96. He did not apply any such discount to TRICARE, which (like Medicaid) is entirely government funded. A896-97.

Applying this methodology, Mr. Dew concluded that Medicare Part D overpaid 14,979,796 claims (out of 25,696,542 that he evaluated), correlating to a discounted overpayment amount of $105,577,107. A899. The Federal Employee Benefit Program overpaid 447,880 claims (out of

974,776 reviewed), for a discounted overpayment amount of $4,565,002. A899. And TRICARE overpaid 519,843 claims (out of 1,834,930), overpaying $4,416,743. A900.

In cross-examination, defendants focused on three points. First, they established that plaintiffs' experts were not attempting to precisely quantify the downstream effects of overpayments on the amounts the government would pay as premiums to Medicare plan sponsors or other private insurers. A744-45; A930-32. Second, they established that plaintiffs' experts were not legal experts on the meaning of "usual and customary." *E.g.*, A726-27; A934-35. And finally, they emphasized that the experts were using a definition of "usual and customary" provided to them by plaintiffs' counsel. *E.g.*, A940, A950.

SuperValu's defense case primarily rested on the testimony of Leslie Norwalk, a former acting administrator of the Centers for Medicare and Medicaid Services. *See generally* A1006, A1013-19, A1029-45. Ms. Norwalk testified that even if SuperValu overbilled the PBMs administering Medicare Part D, that did not mean that the federal government itself would suffer any damages. A1013-14; A1030-35; A1037-38. Thus, she explained that the amount the federal government pays to

plan sponsors is not a direct function of the amounts that pharmacies bill to PBMs, but is instead a function of bids that the plan sponsors present to the government specifying the amount they seek to collect prospectively on a per-beneficiary basis. A1013-18; A1036-37. She also disputed Mr. Bertko's conclusion that at least 72% of the money paid to pharmacies came from the federal government, disputing that the amount accounted for overhead and other payments the federal government made to plan sponsors. A1066-69; A1076-77.

Ultimately, Ms. Norwalk concluded that any overbilling by SuperValu of Medicare Part D did not cause any increase to the government's premiums paid to plan sponsors. A1013-18; A1081-84. Ms. Norwalk did not, however, offer any opinion about any other government programs in this case. Indeed, she expressly disclaimed any opinion relating to Medicaid, the Federal Employees Health Benefit Program, and TRICARE. A1058; *see also* A1087 (sidebar where plaintiffs' counsel confirms, without contradiction, that Ms. Norwalk expressed no opinions on damages vis-à-vis these programs).

*2. The district court's key rulings.*

The verdict and the judgment were the result of at least three district court rulings that plaintiffs challenge on appeal. *First*, even though plaintiffs had established at summary judgment that the phrase "usual and customary" refers to the cash price offered to the general public (as established in *Garbe*), the district court refused to allow plaintiffs to reveal this fact to the jury. *See, e.g.*, A96 (granting Defendants' Motion in Limine No. 1, R.466); A1051-52 (plaintiffs orally requesting curative instruction); A1056 (court denies plaintiffs' request for supplemental jury instructions (A111-27), including specific instruction relating to the meaning of "usual and customary," A123). This was a problem because, under the guise of disputing their scienter, defendants frequently offered alternative understandings of "usual and customary" pricing that had already been rejected by the district court and by this Court in *Garbe*, which led to jury confusion. *E.g.*, A944-46; A982-95; A1008-10.

The problem was acute vis-à-vis plaintiffs' damages presentation. Plaintiffs' primary expert, Ian Dew, testified that he calculated the amount of overpayments by government healthcare programs using the definition of "usual and customary" that had been provided to him by

plaintiffs' counsel (which was adopted in *Garbe* and the district court's prior summary judgment order). A882-83. Defendants repeatedly insinuated that plaintiffs' counsel had simply made up the definition. *E.g.*, A1096-97; A1133-34. Thus, while questioning Mr. Dew, defense counsel asked "You're not making a judgment as to what is an overpayment in the real world, … true?" and followed up by asking "What you're saying when you're talking about overpayments is you are calculating the difference between the amount reimbursed and the number you calculated based on … parameters from relators' counsel, right?" A934-35. Defense counsel then held up a variety of alternative definitions of "usual and customary" and asked Mr. Dew whether he considered them—again suggesting that his analysis was flawed because it relied on a fictitious definition provided by the plaintiffs. *See* A943-50. Despite plaintiffs' objections, the jury was not instructed that "usual and customary" had been defined in a prior order in this very case, following controlling precedent. *See* A944-46 (objection made and overruled).

The jury's questions at trial reflected that defense counsel's questions seeded deep skepticism about the controlling definition of "usual and customary." For example, Jury Question 29 asked:

> [First part] So for all of the statistics, did [the Relators] give you specifics on how exactly they wanted you to calculate all of the numbers? [Second part] So was the usual and customary definition guidelines set by the relators for your statistics? [Third part] If the usual and customary definition standards were "the regular retail price" would your stats be different?

A222; A960-62. Jury Question 33 asked:

> [First part] Repeatedly you have mentioned that your definition of usual and customary was defined by the Relators is that correct? [Second part] Was the bases of all your analysis on what their definition of usual and customary or do you look at the actual contract definition from the PBM (Pharmacy Benefit Managers)? [Third part] Do you think the different contracts with different PBMs and different contract definitions would change the outcome of whether there would be any overpayments?

A226; A966.

Capitalizing on this confusion in closing, defense counsel argued that "[t]he evidence relators presented on damages was all from Mr. Dew and Mr. Dew … sliced the data the way the relators told him to slice the data. The people who are here trying to get a third of any damages award, he just did what they told him to do. … They gave him an arbitrary definition that inflated his claims and damages, and therefore, the amount that that [sic] they're hoping to recover, they gave him an inflated definition that increased that number by 99.5 percent. … So his overpayments are just made up." A1133-34.

*Second*, the district court gave an incomplete instruction as to the determination of damages. The court repeatedly instructed the jury that damages calculations could not be based on speculation and guesswork (A1123-24)—but refused to instruct the jury that it was permitted to make reasonable estimates based on the evidence, and that damages need not be calculated with mathematical precision as plaintiffs proposed in their jury instructions. *See* A67-68 (Plaintiffs' Proposed Instruction No. 34); A84-85 (objecting to the failure to so instruct as incomplete); R.511 at ECF 19-20 (requesting Instruction No. 34); A128, A137, A139 (reiterating and preserving same objections). This gave the misleading impression that the law required greater certainty than it does.

*Finally*, the district court held—over plaintiffs' repeated objections[4]—that absent a finding of damages, there was no liability whatsoever (even for civil monetary penalties). The court thus adopted jury instructions and a verdict form revised the last day of trial that did not permit the

[4] *See. e.g.*, A71-80, A86-92; R.497 at 11 and 497-3 (Ex. C); R.511 at 4-7; 20-21; A99-101; A132-33, A136, A147-48); A1107 ("we preserve our objections as to this verdict form and advocate for the verdict form that the Court provided at the end of January and that we filed on the record as [A105-07]")"; A1108 ("We also disagree that damages is an element of our claims as we sta[t]ed in our pleadings and argument multiple times").

jury to count the number of false claims (for penalty purposes) unless the jury first found that the defendants' false claims caused damages to the government. A179, A183-84 (Final Jury Instructions); A153-55 (Verdict Form). As a result, when the jury returned a verdict finding no damages, the court entered judgment for defendants (SA2)—even though they knowingly presented material false claims to both federal and state programs.

### D. Post-Trial Motions

Both sides made timely post-trial motions. Plaintiffs moved for an alteration to the judgment to include the number of false claims (or in the alternative a new trial on the number of false claims) for penalty purposes, as well as a new trial on damages. R.568 & 569. Defendants moved for judgment as a matter of law on the issue of scienter. R.571.

The district court denied the motions. A250. With respect to plaintiffs' motion, the court concluded that its determination that damages were a prerequisite to penalties was not clearly incorrect under this Court's precedents. A260-65. The court further held that that the jury was not confused about the meaning of "usual and customary," opining that its

instruction that "Whether the claims were false or fraudulent is not for you to decide" was adequate in light of the trial as a whole. A265-67.

With respect to defendants' motion, the district court held that despite SuperValu's arguments, "[t]he jury need not have credited SuperValu executives' testimony, and a rational jury could find for Relators on the issue of scienter based upon the foregoing documentary evidence" including "emails from the executive team at SuperValu that characterized its approach to price matching as 'stealthy,'" recognizing that "routine" price matching would "affect the integrity of our U&C [*i.e.*, usual and customary] price" and reminders sent to SuperValu from PBMs "that usual and customary prices must include 'all applicable discounts,' including 'competitor's matched price.'" A274-75. The court accordingly denied defendants' motion for judgment as a matter of law as to scienter. A275.

Plaintiffs timely appealed; SuperValu cross-appealed. A276-79; A280-82.

## SUMMARY OF ARGUMENT

The False Claims Act imposes liability on any person who "knowingly presents … a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). The district court found—and the jury confirmed—that SuperValu did exactly that: it knowingly presented false claims to Illinois Medicaid and federal healthcare programs, misrepresenting its usual and customary prices to extract millions more than it was entitled to receive. This Court should affirm those determinations.

The district court then committed a fundamental legal error. It held that without proof of damages, there could be no liability at all—not even for the mandatory civil penalties that Congress prescribed for each false claim. The court accordingly refused to let the jury count the false claims, and entered judgment for defendants despite their knowing fraud. That ruling cannot stand. The statute's text is clear: violators "shall be liable" for a civil penalty of at least $5,000 per false claim "plus" treble damages. 31 U.S.C. § 3729(a)(1). The penalty comes first. It is mandatory. And it applies even when damages are zero. Every court of appeals to address this question agrees. So does this Court's own precedent. The district

court's contrary holding eviscerates the FCA's core enforcement mechanism and should be reversed.

Independently, the jury's damages verdict should be vacated because it rests on prejudicial instructional errors and is against the weight of the evidence. The verdict finding no damages to any government program—including programs where defendants offered no contrary evidence whatsoever—is inexplicable unless the jury was fundamentally confused. The record makes clear that it was.

The confusion stemmed from the district court's handling of a critical legal issue: the definition of "usual and customary." That definition had been established by this Court in *Garbe* and adopted by the district court at summary judgment. Plaintiffs' damages expert applied that legally required definition to calculate overpayments. But the district court refused to tell the jury that the definition was legally mandated—and then permitted defense counsel to argue repeatedly that plaintiffs' counsel had simply invented an "arbitrary definition" to inflate damages.

The error was compounded by the court's damages instruction, which told the jury that calculations "must be based on evidence and not speculation or guesswork"—but never explained that the law permits

reasonable estimates and that mathematical precision is not required. This gave the misleading impression that any uncertainty in quantification defeated the damages claim entirely. Moreover, the district court refused to instruct the jury that falsity had been determined at summary judgment, leaving the jury to guess at the extent of defendants' misconduct. These errors, individually and together, warrant a new trial on damages.

## ARGUMENT

### I. Defendants Knowingly Presented False Claims to Illinois Medicaid and Federal Healthcare Programs in Violation of the Federal and State False Claims Acts.

"A defendant is liable under the [False Claims] Act if it knowingly presents, or causes to be presented, a false or fraudulent claim for payment." *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 145 (2025). This "requires proof of falsity, knowledge, [and] materiality." *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 659 (7th Cir.), *aff'd*, 604 U.S. 140 (2025). Through its summary judgment orders and the jury verdict, the district court found that defendants knowingly presented materially false claims to federal programs and Illinois Medicaid. On appeal, this Court reviews the summary judgment orders

de novo, and the jury verdict deferentially. *See United States ex rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816, 839 (7th Cir. 2025). Under that standard of review, the district court's conclusions regarding falsity, materiality, and scienter are correct, and collectively establish defendants' liability under both the federal and state FCAs.

### A. The District Court Correctly Held That Defendants' Claims Were False as a Matter of Law.

A claim is "false or fraudulent" for purposes of the FCA if it makes a misrepresentation or seeks more money than should lawfully be paid. *See, e.g.*, *Heath*, 92 F.4th at 659; *United States v. Molina Healthcare of Ill.*, Inc., 17 F.4th 732, 741 (7th Cir. 2021) (describing this as the "canonical FCA claim"); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) (explaining that "Congress did not define what makes a claim 'false' or 'fraudulent,'" and that under the common law, the term encompasses both "claims containing express falsehoods," as well as "misrepresentations by omission"). In crafting the statute, "Congress wrote expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003).

Claims reporting inflated usual and customary prices are actionable under the FCA. This follows straightforwardly from this Court's decision in *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). There, Kmart was accused of defrauding Medicare Part D by reporting its nominal retail prices as usual and customary prices instead of the lower prices that Kmart offered to members of a discount club that was open to the general public. *See id.* at 635-36. Like plaintiffs here, the plaintiff in *Garbe* argued that "Kmart's real 'usual and customary' prices were not the high ones paid by non-program cash customers or those submitted to third parties for reimbursement, but the low ones it offered to the cash customers participating in one of its 'discount programs.'" *Id.* at 636. This Court agreed, holding that "[u]nless state regulations provide otherwise, the 'usual and customary' price is defined as the 'cash price offered to the general public.'" *Id.* at 643. The Court further held that "[b]ecause Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs." *Id.* at 645.

This was properly regarded as "a question of law," capable of "being resolved at summary judgment." *Id.*

This case is *a fortiori* from *Garbe*. Here, the undisputed evidence showed that defendants offered to match the prices of their lowest-priced competitors for any member of the cash-paying public. *See* R.194 at 8 (admitting R.164, UMF 10); A286 ¶D.2. This discount program had an even lower barrier to entry than Kmart's. At most, it required the customer to request a price match (and often not even that, as many discounts were provided automatically). R.194 at 8 & 10 (admitting R.164, UMFs 10, 25). But SuperValu did not require even the nominal fee that Kmart had charged. R.194 at 12 (admitting R.164, UMF 11). Just as Kmart's cash customers did "not cease to be members of the general public the minute they are offered—or pushed into—'membership' in Kmart's 'discount program,'" *Garbe*, 824 F.3d at 643, defendants' cash customers did not cease to be members of the general public when they were offered price-matches.

Despite offering price-match discounts to the entire cash-paying public, SuperValu neither offered nor reported such discounts when it presented claims to government healthcare programs. R.194 at 9

(admitting R.164, UMF 19). SuperValu instead reported falsely inflated prices and sought reimbursement for more than the true usual and customary price. A24, A27. Under *Garbe*, the district court correctly concluded that each claim for which the defendants failed to include generally available price-matching discounts was false or fraudulent under the federal and state FCAs. A24, 27.

Plaintiffs anticipate that SuperValu will assert that price-matching was not routine, but instead ad hoc. They will say that only a small percentage of total transactions (2%) involved price matches. And they will point to an alternative definition of "usual and customary" from SuperValu's 2009 contract with Express Scripts stating that price-matching is not included. The district court properly rejected these arguments.

As to the frequency of price matches, SuperValu repeatedly stressed that only 2% of its total transactions involved them. But the definition of "usual and customary" has nothing to do with total transactions—which include transactions submitted to insurance; it only has to do with cash transactions where the customer pays out of pocket—and so the 2% number is highly misleading. In actuality, as plaintiffs' evidence showed,

the majority of Supervalu's cash sales for 44 of the top 50 drugs sold involved price-matching a majority of the time.

In any event, as the district court explained, even if "price match transactions did not approach a majority of [SuperValu's] cash transactions," that is irrelevant under *Garbe*: "The key factor is that Kmart offered the terms of its discount programs to the general public and made them the lowest prices for which its drugs were widely and consistently available. Here, the price match program was available to all of the cash customers, as long as the lower price was verified." A26. Indeed, SuperValu's price-match program had even fewer "barriers" to entry than the program in *Garbe*, which required "members to opt-in to the club, provide basic personal information and pay a $10 fee." A24.

As to PBM contracts, this Court explained in *Garbe* that "[r]egulations related to 'usual and customary' price should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal." 824 F.3d at 644. "Contracts between Defendants and Pharmacy Benefit Managers must be construed consistent with those statutes and regulations." A16. Moreover, the relevant contractual

terms—even in the Express Scripts contract, which is the only one stating that usual and customary price would "exclude a pharmacy's competitors matched price discounts," A574 ¶1.19—never state that such an exclusion applies when, as here, price-matching is widespread, routine, and implemented on a company-wide scale. On the contrary, the Express Scripts contract provided that the usual and customary price would include "offers that involve system-wide Usual and Customary Retail Price changes of Covered Medications that are implemented at a particular Pharmacy or pharmacy region or Provider-wide," and further provided that it "shall include any '$4 generic' or similar programs offered on a corporate wide routine basis." A574 ¶1.19.

As the district court explained, SuperValu's "discounted matched prices were not one time lower cash prices," but were instead offered "throughout the benefit year over the years, beginning in 2006." A24. Throughout that period, if any cash customer wanted to pay the same $4 discount price at SuperValu as they would have been charged at Walmart, that is what SuperValu charged them. This means these prices were "the usual and customary price during those years" under *Garbe*. A25.

### B. The District Court Correctly Held That Defendants' Misrepresentations Were Material as a Matter of Law.

As this Court explained in *Garbe*, the FCA's "materiality rule requires only that the false record or statement influence the 'payment *or receipt* of money or property.'" 824 F.3d at 639 (quoting 31 U.S.C. § 3729(b)(4)). Because, in that case, Kmart's inflation of its usual and customary prices was "material to Kmart's receipt of more money than it should have gotten," it was material. *Id.* The Court further recognized that there was "little doubt that much of the money paid to Kmart under Medicare Part D came from government coffers," citing as support a government report indicating that treasury funds "made up 73.1% of total revenue disbursed by Medicare Part D" in the relevant time period. *Id.* And the plaintiff was "not required to trace the movement of currency from the U.S. Treasury through the Medicare Part D funding structure" to prove this point. *Id.*

Subsequent precedent confirms that *Garbe* was correct. As the Court recently explained, "the False Claims Act defines 'material' as 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.' 31 U.S.C. § 3729(b)(4)." *Heath*, 92 F.4th at 664. In *Heath*, the plaintiff alleged that the defendant violated a requirement to give schools and libraries access to telecommunications

services at the same prices it offered similarly situated commercial customers—an obligation closely analogous to the usual and customary price rule. *See id.* at 664-65. The Court held that such a requirement was material because it was "one mechanism" to accomplish the goal of the program (keeping services affordable) "and to control the cost of government subsidies." *Id.* at 665.

Similarly, in *Streck*, the Court affirmed a jury finding of materiality in a case involving overcharging Medicaid. Analogizing the scheme to *Heath*, the Court held that "[n]oncompliance with the law resulting in large price differentials … offers strong support for a finding of materiality." 152 F.4th at 847. The Court rejected the argument that, because the defendant had told the government what it was doing, and the government had not acted, the violations were immaterial. *See id.* at 848. Instead, the Court explained, when the government had not been "told that it had spent tens of millions of dollars it should not have due to Lilly's calculations," the Court was "wary of imputing 'actual knowledge' on the government" of the relevant violations. *Id.* The Court also reiterated that "a statement is material when it is capable of influencing

a decision even if those who make the decision are negligent and fail to appreciate the statement's significance." *Id*.

Here, SuperValu recognized the materiality of its falsehoods when its executives recognized that reporting lower usual and customary prices would cost tens of millions of dollars annually, A490-91, with a "very broad" "financial implication," A558. This Court should hold that when, as here, a defendant's falsity causes a government program to pay (or the defendant to receive) more money than it lawfully should, the falsity is material as a matter of law. Although courts frequently describe materiality as "holistic," that characterization comes from implied false certification cases in which the defendant violated a legal requirement that, on its face, may or may not have been germane to payments. *See, e.g.*, *Escobar*, 579 U.S. at 196 (considering import of staffing and training regulations on mental health claims). In those circumstances, a holistic inquiry is necessary to determine whether the requirement could affect payments or receipts. But when a legal requirement goes *directly* to how much government programs pay, or counterparties receive, it lines up perfectly with the statutory definition of materiality, and a holistic deep-dive is superfluous.

The holistic inquiry produces the same result because one key factor is whether the falsehood goes "to the very essence of the bargain" at issue. *See Escobar*, 579 U.S. at 193 n.5. Price unambiguously does. *See, e.g.*, *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727 (5th Cir. 2023) (holding that fraud went to "essence of the bargain" when it concerned statements that "were the basis for determining reimbursement amounts"); *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020) (holding that misrepresentations that inflated Medicare reimbursements had "plain and obvious materiality" that "went to the heart of the [defendants'] ability to obtain reimbursement from Medicare"); *United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008) (false statements material when they "had the potential effect, or natural tendency, to decrease the amount" the defendant would owe to Medicare in refunds); *United States v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 230 (D.N.J. 2021) (holding that misrepresentation was material when it "touche[d] upon an essential characteristic of [a drug] for government procurement purposes, namely, its price"); *United States ex rel. Campbell v. KIC Dev., LLC*, 2019 WL 6884485, at *12 (W.D. Tex. Dec. 10, 2019) (holding that price is "a quintessentially material contract term that goes to the 'very essence of

the bargain'"); *United States ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*, 2019 WL 1086363, at *14 (N.D. Okla. Mar. 7, 2019) (drug pricing fraud found material); *United States ex rel. Ubl v. IIF Data Sols.*, 2007 WL 2220586, at *4 (E.D. Va. Aug. 1, 2007) (finding materiality when relator alleged that defendant's conduct "caus[ed] the agency to enter into contracts at higher prices tha[n] it would otherwise have paid"). Accordingly when, as here, the falsity goes directly to the amount a government program would pay (or a defendant would receive), this element is satisfied as a matter of law.

### C. The Jury Correctly Found That Defendants Acted Knowingly.

If defendants renew their challenge to the jury verdict on scienter, this Court should reject it. Review of a scienter verdict is highly deferential, and reversal is appropriate only if "the jury was irrational to reach its conclusion," even in the face of a "highly charitable assessment of the evidence" that "disregard[s] all evidence favorable to the [losing] party that the jury is not required to believe." *Streck*, 152 F.4th at 839.

As this Court has recognized, "the False Claims Act has a broad definition of 'knowing,'" which includes actual knowledge, deliberate ignorance, or reckless disregard of the truth. *Astellas US Holding, Inc. v.*

*Fed. Ins. Co.*, 66 F.4th 1055, 1068 (7th Cir. 2023). The Supreme Court clarified the legal standard for scienter in a prior appeal in this case, holding that plaintiffs may establish scienter under the FCA by showing that defendants: (1) actually knew that their reported prices were not their usual and customary prices when they reported those prices, (2) were aware of a substantial risk that their higher, retail prices were not their usual and customary prices and intentionally avoided learning whether their reports were accurate, or (3) were aware of such a substantial and unjustifiable risk but submitted the claims anyway. *See United States ex rel. Schutte v. SuperValu Inc.*, 2023 WL 4819720, at *1 (7th Cir. July 27, 2023).

The trial evidence easily allowed the jury to find the requisite scienter. That evidence is detailed *supra* pp.12-14, 19-20. Briefly: The point of SuperValu's program was to compete with stores like Walmart—and the mechanism SuperValu chose was to simply match Walmart's price whenever a Walmart store was near a SuperValu pharmacy. PBMs told SuperValu that if it implemented a Walmart-like discount program, "no matter how we package the situation," the PBMs would consider the lower price to be the usual and customary price. A755; A548-49.

SuperValu executives internally communicated that if SuperValu routinely matched prices, the matched prices would become its usual and customary price. A795; A548-49. To avoid the $70 million annual revenue decrease SuperValu's Vice President calculated from that result, SuperValu took a stealthy approach to price matching, pretending that it was an exceptional practice done to service individual customers—even though it was done millions of times over the years, and frequently done automatically. A795; A558; A875.

SuperValu also received numerous communications from health care authorities including PBMs indicating that it was required to report all generally available discounts, including matched prices, as its usual and customary prices. A788-90 & A483-84 (Coventry/First Health); A696-97 & A512 (Medco); A753-54 & A546 (Humana); A814-18 & A564 (Prime Therapeutics). When SuperValu received communications from the PBM Prime Therapeutics asking whether it was price matching, its executives internally decided not to respond because they were concerned that acknowledging price matching would require them to pass on the benefit to Prime. A814-18 & A564.

After SuperValu received a subpoena in 2012 in connection with this case (A706; A518), it started concealing its price matching by removing advertisements and discarding competitor price lists—while still offering price-matching to customers who requested it. A675; A552. SuperValu also only offered price-matching to customers paying cash—even if the customer was insured by a government program—which meant that the transactions were not reported to the government, and did not appear in audits. A786-87, A802 & A511. This evidence is collectively sufficient to establish that SuperValu knew, or at least was aware of a substantial risk, that it was required to report its price matches as usual and customary, and yet chose not to.

The thrust of SuperValu's response is that it had conversations with PBMs and state Medicaid agencies asking whether price matching had to be included as usual and customary pricing. The problem with this line of attack is that a jury could reasonably believe that SuperValu never revealed the extent of its price-matching to those counterparties. *See, e.g.*, A1101 (Dr. Schafermeyer); A998-99 (Caremark witness testifies that he did not know if his colleagues had evidence about the extent of price matching); A814-18 & A564 (refusal to disclose price matching

procedures when directly queried by Prime Therapeutics); A820 & A485 (SuperValu refuses Caremark's demand that a lower cash price be submitted as U&C, claiming it was an exception). Thus, it would be entirely reasonable for a PBM or Medicaid agency to opine that if a pharmacy matched prices on occasion, based on individualized determinations made by a pharmacist, those matched prices might not be "usual and customary." But when, as here, SuperValu had a blanket corporate-wide price matching policy that it employed millions of times as a matter of course—and did not disclose that fact—any suggestion that SuperValu could rely on these statements falls flat.

This Court's recent decision in *Streck* is instructive. There, the defendant drug company deliberately miscalculated the rebates it owed to Medicaid to offset the costs of brand-name drugs. The defendant attempted to defeat a scienter argument by showing that it "sent CMS a letter explaining its 'reasonable assumptions,'" detailing its methodology. *See* 152 F.4th at 830. The defendant knew, however, that CMS was not actually reviewing these letters. *Id.* at 831. During an actual audit, the defendant buried the relevant information in a footnote of its response to a request for information. *Id.* After a jury found that the defendant

knowingly overcharged the government for drugs, this Court affirmed. The Court explained that the jury was entitled to infer that the defendant "was aware of, or disregarded, an unjustifiable risk of skirting the law and chose to obfuscate rather than conduct a reasonable inquiry." *Id.* at 843. Even though the evidence "len[t] some support to th[e] view" that the defendant "genuinely thought" its conduct was lawful, the evidence did "not command" that view, "as it must for reversal." *Id.* at 844. The Court further explained that even if government knowledge of the defendant's conduct can undercut a finding of scienter, "merely showing *some* government knowledge of the falsity is not enough; there must be evidence of the government's cooperation and collaborative problem-solving or explicit approval to undercut scienter." *Id.* at 845. Even though the defendant gave the government "a candid admission" of what it was doing in its letter, other evidence suggested "continued efforts to hide the ball." *Id.*

*Streck* compels affirmance here. Put simply, no record evidence proves conclusively that any of the PBMs or state Medicaid agencies had a complete understanding of the extent of SuperValu's price matching. And indeed, SuperValu took deliberate steps—including always recording

price-matched transactions as cash sales, not responding to PBM inquiries, excluding its cash transactions from PBM audits, and simply not disclosing the extent of its price-matching—to keep these counterparties in the dark about whether its price-matching was exceptional or instead routine (as it was). No evidence compels a finding that SuperValu was fully transparent with the government; its stealthy approach supports an inference of scienter; and so the jury's verdict on this point should be affirmed.

## II. The District Court Erred by Refusing to Award Penalties for Each Violation of the False Claims Acts.

An overwhelming consensus holds that the FCA's statutory penalties are mandatory, even absent any showing of damages. The district court committed an error of law in holding otherwise. On de novo review, the district court's judgment should be reversed and remanded with instructions to award one penalty for each false claim knowingly presented. This includes, at a minimum, all of the Illinois Medicaid claims.

This circuit's precedent requires penalties even absent damages. In *United States v. Hughes*, 585 F.2d 284 (7th Cir. 1978), "the government withdrew its request for damages and relied solely on the forfeiture

provision of the act." *Id.* at 286. This Court recognized that "[t]his forfeiture provision is mandatory," and applies "even though the United States has suffered no measurable damages from the claim." *Id.* at 286 & n.1. More recently, this Court reiterated that "[t]he [FCA] provides for penalties even if (indeed, especially if) actual loss is hard to quantify." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005).[5] Under these precedents, the district court should have required the jury to count false claims, and the court should then have determined the appropriate civil penalty to be assessed within the statutory range on each claim.

---

[5] District courts in this Circuit agree. *See, e.g.*, *United States v. Rogan*, 2006 WL 8427270, at *21 (N.D. Ill. Oct. 2, 2006) ("The United States does not need to prove actual damages in order to recover these statutory penalties."), *aff'd*, 517 F.3d 449 (7th Cir. 2008); *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 739 (N.D. Ill. 2007) (holding that penalties are mandatory); *United States v. Williams*, 2003 WL 21384640, at *6 (N.D. Ill. June 12, 2003) ("With respect to the mandatory civil penalties, the Court finds that it must impose a separate fine for each of the false claims submitted."); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 985 n.5 (E.D. Wis. 1998) (rejecting suggestion to "include[] the additional element that the United States must have suffered actual damages" as "not true under a plain reading of the statute and … rejected by precedent"), *aff'd*, 168 F.3d 1013 (7th Cir. 1999); *United States ex rel. Hartigan v. Palumbo Bros.*, 797 F. Supp. 624, 632 (N.D. Ill. 1992) ("Because of the inherent difficulty of quantifying these losses and in proving actual damages, Congress has provided for both damages and civil penalties.").

The district court concluded otherwise based on *United States ex rel. Calderon v. Carrington Mortgage Services*, 70 F.4th 968 (7th Cir. 2023). There, the Court noted that other circuits have permitted cases to proceed solely on the basis of civil penalties, without proof of causation of damages. But because the plaintiff in that case did not argue on appeal that she could proceed only seeking penalties, the court "did not consider the possibility of a claim limited to civil penalties," and stated that it would "leave for another day" the question whether such claims were permissible. *Id*. at 978. The district court interpreted this to mean that the question remains open in the Seventh Circuit—but *Calderon* never considered or discussed the statements in *Hughes* and *Main* cited *supra* (understandably, since a claim for penalties was not presented). It certainly never suggested that damages are a prerequisite to penalties.

Even if the question were open, the Court should shut it quickly. The statute is clear on its face, providing that: "any person who … knowingly presents … a false or fraudulent claim for payment or approval … is liable … for a civil penalty of not less than $5,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(A). This plain text does not use any

conditional language stating that penalties are available *only* if the government suffers damages. On the contrary, the statute provides that the defendant "is liable" upon presentment of the claim—even if the claim is never paid, or even if it is only presented to a government contractor (and thus never does any damage to the government). Moreover, the remedial language expressly states that courts must award a civil penalty "of not less than $5,000 … ***plus***" treble damages. *Id.* In this calculation, the penalty comes first—and at least $5,000 per false claim must be awarded no matter the damages (even if zero).

Legislative history confirms that the imposition of the civil penalty "is automatic and mandatory for each claim which is found to be false. The United States is entitled to recover such forfeitures solely upon proof that false claims were made, without proof of any damages." S. Rep. No. 99-345, at 8 (1986). This is because, "[e]ven in case where there is no dollar loss," "fraud erodes public confidence in the Government's ability to efficiently and effectively manage its programs." *Id.* at 3. Indeed, Congress included a mandatory minimum penalty because "defrauding the Government is serious enough to warrant an automatic forfeiture rather than leaving fine determinations with district courts, possibly

resulting in discretionary nominal payments." *Id.* at 17. An interpretation that allows district courts to forgo penalties altogether flies in the face of that clear congressional guidance.

Every other court of appeals that has addressed the question (at least eight circuits) has held that liability for penalties attaches even absent a finding of damages. *See, e.g.*, *Hendrix ex rel. United States v. J-M Mfg. Co.*, 76 F.4th 1164, 1173 n.5 (9th Cir. 2023) ("It has long been settled that a statutory penalty may be imposed for violation of the federal FCA even absent proof of actual damages."); *United States v. Killough*, 848 F.2d 1523, 1533-34 (11th Cir. 1988) ("Even if no payment was made on a claim or the government cannot prove actual damages, a forfeiture shall be awarded on each false claim submitted."); *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 409, 411 (4th Cir. 2013) (affirming award of $24 million in penalties when the plaintiff did not even seek, let alone prove, damages); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1277 (D.C. Cir. 2010) ("[A] defendant who submits a false claim … is liable for civil penalties regardless of whether the government shows that the submission of that claim caused the government damages."); *United States ex rel. Grubbs v. Kanneganti*, 565

F.3d 180, 189 (5th Cir. 2009) ("The False Claims Act … lacks the elements of reliance and damages," and "exposes even unsuccessful false claims to liability … for the Act's civil penalty."); *Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 429 (6th Cir. 2001) ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages."); *Com. Contractors, Inc. v. United States*, 154 F.3d 1357, 1371 (Fed. Cir. 1998) (penalties available even absent a showing of damages); *United States v. Tieger*, 234 F.2d 589, 590 n.4 (3d Cir. 1956) ("[A] false claim may be actionable though in the given case the government has not been injured by its assertion."). By contrast, no court of appeals has ever embraced the interpretation adopted by the district court below.

The reasoning in these decisions—tracking the FCA's plain text, legislative history, and purpose—is highly persuasive. The contrary interpretation would require the Court to read words into (and out of) the statute, ignore a chorus of authority, and fatally compromise the FCA's effectiveness in cases where fraud undermines the integrity of public programs, but money damages are hard to prove.

The district court's confusion may have stemmed from the use of slippery nomenclature. Specifically, the district court believed that

"causation" is an element of an FCA claim. But that is not always true. To be sure, causation is an element of *some* FCA claims. For example, when the plaintiff seeks to impose liability on a defendant that did not itself present a false claim, but instead "causes to be presented … a false or fraudulent claim," causation is an element. 31 U.S.C. § 3729(a)(1)(A). Similarly, in fraudulent inducement cases, some courts hold that the defendant's misconduct must cause the government to enter into a contract or grant some benefit. *See, e.g.*, *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 418-19 (D.C. Cir. 2021). And, of course, the FCA's treble damages are based on "the amount of damages which the Government sustains *because of* the act of" the defendant—and so causation is required for treble damages. 31 U.S.C. § 3729(a)(1). But this case does not raise any of those situations. Here, defendants themselves presented false claims, fraudulent inducement was not alleged, and damages are independent of penalties. In this case, the statutes mandate a penalty for each false claim knowingly presented.

If the Court agrees (as it should) that the district court erred by refusing to award civil penalties, the appropriate remedy would be to remand with instructions to award a civil penalty for each false claim.

The first essential step is to count the number of violations. Accordingly, this Court should instruct the district court as to the number of false claims when it is possible to do so as a matter of law, and remand for a determination of the remainder. *See, e.g.*, *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, 171 (7th Cir. 1990) ("In a case in which the record permits only one resolution of the factual issue, the appellate court can and should resolve the issue without a remand.").

Based on the record evidence, the number of false claims to Illinois Medicaid (actionable under both the federal and the state statutes, and subject to a penalty under each)[6] was 1,297,037; the number of false claims to Medicare (actionable only under the federal statute) was 14,979,796; the Federal Employees Benefit Program was 447,880; and TRICARE was 519,843. *Supra* pp.21, 23-24.

In this case, the Medicaid claims are the low-hanging fruit. The jury found that defendants knowingly presented false claims to Illinois—and the Illinois Medicaid claims were the *only* claims meeting that

---

[6] *Tyson*, 488 F. Supp. 2d at 739-740 (holding that claims to Illinois Medicaid violated both the federal and state FCA, and were subject to penalties under both statutes); *United States ex rel. Fahner v. Alaska*, 591 F. Supp. 794, 802 (N.D. Ill. 1984) (similar).

description. Accordingly, the jury necessarily found that defendants knowingly presented false claims to Illinois Medicaid, and thus violated the federal and state FCAs.

The scope of that violation was essentially undisputed. Plaintiffs presented unrebutted evidence (Mr. Dew's testimony) that defendants presented 1,297,037 false claims to Illinois Medicaid. A912. At no point did defendants ever call a damages expert and attempt to divide that universe of claims into subsets where some might be actionable and others not. *See, e.g.*, A1129-30 (SuperValu's entire closing argument vis-à-vis Illinois, which merely argued that SuperValu did not have scienter, and that Illinois audits did not raise any concerns about price-matching). Nor would any such internal distinction make sense: Illinois Medicaid used a single definition of "usual and customary," and defendants' knowledge of their conduct and of Illinois's rules was consistent throughout the relevant period. *See, e.g.*, 225 ILCS 85/3(w) ("the price that a pharmacy charges to a non-third-party payor"); Ill. Admin. Code tit. 89, § 140.447 ("If a pharmacy gives discounts to the general public, it must provide the same to Public Aid recipients."); A707 (SuperValu witness testifies that he was not aware of any rule changes in Illinois during the

relevant period). Accordingly, there is no basis in the record to hold that any of these claims are outside the scope of the jury's verdict, and the verdict necessarily implies that they were all presented knowingly. The Court should accordingly amend the judgment to state the number of false claims to Illinois Medicaid and hold, as a matter of law, that each and every one of these 1,297,037 claims gives rise to both a federal and a state civil monetary penalty. The Court should leave determination of the penalty amount to the district court's discretion on remand.

The evidentiary picture is more complex for the federal claims to Medicare, the Federal Employees Health Benefit Program, and TRICARE. Although defendants did not call a damages expert to present alternative numbers regarding overpayments, the federal programs were administered by different PBMs with different contracts in different parts of the country. Thus, although all of the identified claims to these programs were false under *Garbe*, and the jury necessarily found at least *some* of them were knowingly presented, the trial evidence did not establish definitively that *all* of them were presented with scienter. Nevertheless, every knowingly false claim warrants a civil penalty, and the district court was wrong to hold otherwise. With respect to these

claims, the Court should remand for the district court to determine the number of false claims and to apply a civil monetary penalty for each.

## III. The Jury's Damages Verdict Should Be Vacated in Light of Trial Errors and the Evidence Presented at Trial.

The jury's verdict finding that plaintiffs failed to prove damages should be set aside, as it is the product of erroneous instructions and is against the weight of the evidence. As plaintiffs showed, the federal and state governments collectively directly paid all the money claimed from Illinois Medicaid; the federal government paid all the money claimed from TRICARE; it also provided at least 72% of the funds paid out by Medicare Part D; and it paid at least 70% of the money paid out by the Federal Employees Health Benefit Program. All told, the governments paid out many millions of dollars more than they should have paid. At a high level, if it sounds counterintuitive that overbilling these government-funded health care programs to the tune of millions of dollars could somehow not cause financial harm to the government, that is because it is, in fact, impossible. When a defendant takes money from a government program, that money has to come from *somewhere*. And for these programs, all or most of the funds come from the government, ensuring some damages. The jury's evident confusion on this point almost

certainly resulted from misunderstandings relating to the vagaries of the Medicare system, exacerbated by the district court's flawed instructions.

Beginning with the evidence: Mr. Dew's calculations offered conservative assessments of the number and amount of false claims for each affected government program. *See, e.g.*, A918. For Medicare Part D and the Federal Employee Health Benefit Program, those figures were discounted based on inputs from Mr. Bertko to account for the fact that the government does not provide all the money paid out. A953-54. The methodology was validated by Dr. Schafermeyer. A1090-93. Defendants cross-examined Mr. Dew, but never offered alternative figures. Their evidence relevant to damages came from Ms. Norwalk, who opined *only* with respect to Medicare Part D that overcharges to the PBMs would not cause the government to pay higher premiums to plan sponsors. A1058; *see also* A1087 (sidebar where plaintiffs' counsel confirms, without contradiction, that Ms. Norwalk expressed no opinions on damages vis-à-vis Medicaid, the Federal Employees Health Benefit Program, and TRICARE). Even if the Court were to fully credit Ms. Norwalk's damages testimony, that would only affect Medicare Part D. On the other hand, plaintiffs presented essentially unrebutted testimony regarding damages

to Illinois Medicaid, the Federal Employees Health Benefit Program, and TRICARE. *See* A912, A924, A927-29; A556-57.

The testimony relating to Illinois Medicaid was particularly significant because we know conclusively that the jury found these claims false. *See* A154. And the testimony established that all of the money paid by Illinois Medicaid came from the federal government and the state, A912—with no intervening plan sponsor or PBM—and so we know that these governments suffered damages in the amount of the overpayment, even if the Court completely credits Ms. Norwalk's testimony about Medicare Part D.

The overwhelmingly likely explanation for why the jury rendered a verdict against the weight of this evidence is that the jury was confused by the district court's erroneous instructions. This Court reviews jury instructions de novo "when the underlying assignment of error implicates a question of law." *Brooks v. City of Kankakee*, 7 F.4th 649, 662-63 (7th Cir. 2021). The Court will reverse if an instruction "failed to state the law completely and correctly and the error caused prejudice." *Id.* at 663. To assess prejudice the court asks whether, on the basis of "the evidence as a whole," the "jury could have reached a different outcome had the

instructions been correct." *Id.* at 664. Courts take a holistic view to determine whether the cumulative effect of any errors at trial was unfairly prejudicial. *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir. 2013). Here, the district court committed multiple prejudicial errors of law.

*First*, the court refused to instruct the jury that it could find damages based on "a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). *See* A67-68 (Plaintiffs' Proposed Instruction No. 34 entitled "Damages Need Not be Proven Precisely"); A128, 137, 139 (objecting to the Court's failure to give Plaintiffs' requested instructions on this point). This was an error of law. "Once the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification." *BCS Servs., Inc. v. BG Invs., Inc.*, 728 F.3d 633, 640 (7th Cir. 2013). "Even speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." *Id.* Indeed, it is well-established that "[t]he computation of [FCA] damages does not have to be done with mathematical precision but, rather, may be based upon a reasonable estimate of the loss." *Rogan*,

2006 WL 8427270, at *21; *see also United States ex rel. Grant v. Zorn*, 107 F.4th 782, 796 (8th Cir. 2024) ("[T]he Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas."); *Hendrix*, 76 F.4th at 1175 ("In general, a jury may make a just and reasonable estimate of the damage based on relevant data and is allowed to act on probable and inferential as well as (upon) direct and positive proof."); *Killough*, 848 F.2d at 1531 (damages need not be proved with "mathematical precision"). Moreover, FCA damages "are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it." *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998).

Instead of issuing a complete legal instruction, the court instead instructed the jury that "[y]ou must determine to the best of our ability, what amount of actual loss the government incurred as a result of the submission of any false claims. Your numbers must be based on evidence and not speculation or guesswork." A1123; *see also* A1124 (reiterating).[7]

---

[7] Plaintiffs repeatedly objected to these instructions, preserving their objections to them. *See, e.g.*, A84-85; R.511, Plaintiffs' Responses to (R.501) Defendants' Objections to the Court's and Plaintiffs' Jury

These instructions were misleading because they never explained that the jury was allowed to make reasonable estimates (*see* A67-68)—and therefore gave the jury the misimpression that plaintiffs had to prove damages with a degree of precision that the law simply does not require.

*Second*, it was error for the district court not to instruct the jury that plaintiffs' definition of "usual and customary" had been adopted in the district court's prior summary judgment order relying on this Court's *Garbe* decision. District courts must correctly and completely instruct the jury as to the law—and the meaning of "usual and customary" was settled law of the case. By refusing to so instruct the jury, the district court gave the jury insufficient guidance about what standard to apply in the damages calculations.

This error was manifestly prejudicial. Mr. Dew calculated overpayments by comparing the amounts actually paid to the usual and customary price, using the definition of "usual and customary" required by controlling law. The district court nevertheless permitted defense counsel repeatedly to characterize that definition as having been

---

Instructions and to Defendants' Proposed Alternate and Additional Instructions at 13 and 20; A137, A139.

invented by plaintiffs' counsel, and refused repeatedly to allow plaintiffs to correct that misimpression during cross and direct examinations by referencing *Garbe* or the prior summary judgment ruling. *See supra* pp.26-28.

This Court's decision in *Schmitz v. Canadian Pacific Railway Co.*, 454 F.3d 678 (7th Cir. 2006), is instructive with respect to prejudice. There, the plaintiff sought an instruction informing the jury that a federal regulation required railways to trim vegetation near railway beds. The trial court refused to issue the instruction. On appeal, the defendant argued that there was no prejudice because "the jury still heard the essence of Schmitz's claim regarding the regulation—that Schmitz alleged the railroad was negligent because it did not keep the vegetation trimmed." *Id*. at 684. But, as the Court recognized, "there is a world of difference between telling the jury that Schmitz alleged the railroad should have taken a particular precaution and telling the jury that federal law *required* the railroad to take that very precaution." *Id*. The Court accordingly had "little doubt that the omission of [the] instruction … prejudiced Schmitz's case." *Id*. The same logic applies here: there is a world of difference between telling the jury that the definition of "usual

and customary" used by Mr. Dew was "an arbitrary definition that inflated his claims and damages, and therefore, the amount that that [plaintiffs are] hoping to recover," (A1133-34) versus telling the jury that the definition was required by law.

Similarly, this Court held in *Guzman v. City of Chicago*, 689 F.3d 740 (7th Cir. 2012), that when a district court permitted liability issues to creep into its instructions in a damages-only trial (after liability had been decided in the plaintiffs' favor at summary judgment), the court committed prejudicial error. The errors here had the same effect: The jury was effectively invited to reconsider the meaning of "usual and customary," even though it had been set by a prior order in this case, and by binding precedent.

Significantly, there is no need to speculate regarding whether the jury was confused by the court's failure to issue this instruction. The jury's questions show the truth. Jurors asked whether the "usual and customary definition guidelines" were "set by the relators," and whether "different contract definitions would change the outcome." A222; A960-62. They asked whether the expert was calculating overpayments "in the real world" or just "based on parameters from relators' counsel." A934-35.

These questions reflect fundamental confusion about whether the governing legal standard was legitimate—confusion the district court created by refusing to issue a curative instruction and then allowed defense counsel to exploit. Put simply, the district court's failure to instruct the jury as to the law caused it to be misled—and the jury accordingly could not apply the law faithfully to the question of damages. That makes this case *a fortiori* from the authorities cited *supra*. A new damages trial is the appropriate remedy.

*Finally*, the district court should have instructed the jury that falsity had been shown as a matter of law. In Illinois, Pattern Civil Jury Instruction 1.02 provides that when "summary judgment on an issue has been granted in favor of plaintiff," a cautionary instruction should be given informing the jury that "[t]he Court has found" what it found, "so that is not an issue you will need to decide." *Available at* https://www.illinoiscourts.gov/courts/circuit-court/illinois-pattern-jury-instructions-civil/. Multiple courts in FCA cases have instructed juries when partial summary judgment was granted to the plaintiffs—including in *Streck*, 152 F.4th at 841-46, where the jury found scienter at trial, and this Court affirmed. *See* A378; A397; A423-24; *see also* A435-36; A445.

Although giving such an instruction is discretionary, failure to give it is reversible error when "the complaining party has in some way been prejudiced by the court's denial." Illinois Pattern Civil Jury Instructions, General Cautionary Instructions, Introduction. Here, the court's refusal to instruct the jury that falsity had already been determined left the jury to guess at the *extent* of the falsity, enabling a back-door collateral challenge to the court's prior summary judgment order. Individually and combined with the other instructional errors, this, too, supports a new trial on damages.

## CONCLUSION

This Court should: (1) affirm that defendants knowingly presented false claims to the federal government and Illinois; (2) hold that civil monetary penalties are mandatory for each false claim knowingly presented, even absent a showing of damages; (3) hold that plaintiffs established liability with respect to 1,297,037 false claims to Illinois Medicaid; (4) remand for the district court to assess the appropriate penalty for those claims; (5) remand for the district court to determine the number of false claims to the other federal programs and assess a penalty for each of those; and (6) vacate the jury's damages verdict and remand for a new damages trial.

Respectfully submitted,

s/Tejinder Singh

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I certify that the foregoing brief complies with the type-volume limitation of this Circuit's Rule 28.1 because, excluding the portions of the brief exempted from the word count by Rule 32(f), it contains 13,939 words. I am relying on the word count generated by Microsoft Word for Microsoft 365, which was used to prepare this brief.

s/Tejinder Singh

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Pursuant to Seventh Circuit Rule 30(d), counsel certifies that all materials required by Seventh Circuit Rule 30(a) and (b) are included in the appendix.

s/Tejinder Singh

*Counsel for Plaintiffs-Appellants*

## REQUIRED SHORT APPENDIX

Final Judgment entered March 12, 2025 .......................................... SA1

E-FILED
Wednesday, 12 March, 2025 04:06:21 PM
Clerk, U.S. District Court, ILCD

Judgment in a Civil Case (02/11)

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

FILED
MAR 12 2025
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF MARYLAND, STATE OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NORTH CAROLINA, STATE OF RHODE ISLAND, STATE OF VIRGINIA, STATE OF WISCONSIN,**

**Plaintiffs,**

**and**

**TRACY SCHUTTE, MICHAEL YARBERRY,**

**Relators,**

**vs.**

**SUPERVALU INC, AAME SAV-ON PHARMACY, ALBERTSONS OSCO PHARMACY, ALBERTSONS SAV-ON PHARMACY, BIGGS PHARMACY, CUB PHARMACY, FARM FRESH PHARMACY, JEWEL PHARMACY, JEWEL-OSCO PHARMACY, SHAWS OSCO PHARMACY, SHOP N SAVE PHARMACY, SHOP N SAVE OSCO PHARMACY, SHOPPERS PHARMACY, STAR OSCO PHARMACY, SUPERVALU HOLDINGS, INC, FF ACQUISITIONS, LLC, FOODARAMA LLC, SHOPPERS FOOD WAREHOUSE CORP., SUPERVALU PHARMACIES, INC., ALBERTSON'S, LLC, JEWEL OSCO SOUTHWEST LLC, NEW ALBERTSON'S, INC., AMERICAN DRUG STORES, LLC, ACME MARKETS, INC., SHAW'S SUPERMARKET, INC., STAR**

**Case Number: 11-3290**

**MARKET COMPANY, INC., JEWEL FOOD STORES, INC. AB ACQUISITION LLC** )
)
)
)
**Defendants.** )

## JUDGMENT IN A CIVIL CASE

☒ **JURY VERDICT**. This action came before the Court for a trial by jury. The issues have been tried, and the jury has rendered its verdict.

☐ **DECISION BY THE COURT**. This action came before the Court, and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that judgment is entered on the verdict of the jury in favor of Defendants and against Relators as to Relators' and Plaintiffs' False Claims Act claims. The Relators recover nothing on their claims against Defendants.

**Dated: 3/12/2025**

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

SEM

Approved: s/ Sue E. Myerscough
Sue E. Myerscough
U.S. District Judge