Nos. 25-3194, 25-3134

# In the United States Court of Appeals for the Seventh Circuit

THE UNITED STATES OF AMERICA AND THE STATE OF ILLINOIS EX REL. TRACY SCHUTTE AND MICHAEL YARBERRY,
*Relators-Appellants, Cross-Appellees*

*v.*

SUPERVALU, INC., SUPERVALU HOLDINGS, INC., FF ACQUISITIONS, LLC, FOODARAMA, LLC, SHOPPERS FOOD WAREHOUSE CORP.,
*Defendants-Appellees, Cross-Appellants*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS (CIV. NO. 11-3290) (THE HONORABLE SUE MYERSCOUGH, J.)*

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES AND OPENING BRIEF OF CROSS-APPELLANTS**

ENU MAINIGI
*Counsel of Record*
CRAIG SINGER
JENNIFER WICHT
A. JOSHUA PODOLL
ANNIE SHOWALTER
WILLIAMS & CONNOLLY LLP
*680 Maine Ave., S.W.*
*Washington, D.C. 20024*
*(202) 434-5000*

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134; 25-3194

Short Caption: Tracy Schutte, et al. v. SuperValu, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
SuperValu, Inc., SuperValu Holdings, Inc., FF Acquisition, LLC, Foodarama, LLC, Shoppers Food Warehouse Corp.,
SuperValu Pharms., Inc., Albertsons, Inc., Jewel Osco Sw., LLC, New Albertson, Inc., Am. Drug Stores, LLC,
Acme Markets, Inc., Shaw's Supermarkets, Inc., Star Markets Cos., Inc., Jewel Food Stores, Inc., AB Acquisition LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Williams & Connolly LLP, Kirkland & Ellis LLP, Robins Kaplan LLP, Hinshaw & Culbertson, Reed Smith LLP,
Norton Rose Fulbright US LLP, Hepler Broom LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

See Attachment

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See Attachment

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Enu Mainigi Date: 3/6/2026

Attorney's Printed Name: Enu Mainigi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 680 Maine Ave SW
Washington, DC 20024

Phone Number: 202-434-5000 Fax Number: N/A

E-Mail Address: emainigi@wc.com

**(3) If the party, amicus or intervenor is a corporation:**

**(i) Identify all its parent corporations, if any; and**

- SuperValu Inc. is a wholly owned subsidiary of United Natural Foods, Inc. ("UNFI"), which is a publicly traded Delaware corporation. UNFI has no parent corporation; it is the parent company of:[1]
    - FF Acquisition, LLC
    - Foodarama, LLC
    - Shoppers Food Warehouse Corp.
    - SuperValu Pharmacies, Inc.
- Albertsons Companies, Inc., a Delaware corporation ("ACI"), is the parent company of the following defendant entities, all of which are wholly owned by ACI (directly or through intermediary subsidiaries):
    - Albertson's LLC
    - New Albertsons, Inc., n/k/a New Albertsons LP
    - AB Acquisition LLC
    - American Drug Stores LLC
    - Acme Markets, Inc.
    - Jewel Food Stores, Inc.
    - Jewel Osco Southwest LLC
    - Shaw's Supermarkets, Inc.
    - Star Markets Company, Inc.

---

[1] SuperValu Holdings, Inc., a party to this litigation, no longer exists; it has now been merged into UNFI Distribution Co., LLC.

**(ii) List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:**

- Blackrock, Inc., owns more than 10% of UNFI's stock.
- ACI is a publicly traded corporation on the New York Stock Exchange under the symbol "ACI". No publicly held company owns 10% or more of ACI's stock, nor does ACI have any parent corporation.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3134; 25-3194

Short Caption: Tracy Schutte, et al. v. SuperValu, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

SuperValu, Inc., SuperValu Holdings, Inc., FF Acquisition, LLC, Foodarama, LLC, Shoppers Food Warehouse Corp.,

SuperValu Pharms., Inc., Albertsons, Inc., Jewel Osco Sw., LLC, New Albertson, Inc., Am. Drug Stores, LLC,

Acme Markets, Inc., Shaw's Supermarkets, Inc., Star Markets Cos., Inc., Jewel Food Stores, Inc., AB Acquisition LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Williams & Connolly LLP, Kirkland & Ellis LLP, Robins Kaplan LLP, Hinshaw & Culbertson, Reed Smith LLP,

Norton Rose Fulbright US LLP, Hepler Broom LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

See Attachment

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See Attachment

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Craig Singer Date: 3/6/2026

Attorney's Printed Name: Craig Singer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 680 Maine Ave SW

Washington, DC 20024

Phone Number: 202-434-5000 Fax Number: N/A

E-Mail Address: csinger@wc.com

**(3) If the party, amicus or intervenor is a corporation:**

**(i) Identify all its parent corporations, if any; and**

- SuperValu Inc. is a wholly owned subsidiary of United Natural Foods, Inc. ("UNFI"), which is a publicly traded Delaware corporation. UNFI has no parent corporation; it is the parent company of:[1]
  - FF Acquisition, LLC
  - Foodarama, LLC
  - Shoppers Food Warehouse Corp.
  - SuperValu Pharmacies, Inc.
- Albertsons Companies, Inc., a Delaware corporation ("ACI"), is the parent company of the following defendant entities, all of which are wholly owned by ACI (directly or through intermediary subsidiaries):
  - Albertson's LLC
  - New Albertsons, Inc., n/k/a New Albertsons LP
  - AB Acquisition LLC
  - American Drug Stores LLC
  - Acme Markets, Inc.
  - Jewel Food Stores, Inc.
  - Jewel Osco Southwest LLC
  - Shaw's Supermarkets, Inc.
  - Star Markets Company, Inc.

---

[1] SuperValu Holdings, Inc., a party to this litigation, no longer exists; it has now been merged into UNFI Distribution Co., LLC.

**(ii) List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:**

- Blackrock, Inc., owns more than 10% of UNFI's stock.
- ACI is a publicly traded corporation on the New York Stock Exchange under the symbol "ACI". No publicly held company owns 10% or more of ACI's stock, nor does ACI have any parent corporation.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3134; 25-3194

Short Caption: Tracy Schutte, et al. v. SuperValu, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

SuperValu, Inc., SuperValu Holdings, Inc., FF Acquisition, LLC, Foodarama, LLC, Shoppers Food Warehouse Corp.,

SuperValu Pharms., Inc., Albertsons, Inc., Jewel Osco Sw., LLC, New Albertson, Inc., Am. Drug Stores, LLC,

Acme Markets, Inc., Shaw's Supermarkets, Inc., Star Markets Cos., Inc., Jewel Food Stores, Inc., AB Acquisition LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Williams & Connolly LLP, Kirkland & Ellis LLP, Robins Kaplan LLP, Hinshaw & Culbertson, Reed Smith LLP,

Norton Rose Fulbright US LLP, Hepler Broom LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

See Attachment

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See Attachment

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Jennifer Wicht Date: 3/6/2026

Attorney's Printed Name: Jennifer Wicht

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 680 Maine Ave SW

Washington, DC 20024

Phone Number: 202-434-5000 Fax Number: N/A

E-Mail Address: jwicht@wc.com

**(3) If the party, amicus or intervenor is a corporation:**

**(i) Identify all its parent corporations, if any; and**

- SuperValu Inc. is a wholly owned subsidiary of United Natural Foods, Inc. ("UNFI"), which is a publicly traded Delaware corporation. UNFI has no parent corporation; it is the parent company of:[1]
  - FF Acquisition, LLC
  - Foodarama, LLC
  - Shoppers Food Warehouse Corp.
  - SuperValu Pharmacies, Inc.
- Albertsons Companies, Inc., a Delaware corporation ("ACI"), is the parent company of the following defendant entities, all of which are wholly owned by ACI (directly or through intermediary subsidiaries):
  - Albertson's LLC
  - New Albertsons, Inc., n/k/a New Albertsons LP
  - AB Acquisition LLC
  - American Drug Stores LLC
  - Acme Markets, Inc.
  - Jewel Food Stores, Inc.
  - Jewel Osco Southwest LLC
  - Shaw's Supermarkets, Inc.
  - Star Markets Company, Inc.

---

[1] SuperValu Holdings, Inc., a party to this litigation, no longer exists; it has now been merged into UNFI Distribution Co., LLC.

**(ii) List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:**

- Blackrock, Inc., owns more than 10% of UNFI's stock.
- ACI is a publicly traded corporation on the New York Stock Exchange under the symbol "ACI". No publicly held company owns 10% or more of ACI's stock, nor does ACI have any parent corporation.

Save As Clear Form



# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3134; 25-3194

Short Caption: Tracy Schutte, et al. v. SuperValu, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
SuperValu, Inc., SuperValu Holdings, Inc., FF Acquisition, LLC, Foodarama, LLC, Shoppers Food Warehouse Corp.,
SuperValu Pharms., Inc., Albertsons, Inc., Jewel Osco Sw., LLC, New Albertson, Inc., Am. Drug Stores, LLC,
Acme Markets, Inc., Shaw's Supermarkets, Inc., Star Markets Cos., Inc., Jewel Food Stores, Inc., AB Acquisition LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Williams & Connolly LLP, Kirkland & Ellis LLP, Robins Kaplan LLP, Hinshaw & Culbertson, Reed Smith LLP,
Norton Rose Fulbright US LLP, Hepler Broom LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

See Attachment

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See Attachment

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ A. Josh Podoll Date: 3/6/2026

Attorney's Printed Name: A. Josh Podoll

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 680 Maine Ave SW
Washington, DC 20024

Phone Number: 202-434-5000 Fax Number: N/A

E-Mail Address: apodoll@wc.com

**(3) If the party, amicus or intervenor is a corporation:**

**(i) Identify all its parent corporations, if any; and**

- SuperValu Inc. is a wholly owned subsidiary of United Natural Foods, Inc. ("UNFI"), which is a publicly traded Delaware corporation. UNFI has no parent corporation; it is the parent company of:[1]
    - FF Acquisition, LLC
    - Foodarama, LLC
    - Shoppers Food Warehouse Corp.
    - SuperValu Pharmacies, Inc.
- Albertsons Companies, Inc., a Delaware corporation ("ACI"), is the parent company of the following defendant entities, all of which are wholly owned by ACI (directly or through intermediary subsidiaries):
    - Albertson's LLC
    - New Albertsons, Inc., n/k/a New Albertsons LP
    - AB Acquisition LLC
    - American Drug Stores LLC
    - Acme Markets, Inc.
    - Jewel Food Stores, Inc.
    - Jewel Osco Southwest LLC
    - Shaw's Supermarkets, Inc.
    - Star Markets Company, Inc.

[1] SuperValu Holdings, Inc., a party to this litigation, no longer exists; it has now been merged into UNFI Distribution Co., LLC.

**(ii) List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:**

- Blackrock, Inc., owns more than 10% of UNFI's stock.
- ACI is a publicly traded corporation on the New York Stock Exchange under the symbol "ACI". No publicly held company owns 10% or more of ACI's stock, nor does ACI have any parent corporation.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3134; 25-3194

Short Caption: Tracy Schutte, et al. v. SuperValu, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

SuperValu, Inc., SuperValu Holdings, Inc., FF Acquisition, LLC, Foodarama, LLC, Shoppers Food Warehouse Corp.,

SuperValu Pharms., Inc., Albertsons, Inc., Jewel Osco Sw., LLC, New Albertson, Inc., Am. Drug Stores, LLC,

Acme Markets, Inc., Shaw's Supermarkets, Inc., Star Markets Cos., Inc., Jewel Food Stores, Inc., AB Acquisition LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Williams & Connolly LLP, Kirkland & Ellis LLP, Robins Kaplan LLP, Hinshaw & Culbertson, Reed Smith LLP,

Norton Rose Fulbright US LLP, Hepler Broom LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

See Attachment

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See Attachment

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Annie Showalter Date: 3/6/2026

Attorney's Printed Name: Annie Showalter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 680 Maine Ave SW

Washington, DC 20024

Phone Number: 202-434-5000 Fax Number: N/A

E-Mail Address: ashowalter@wc.com

**(3) If the party, amicus or intervenor is a corporation:**

**(i) Identify all its parent corporations, if any; and**

- SuperValu Inc. is a wholly owned subsidiary of United Natural Foods, Inc. ("UNFI"), which is a publicly traded Delaware corporation. UNFI has no parent corporation; it is the parent company of:[1]
    - FF Acquisition, LLC
    - Foodarama, LLC
    - Shoppers Food Warehouse Corp.
    - SuperValu Pharmacies, Inc.
- Albertsons Companies, Inc., a Delaware corporation ("ACI"), is the parent company of the following defendant entities, all of which are wholly owned by ACI (directly or through intermediary subsidiaries):
    - Albertson's LLC
    - New Albertsons, Inc., n/k/a New Albertsons LP
    - AB Acquisition LLC
    - American Drug Stores LLC
    - Acme Markets, Inc.
    - Jewel Food Stores, Inc.
    - Jewel Osco Southwest LLC
    - Shaw's Supermarkets, Inc.
    - Star Markets Company, Inc.

[1] SuperValu Holdings, Inc., a party to this litigation, no longer exists; it has now been merged into UNFI Distribution Co., LLC.

**(ii) List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:**

- Blackrock, Inc., owns more than 10% of UNFI's stock.
- ACI is a publicly traded corporation on the New York Stock Exchange under the symbol "ACI". No publicly held company owns 10% or more of ACI's stock, nor does ACI have any parent corporation.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3134; 25-3194

Short Caption: Tracy Schutte, et al. v. SuperValu, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
SuperValu, Inc., SuperValu Holdings, Inc., FF Acquisition, LLC, Foodarama, LLC, Shoppers Food Warehouse Corp.,
SuperValu Pharms., Inc., Albertsons, Inc., Jewel Osco Sw., LLC, New Albertson, Inc., Am. Drug Stores, LLC,
Acme Markets, Inc., Shaw's Supermarkets, Inc., Star Markets Cos., Inc., Jewel Food Stores, Inc., AB Acquisition LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Williams & Connolly LLP, Kirkland & Ellis LLP, Robins Kaplan LLP, Hinshaw & Culbertson, Reed Smith LLP,
Norton Rose Fulbright US LLP, Hepler Broom LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

See Attachment

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See Attachment

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Kimberly Broecker Date: 3/6/2026

Attorney's Printed Name: Kimberly Broecker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 680 Maine Ave SW
Washington, DC 20024

Phone Number: 202-434-5000 Fax Number: N/A

E-Mail Address: kbroecker@wc.com

**(3) If the party, amicus or intervenor is a corporation:**

**(i) Identify all its parent corporations, if any; and**

- SuperValu Inc. is a wholly owned subsidiary of United Natural Foods, Inc. ("UNFI"), which is a publicly traded Delaware corporation. UNFI has no parent corporation; it is the parent company of:[1]
    - FF Acquisition, LLC
    - Foodarama, LLC
    - Shoppers Food Warehouse Corp.
    - SuperValu Pharmacies, Inc.
- Albertsons Companies, Inc., a Delaware corporation ("ACI"), is the parent company of the following defendant entities, all of which are wholly owned by ACI (directly or through intermediary subsidiaries):
    - Albertson's LLC
    - New Albertsons, Inc., n/k/a New Albertsons LP
    - AB Acquisition LLC
    - American Drug Stores LLC
    - Acme Markets, Inc.
    - Jewel Food Stores, Inc.
    - Jewel Osco Southwest LLC
    - Shaw's Supermarkets, Inc.
    - Star Markets Company, Inc.

---

[1] SuperValu Holdings, Inc., a party to this litigation, no longer exists; it has now been merged into UNFI Distribution Co., LLC.

**(ii) List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:**

- Blackrock, Inc., owns more than 10% of UNFI's stock.
- ACI is a publicly traded corporation on the New York Stock Exchange under the symbol "ACI". No publicly held company owns 10% or more of ACI's stock, nor does ACI have any parent corporation.

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1
STATEMENT OF JURISDICTION ..... 5
STATEMENT OF THE ISSUES ON APPEAL ..... 5
STATEMENT OF THE CASE ..... 5
A. Regulatory & Industry Background ..... 5
a. Government Healthcare Programs ..... 5
b. Public Health Program Payments ..... 8
i. Payments to Pharmacies by PBMs ..... 8
ii. Payments to Plans by the Government ..... 10
B. Factual Background ..... 11
C. Relators ..... 12
D. Procedural History ..... 13
SUMMARY OF ARGUMENT ..... 21
ARGUMENT ..... 24
I. SuperValu Is Not Liable Under the FCA Because It Caused No Injury. ..... 24
A. Causation Is an Element of Liability Under the FCA. ..... 25
B. Relators Cannot Obtain Judgment as a Matter of Law. ..... 36
II. Relators Are Not Entitled to a New Trial on Damages. ..... 38
A. The Jury's Verdict Did Not "Shock the Conscience." ..... 39
B. The District Court Correctly Instructed the Jury ..... 42
a. The Damages Instruction Was Correct. ..... 42
b. The Falsity Instruction Was Correct. ..... 44
c. The Decision Not to Instruct on the Meaning of "Usual and Customary" Was Correct. ..... 47
III. The District Court Should Have Awarded Summary Judgment to SuperValu on Materiality. ..... 51
IV. A Partial Retrial Would Be Unjust. ..... 51
STATEMENT OF THE ISSUES ON CROSS-APPEAL ..... 53
SUMMARY OF THE ARGUMENT ON CROSS-APPEAL ..... 53
I. The District Court Erred in Granting Relators Summary Judgment on Falsity Based on a Misreading of *Garbe* ..... 55
A. *Garbe* Did Not Establish a Universal Definition of "Usual and Customary." Nor Does One Exist. ..... 57

B. Even if *Garbe* Had Defined "Usual and Customary" for All Purposes, the District Court's Grant of Summary Judgment Was Error....63
C. *Garbe* Was Wrongly Decided. ....65
II. The District Court Incorrectly Applied a *Per Se* Materiality Rule and Impermissibly Shifted the Burden to Defendants....67
A. A *Per Se* "Money Is Material" Rule Conflicts with Supreme Court and Circuit Precedent....68
B. The District Court Applied the Wrong Standard for Government Knowledge....77
C. The Court Improperly Shifted the Burden of Proof to SuperValu....78
CONCLUSION....81

# TABLE OF AUTHORITIES

Page

## CASES

*Alloy Int'l Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222 (7th Cir. 1980) ....49
*Arkansas Pharmacists Association v. Harris*, 627 F.2d 867 (8th Cir. 1980) ....66
*BCS Servs., Inc. v. BG Invs., Inc.*, 728 F.3d 633 (7th Cir. 2013) ....43
*Beech Acceptance Corp. v. Connell*, 1990 WL 171000 (D. Kan. Oct. 31, 1990) ....45, 46, 48
*Bostock v. Clayton County*, 590 U.S. 644 (2020) ....30, 31
*Burford v. Acct. Prac. Sales, Inc.*, 2016 WL 1086660 (S.D. Ill. Mar. 21, 2016), *aff'd*, 851 F.3d 641 (7th Cir. 2017) ....43
*California ex rel. Omlansky v. Save Mart Supermarkets*, 251 Cal. Rptr. 3d 868 (Ct. App. 2019) ....60
*Carman v. Tinkes*, 762 F.3d 565 (7th Cir. 2014) ....79
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....26, 27, 80
*Century Wrecker Corp. v. E.R. Buske Mfg. Co.*, 898 F. Supp. 1344 (N.D. Iowa 1995) ....45
*Clarett v. Roberts*, 657 F.3d 664 (7th Cir. 2011) ....40, 42, 47
*Clipco, Ltd. v. Ignite Design, LLC*, 2005 WL 2861032 (N.D. Ill. Oct. 28, 2005) ....46
*Commercial Contractors, Inc. v. United States*, 154 F.3d 1357 (Fed. Cir. 1998) ....35
*Cont'l Cas. Co. v. Howard*, 775 F.2d 876 (7th Cir. 1985) ....51
*Corley v. United States*, 556 U.S. 303 (2009) ....30
*Cruz v. Safford*, 579 F.3d 840 (7th Cir. 2009) ....24, 42, 50
*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988) ....28
*EEOC v. Charter Commc'ns, LLC*, 75 F.4th 729 (7th Cir. 2023) ....57, 63, 64, 68
*Envolve Pharmacy Solutions, Inc. v. Rite Aid Headquarters Corp.*, 2023 WL 2547994 (Del. Sup. Ct. Mar. 17 2023) ....60
*F.E.L. Publ'ns, Ltd. v. Cath. Bishop of Chi.*, 1987 WL 15409 (N.D. Ill. Aug. 3, 1987) ....51, 52
*Forth v. Walgreen Co.*, 2019 WL 10255628 (N.D. Ill. July 10, 2019) ....60
*Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494 (1931) ....51

Page

Cases—continued:

*Gonzales v. Carhart*, 550 U.S. 124 (2007).....28
*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280 (2010).....29
*Grant ex rel. United States v. Zorn*, 107 F.4th 782 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2816 (2025).....28
*Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir. 1987).....45, 48
*Guzman v. City of Chicago*, 689 F.3d 740 (7th Cir. 2012).....48, 49
*Hairston v. Wash. Metro. Area Transit Auth.*, 1997 WL 411946 (D.D.C. Apr. 10, 1997).....46
*Harris v. New Rez, LLC*, 2022 WL 184000 (E.D. Cal. Jan. 20, 2022).....76
*Hendrix ex rel. United States v. J-M Manufacturing Co.*, 76 F.4th 1164 (9th Cir. 2023).....35, 43
*Herrick v. Garvey*, 298 F.3d 1184 (10th Cir. 2002).....45
*Humana Health Plan, Inc. v. CVS Pharmacy, Inc.*, Comm. Arb. Trib., No. 01-19-0000-6924 (Henry L. Parr, arb.) (D. Minn. May 24, 2022), 23-mc-00077-DJF, Dkt. No. 4-4.....61
*Humana Health Plan, Inc. v. Rite Aid Headquarters Corp.*, 2023 WL 5002875 (W.D. Ky. Aug. 4, 2023).....61
*Kapelanski v. Johnson*, 390 F.3d 525 (7th Cir. 2004).....39, 40, 41, 50
*King v. Burwell*, 576 U.S. 473 (2015).....29
*Kousisis v. United States*, 605 U.S. 114 (2025).....28
*Kungys v. United States*, 485 U.S. 759 (1988).....78
*Lange v. City of Oconto*, 28 F.4th 825 (7th Cir. 2022).....33
*Lewis v. City of Chi. Police Dep't*, 590 F.3d 427 (7th Cir. 2009).....44
*Locklin v. Day-Glo Color Corp.*, 429 F.2d 873 (7th Cir. 1970).....43
*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).....69, 72
*McClain v. Retail Food Emps. Joint Pension Plan*, 413 F.3d 582 (7th Cir. 2005).....26
*Mlsna v. Union Pac. R.R. Co.*, 2021 WL 2461733 (W.D. Wis. June 16, 2021).....46
*Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262 (7th Cir. 1996).....27
*Nipper v. Snipes*, 7 F.3d 415 (4th Cir. 1993).....45
*Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118 (11th Cir. 1993).....45

Page

Cases—continued:

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016)....................27
*Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089 (11th Cir. 2020)..........................74
*Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456 (7th Cir. 1997).......................77
*Schmitz v. Canadian Pacific Railway Co.*, 454 F.3d 678 (7th Cir. 2006).......48
*SEC v. Retail Pro, Inc.*, 2011 WL 589828 (S.D. Cal. Feb. 10, 2011)...............46
*Six Star Holdings, LLC v. City of Milwaukee*,
821 F.3d 795 (7th Cir. 2016)..........................................................................36
*State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003)..................29
*Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994 (7th Cir. 2014)...........56
*Trinity Homes LLC v. Ohio Cas. Ins. Co.*,
629 F.3d 653 (7th Cir. 2010)...................................................................77, 80
*United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*,
764 F.3d 699 (7th Cir. 2014)..........................................................................78
*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013)..........................................................................34
*United States ex rel. Calderon v. Carrington Mortg. Servs., LLC*,
70 F.4th 968 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 331 (2023)........*passim*
*United States ex rel. Campbell v. KIC Dev., LLC*,
2019 WL 6884485 (W.D. Tex. Dec. 10, 2019)................................................74
*United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*,
675 F.3d 394 (4th Cir. 2012)..........................................................................38
*United States ex rel. Foreman v. AECOM*, 19 F.4th 85 (2d Cir. 2021).....71, 73
*United States ex rel. Garbe v. Kmart Corp.*,
824 F.3d 632 (7th Cir. 2016).....................................................................*passim*
*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009)..........................................................................34
*United States ex rel. Heath v. Wisconsin Bell, Inc.*,
92 F.4th 654 (7th Cir. 2024),
*aff'd on other grounds*, 604 U.S. 140 (2025)...........................................74, 75
*United States ex rel. Laymon v. Bombardier Transp. (Holdings) USA, Inc.*, 656 F. Supp. 2d 540 (W.D. Pa. 2009)....................................................38
*United States ex rel. Lemon v. Nurses To Go, Inc.*,
924 F.3d 155 (5th Cir. 2019)..........................................................................73
*United States ex rel. Lisitza v. Par Pharms. Cos.*,
276 F. Supp. 3d 779 (N.D. Ill. 2017)...........................................................73

Page

Cases—continued:

*United States ex rel. Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005) .......... 32, 33
*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 2007 WL 851868 (D.D.C. Mar. 14, 2007) .......... 38
*United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017) .......... 73, 74
*United States ex rel. Schutte v. SuperValu Inc.*, 2023 WL 4819720 (7th Cir. July 27, 2023) .......... 16
*United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2016) .......... 15, 16, 27, 67
*United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455 (7th Cir. 2021) .......... 15, 67
*United States ex rel. Strauser v. Stephen L. LaFrance Holdings*, 2019 WL 1086363 (N.D. Okla. Mar. 7, 2019) .......... 74
*United States ex rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816 (7th Cir. 2025) .......... *passim*
*United States ex rel. Ubl v. IIF Data Sols.*, 2007 WL 2220586 (E.D. Va. Aug. 1, 2007) .......... 75
*United States v. Bajakajian*, 524 U.S. 321 (1998) .......... 28
*United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008) .......... 74
*United States v. Brown*, 911 F.2d 736 (7th Cir. 1990) (unpublished table decision), 1990 WL 116864 .......... 37
*United States v. Chaoqun*, 107 F.4th 715 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 551 (2024) .......... 30, 31
*United States v. Corp. Mgmt., Inc.*, 78 F.4th 727 (5th Cir. 2023) .......... 73, 74
*United States v. Griffin*, 84 F.3d 912 (7th Cir. 1996) .......... 41
*United States v. Hughes*, 585 F.2d 284 (7th Cir. 1978) .......... 32, 33
*United States v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212 (D.N.J. 2021) .......... 74
*United States v. Killough*, 848 F.2d 1523 (11th Cir. 1988) .......... 34
*United States v. Luce*, 873 F.3d 999 (7th Cir. 2017) .......... 21, 25, 31
*United States v. Molina Healthcare, Inc.*, 17 F.4th 732 (7th Cir. 2021), *cert. denied*, 143 S. Ct. 352 .......... *passim*
*United States v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016) .......... 69

Page

Cases—continued:

*United States v. Science Applications International Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ........ 35
*United States v. Tieger*, 234 F.2d 589 (3d Cir. 1956) ........ 34, 35
*United States v. Villegas*, 655 F.3d 662 (7th Cir. 2011) ........ 47, 50
*Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) ........ *passim*
*Varljen v. Cleveland Gear Co.*, 250 F.3d 426 (6th Cir. 2001) ........ 35
*Willis v. Lepine*, 687 F.3d 826 (7th Cir. 2012) ........ 39
*Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. 2021) ........ 28

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const. amend. VIII ........ 28
31 U.S.C.
§ 3729 ........ *passim*
§ 3730 ........ 26
§ 3731 ........ *passim*
42 U.S.C.
§ 1395 *et seq.* ........ 6
§ 1395c ........ 6
§ 1395w-102 ........ 6
§ 1395w-111 ........ *passim*
§ 1395w-112 ........ 6
§ 1396 *et seq.* ........ 6
§ 1396a ........ 6
§ 1396b ........ 7
§ 1396u-2 ........ 6
False Claims Act (FCA) ........ *passim*
Pub. L. No. 99-562, § 5, 100 Stat. 3153 (1986) ........ 32
Ill. Admin. Code tit. 89, § 140.12 (2006 and 2016) ........ 10
225 Ill. Comp. Stat. Ann. 85/3(w) (2007 and 2018) ........ 10

Page

Constitution, Statutes, Regulations, and Rules—continued:

32 C.F.R. § 199.17 ....... 7
42 C.F.R.
 § 50.503 ....... 66
 § 199.17 ....... 7
 § 423.100 ....... *passim*
 § 423.265 ....... 6, 11
 § 423.329 ....... 11
 § 423.504 ....... 6
 § 423.505 ....... 6
 § 423.514 ....... 6
 Pt. 447 ....... 7
 § 447.200 ....... 66
 § 447.500 ....... 7
 § 447.502 ....... 59, 66
 § 447.512 ....... 59, 65, 66
 § 447.518 ....... 7, 59
Federal Rules of Civil Procedure
 9 ....... 35
 50 ....... 2, 20, 21, 36
 56 ....... 57
 59 ....... 20, 39
7th Cir. Rule 40 ....... 54, 65

## OTHER AUTHORITIES

*Element*, *Black's Law Dictionary* (12th ed. 2024) ....... 26, 27
John T. Boese & Douglas W. Baruch, *Civil False Claims and Qui Tam Actions* § 2.05 (5th ed., 2025-1 Supp. 2020) ....... 25
CMS, *Medicare Prescription Drug Benefit Manual*: Chapter 14—Coordination of Benefits 19 n.1 (2006) ....... 66
W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* § 110 (5th ed. 1984) ....... 28
Restatement (Second) of Torts (1976) ....... 27
S. Rep. No. 99-345 (1986) ....... 30, 35
9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2556 (3d ed. 2025) ....... 44

## INTRODUCTION

After a three-week trial featuring testimony from nineteen witnesses, thousands of pages of exhibits, and dozens of questions from highly engaged jurors, a jury unanimously found that Defendants (collectively, "SuperValu") did not violate the False Claims Act ("FCA"). That verdict was more than amply supported by the record, and the legal rulings Plaintiffs challenge were correct. The Court should affirm.

Plaintiffs ("Relators") are private citizens proceeding as *qui tam* relators on behalf of the federal government, which did not intervene. They argued SuperValu's pharmacies knowingly submitted false "usual and customary" prices for generic prescription medicines, causing government payors including Medicare and Medicaid to overpay. The jury rejected Relators' claims, finding specifically that Relators had not proved SuperValu's price reporting caused the government any loss. Relators now ask the Court to vacate the jury's verdict, enter judgment in their favor, and instruct the district court to impose statutory penalties for more than a million supposedly false claims. Each request is baseless.

To start, the district court correctly instructed the jury that causation is an element of an FCA claim. This Court repeatedly has held that causation is

an element of a *qui tam* relator's liability case. Those decisions are the settled law of this Circuit. And they are correct. The plain text of the FCA describes damages as an "essential element" of an FCA "cause of action." The Supreme Court repeatedly and recently has emphasized that the FCA should be interpreted to track the common law tort of deceit, which requires proof of causation. Any contrary ruling would create serious constitutional issues, given the FCA's per-claim penalty scheme.

Relators' argument that the Court should enter judgment in their favor is meritless twice over. Relators never requested judgment as a matter of law under Rule 50 below, so they cannot seek judgment here. In any event, if the number of false claims were not moot (it is, because there was no causation) that number would be for a jury to decide—as Relators themselves argued throughout trial.

Relators' request for a new trial on damages is similarly baseless. The record amply supported the jury's determination that Relators failed to prove harm to the government. And the district court's instructions correctly stated the law.

When the district court erred, it erred in Relators' favor. At the summary-judgment stage, the district court incorrectly granted Relators'

summary-judgment motions on the elements of falsity and materiality, taking those issues away from the jury. If the Court reaches SuperValu's cross-appeal, it should reverse on those issues.

First, the district court wrongly held as a matter of law that SuperValu submitted "false" claims. SuperValu did not, and the issue of falsity should have gone to the jury. The district court's summary-judgment decision rested on a misinterpretation of this Court's decision in *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). The district court reasoned that *Garbe* defined as a matter of law the key term in this case, "usual and customary." But *Garbe* did not address these contracts or the price-matching policy at issue here; and it did not make, and could not have made, such a sweeping pronouncement. Had the district court evaluated the contracts and state regulations that define usual and customary *in this case*, it would have concluded that whether the claims were false was an issue for trial—as other courts nationwide have held.

Second, the district court held as a matter of law that the allegedly false claims were material. In doing so, the district court made three independent legal errors. First, the district court applied a *per se* "money-is-material" rule that directly contradicts *Universal Health Services, Inc. v. United States ex*

*rel. Escobar*, 579 U.S. 176 (2016), which requires a rigorous, holistic approach to the materiality element. Second, the district court applied the wrong standard. The court considered whether government payors knew SuperValu's claims were *false*—an issue that had not been decided when SuperValu submitted the claims. The proper question was whether payors knew of the facts underlying Relators' allegations of falsity. As the district court's summary-judgment opinion acknowledged, the answer was "yes": the summary-judgment record included evidence government payors *knew* SuperValu price matched and did not submit price-matched prices as usual-and-customary prices. *See* Rel.App.A52-53. Third, the district court impermissibly shifted the burden of proving materiality to SuperValu, requiring that *SuperValu* provide "evidence [that payors] knew claims submitted were false, in that the usual and customary price was inflated." Rel.App.A53. Under the proper standard, the district court should have granted summary judgment to SuperValu—and this Court could do the same as an alternative basis for affirming. The Court should at least vacate the district court's materiality ruling if it remands for further proceedings.

This Court should affirm the judgment, either on its terms or because Relators failed to establish materiality as a matter of law. *See infra* Cross-

Appeal Part II. In the alternative, the Court should reverse the district court's falsity and materiality decisions and remand for a trial on all issues, including scienter.

## STATEMENT OF JURISDICTION

Relators-Appellants' Statement of Jurisdiction is complete and correct.

## STATEMENT OF THE ISSUES ON APPEAL

The issues presented by Relators' appeal are:

1. Whether SuperValu may be held liable for violating the False Claims Act where the jury found SuperValu did not cause any injury to any government payor.

2. Whether the Court should set aside the jury's verdict where the jury was correctly instructed on causation and damages, and the verdict was fully supported by the evidence.

3. As an alternative basis for affirmance, whether the district court should have granted summary judgment to SuperValu on materiality.

## STATEMENT OF THE CASE

### A. Regulatory & Industry Background

#### *a. Government Healthcare Programs*

The federal government, through the Department of Health and Human Services ("HHS"), the Center for Medicare and Medicaid Services ("CMS"),

and the Department of Defense ("DOD"), offers a range of public health insurance programs. Four are at issue here.

The first, and by far the largest, is Medicare. Medicare offers health insurance to people over 65 and people with disabilities, including a prescription-drug benefit called Medicare Part D. *See* 42 U.S.C. §§ 1395 *et seq.*, 1395c, 1395w-102. To administer Medicare Part D, CMS relies on partnerships with private third-party plan sponsors—health insurers like Aetna and Blue Cross Blue Shield. *See* 42 U.S.C. § 1395w-112; 42 C.F.R. §§ 423.265, 423.504, 423.505. Those sponsors engage pharmacy benefit managers, or PBMs, to administer prescription-drug benefits. *See* 42 C.F.R. § 423.514. PBMs contract with pharmacies like SuperValu to form pharmacy networks they offer to sponsors. Those PBM-pharmacy contracts set the terms on which pharmacies dispense medicine to plan beneficiaries, including the pricing structure the plan will use to reimburse the pharmacy.

The second relevant government program is Medicaid. Medicaid provides medical assistance to certain low-income individuals through a cooperative federal-state partnership. *See* 42 U.S.C. § 1396 *et seq.* There are two kinds of Medicaid plans: managed Medicaid and non-managed Medicaid. *See* 42 U.S.C. §§ 1396u-2, 1396a. Managed Medicaid plans operate like

Medicare Part D plans. Private insurance companies contract with states to administer pharmacy benefits for the states' Medicaid beneficiaries. *See* 42 U.S.C. § 1396b(m). The insurance companies then hire PBMs which, in turn, contract with pharmacies. Non-managed Medicaid plans operate differently. Rather than contract with a private insurer, the state directly reimburses pharmacies that dispense prescription drugs to beneficiaries. *See* 42 C.F.R. Pt. 447. Each state establishes its own benefits, eligibility, and reimbursement policies, subject to CMS's approval. *Id.* §§ 447.500, 447.518. States typically define the terms relevant to their Medicaid programs—like the phrase "usual and customary"—in their own regulations. *See* App.454:2-6.

The third government health program at issue is TRICARE, a Department of Defense health insurance program for active-duty military service members, retirees, and their families. *See* 32 C.F.R. § 199.17. The Department of Defense contracts with Express Scripts, Inc., a PBM, to administer TRICARE plans. *See* Rel.App.A974:4-10.

The fourth and final government health program at issue, the Federal Employees Health Benefits ("FEHB") program, provides health care benefits for Federal civilian employees, retirees, and their families. Like Medicare Part D, managed Medicaid, and TRICARE, FEHB relies on a PBM—during

the relevant period, Caremark—to administer pharmacy benefits. *See* App.408:13-23; App.446:18-447:1, 448:4-11, 483:7-11.

### *b. Public Health Program Payments*

Two different kinds of payments are relevant to this case. First, when a pharmacy dispenses medicine to a health-plan beneficiary, either the health plan (for non-managed Medicaid plans) or the health plan's PBM pays the pharmacy.[1] Second, when a health plan provides benefits for government beneficiaries, the government pays the health plan.

Critically, those payment streams are independent. For the vast majority of claims at issue, the amount the government pays a health plan *is not* the same amount the health plan's PBM paid the pharmacy for a particular beneficiary's medicine.

#### *i. Payments to Pharmacies by PBMs*

For Medicare Part D, managed Medicaid, TRICARE, and FEHB, the contracts between PBMs and pharmacies specify how pharmacies will be reimbursed for drugs they dispense to plan beneficiaries. *See* 42 U.S.C. § 1395w-111(i); App.580:24-585:9. Those contracts typically rely on a "lesser-

[1] When a PBM is involved, the health plan pays the PBM under a separate PBM-health plan agreement.

of logic." The price a PBM will pay a pharmacy is the lowest of three figures: average wholesale price, maximum allowable cost, and the usual-and-customary, or "U&C," price. App.380:11-381:8. Of the three, pharmacies set only the U&C price. App.381:6-18; App.601:14-604:4.

The term "usual-and-customary price" is a contractually defined term for health plans that contract with PBMs, typically included in the contract between the PBM and the pharmacy. Federal law does not define what "usual-and-customary" means in that contract.[2] To the contrary, federal law ***prohibits*** HHS from instituting "a price structure for the reimbursement of covered part D drugs." 42 U.S.C. § 1395w-111(i). Each contract defines "usual-and-customary price" slightly differently, but, at a high level, the U&C price is ordinarily defined as the "cash" price or the price paid by a "cash" customer. *See, e.g.*, Rel.App.A576; App.624; App.629; Rel.App.A1008:7-12.

Non-managed Medicaid plans also use the "lesser-of logic." Rel.App.A598:19-599:17. But for these plans, state statutes or regulations—

---

[2] The only definition of "usual and customary" appearing in Medicare regulations is 42 C.F.R. § 423.100, which relates exclusively to the circumstance (not relevant here) when the dispensing pharmacy was out of the health plan's network. Regardless, that definition says a U&C price is the out-of-network pharmacy's price to a customer who "does not have any form of prescription drug coverage." *Id.*

not a PBM-pharmacy contract—define the meaning of "usual and customary." App.454:2-6. In the 2006 to 2016 timeframe, Illinois's statutes defined U&C price as the "price that a pharmacy charges to a non-third-party payor." 225 Ill. Comp. Stat. Ann. 85/3(w) (2007 and 2018). And Illinois's Medicaid regulations required that providers "[m]ake charges for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges and in the same quality and mode of delivery as are provided to the general public." Ill. Admin. Code tit. 89, § 140.12 (2006 and 2016).

#### *ii. Payments to Plans by the Government*

The government pays Medicare and Medicaid plans one of two ways: on a fee-for-service basis or using a "capitated" model. Fee-for-service payment is straightforward. The government reimburses the plan, on a prescription-by-prescription basis, each time the plan pays for a beneficiary's medicine.

The capitated model, while more complex, is far more common. Medicare Part D, managed Medicaid plans, and FEHB all rely on it to reimburse health plans that provide government-sponsored health benefits.

In the capitated model the government does "not directly pay or reimburse any individual prescriptions." *Garbe*, 824 F.3d at 635; *see also*

App.588:14-589:14. Instead, the government makes monthly payments to plan sponsors. The amount the government will pay Part D plan sponsors, for instance, is set ahead of time based on per-beneficiary bids the sponsors submit half a year in advance. *See* 42 C.F.R. § 423.265. These "fixed monthly payments" do not change based on the amount of money a plan pays for its beneficiaries' prescriptions in a given month. *Garbe*, 824 F.3d at 635. Instead, CMS accounts for variances from plans' bids by "conduct[ing] 'reconciliation' with the sponsors" "[a]t the end of each year." *Id.*; *see also* 42 C.F.R. §§ 423.329; 423.343. Relators have not argued that the government made any true-up payments as a result of the claims at issue. Rel.App.A742:5-22, A743:25-744:15 (Relators' expert admitting that true-up payments are irrelevant to this case).[3]

## B. Factual Background

From the 1980s until the mid-2010s, SuperValu had a policy that allowed pharmacists to match competitors' prices as a customer-service accommodation. To receive a price match, a customer presenting a prescription had to initiate a conversation about price, and the pharmacy had

---

[3] And, in any event, the true-ups are not a dollar-for-dollar reconciliation to the plan's actual spend.

to confirm the availability of that price for that particular prescription at a local competitor. *See, e.g.*, App.621. Because price matching was limited to situations where those criteria were satisfied, SuperValu did not consider its sometimes-lower-matched prices to be its U&C prices. *See infra* pp.16-17. SuperValu instead believed its regular retail prices, set by its corporate pricing staff, were "usual and customary." *See, e.g.*, Rel.App.A700:2-8; A792:19-793:3; App.457:8-13; App.491:1-4.

PBMs agreed. The PBMs were aware SuperValu price matched and, like SuperValu, did not view price-matched prices as U&C prices. *See infra* p.17. From 2006 to 2016, SuperValu price matched less than 2% of prescriptions. *See* Rel.App.A302-04.

### C. Relators

The Relators are Michael Yarberry and Tracy Schutte. Before this case, Yarberry had brought several other *qui tam* lawsuits against other entities with Relators' same counsel in this action. *See* App.524:5-7. Yarberry never worked at SuperValu, but instead encouraged Schutte to apply to SuperValu "to get in the stores and see what was going on." App.509:22-510:6.

Schutte worked only four shifts at SuperValu between April and July 2011. App.510:11-16. During his first shift, Schutte began taking handwritten

notes on points related to his and Yarberry's planned lawsuit. App.518:15-21, 516:2-15. Schutte would read the notes to Yarberry over the phone. App.517:14-16. Once Yarberry prepared documents supposedly summarizing those handwritten notes, Schutte shredded some of them. App.521:7-11. Nine days after Schutte's fourth shift, Relators filed this action. App.511:1-10. Although Schutte never formally resigned from his position at SuperValu, he did not continue working there after filing the lawsuit. App.512:4-6, 513:6-8.

### D. Procedural History

Relators filed a sealed complaint on August 9, 2011, alleging that SuperValu violated the FCA and its Illinois analog by submitting U&C prices that did not account for price matching from 2006 to 2016. App.2. On May 22, 2015, the United States declined to intervene. App.48. On October 21, 2016, the district court denied SuperValu's Motion to Dismiss. App.52.

1. In 2019, the district court granted summary judgment to Relators on the issue of falsity, relying on this Court's decision in *United States ex rel. Garbe v. Kmart*, 824 F.3d 632, 645 (7th Cir. 2016). Rel.App.A7-27. *Garbe* relied on a general understanding of U&C price as the "cash price offered to the general public"—unless the parties defined the term differently. 824 F.3d at 643. Without considering the specific PBM contracts and state regulations

that control the meaning of U&C price in this case, the district court concluded that under *Garbe*'s general definition of "usual and customary," SuperValu should have submitted price-matched prices as the U&C price. Rel.App.A27. SuperValu sought interlocutory review on that issue, but the district court denied certification. App.77.

2. The district court subsequently granted SuperValu's motion for summary judgment on scienter, reasoning that SuperValu's interpretation of U&C price was objectively reasonable and therefore its submissions were not knowingly false. App.96-107. As to *Garbe*, the district court explained that because that decision post-dated the claims at issue, *Garbe* "could not have warned" SuperValu "away from the view" that its price-matched prices were not usual and customary.[4] App.96. The Court also emphasized that SuperValu "sought guidance from the Pharmacy Benefit Managers if there was a question about whether price matches would affect usual and customary price." App.106. As to state regulations, the court explained that "[t]he meaning of the usual and customary provisions of the[] state regulations [was] at least ambiguous." App.101. Thus, the district court held, "[b]efore *Garbe*,

---

[4] Before or around the time *Garbe* was decided, all SuperValu pharmacies had ended their price-matching policies. *See* App.494:10-20; App.497:19-21.

the meaning of 'usual and customary' within the pharmacy industry did not encompass individualized price-matching as defined by State Medicaid legal authorities." App.101-02.

This Court affirmed. *See United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455 (7th Cir. 2021), *vacated by* 598 U.S. 739. The Court held that SuperValu's view that price-matched prices were not usual and customary was "not inconsistent with the text of the U&C price definition" and was therefore "an objectively reasonable interpretation of U&C price." *Id.* at 469-70. The Court clarified that *Garbe* did not hold "that the meaning of U&C price is unambiguous"; instead, *Garbe* held only "that the correct interpretation of U&C price included certain discount program prices—it did not hold that this was the *only* objectively reasonable interpretation of the term." *Id.* at 470.

The Supreme Court reversed, holding that the scienter inquiry turns on the *subjective* beliefs of SuperValu. *Schutte*, 598 U.S. at 743. The Court did not review whether any of SuperValu's "claims were, in fact, inaccurate or otherwise false." *Id.* at 749. Nor did the Court resolve any "factual disputes about what [SuperValu] did or did not believe or do." *Id.* The Supreme Court remanded to the Seventh Circuit for further proceedings, and this Court

remanded to the district court. *Id.* at 758; *United States ex rel. Schutte v. SuperValu Inc.*, 2023 WL 4819720 (7th Cir. July 27, 2023).

3. On remand, both parties moved for summary judgment on scienter and materiality. App.110; App.165; App.184. The district court granted Relators' motion for summary judgment on materiality, holding that "a misstatement regarding the collection of more money than actually owed [is] sufficient to establish materiality." Rel.App.A53. The district court explained that SuperValu failed to put forth evidence that "payors knew claims submitted were false … and continued to pay the Defendants." Rel.App.A53. The court denied all the other motions. Rel.App.A53; App.255.

4. The case proceeded to trial on scienter, causation, and damages. The trial lasted fourteen days. The jury heard testimony from nineteen witnesses—including current and former SuperValu employees, PBM witnesses, Relators, and experts. The jury sent 56 notes asking questions of witnesses. Rel.App.A194-249. And the parties introduced over 300 exhibits.

SuperValu witnesses testified that SuperValu's contracts with PBMs defined the term "usual and customary." *See, e.g.*, App.400:8-14; App.451:21-452:24. Those witnesses further explained that SuperValu offered price matching as a customer-service exception pursuant to a longstanding price-

matching policy. *See, e.g.*, App.389:2-9; App.396:22-397:1; App.405:14-406:1; Rel.App.A762:7-18; App.431:3-8, 440:22-24, 443:4-22. Accordingly, SuperValu witnesses uniformly testified that they did not believe they were required to submit price-matched prices as U&C prices. *See, e.g.*, App.384:4-9; App.411:3-25; Rel.App.A690:6-12; App.424:21-425:15, 428:2-14; App.457:5-13, 459:4-22, 462:3-20, 465:18-24, 468:12-20, 470:6-12, 471:8-23, 474:20-475:3, 476:10-477:17, 480:11-14, 486:11-16; App.491:1-4; App.500:1-6.

PBM witnesses—SuperValu's contractual counterparties—agreed. They uniformly testified that PBMs were aware SuperValu price matched and, just like SuperValu, did not view price-matched prices as SuperValu's U&C prices under their contracts. App.541:11-14, 542:7-544:1, 544:12-18; App.552:12-19; App.555:5-20, 558:6-559:3; App.562:5-564:9; App.569:16-571:1; App.575:8-11. And SuperValu's expert, former CMS Acting Administrator Leslie Norwalk, testified that the industry definition of "usual and customary" between 2006 and 2016 would not "include price matches in usual and customary." Rel.App.A1009:25-1010:16.

Relators' expert, Ian Dew, testified that SuperValu submitted 17,630,692 false claims. *See* Rel.App.A919:15-17. Mr. Dew relied on two assumptions to reach that figure. First, he applied a single "matched" price

for a given drug across an entire state; and second, he applied that single "matched" price for all transactions across an entire month. *See* Rel.App.A938:9-21, A950:10-25. But Mr. Dew admitted that he was aware of no contract or regulation that defined "usual and customary" in that way. *See* Rel.App.A939:3-943:7. And Mr. Dew confirmed that he did not consider the definitions of U&C price included in SuperValu's contracts with PBMs and that he did not "try to figure out whether the numbers" in his analysis "actually matched up to what [any] contract regulation or law require[d]." Rel.App.A934:20-935:4; Rel.App.A950:10-25; App.535:20-536:2, 537:18-22. Mr. Dew admitted that, if he set aside his assumptions and instead abided by controlling contracts and regulations, his damages calculation would be reduced by "more than 99 percent." App.536:14-538:4.

In any event, Mr. Dew made clear he was "not offering any opinion about damages in this case" and had no "opinion about the connection between" what he called "discounted overpayment amounts and any actual harm to anybody." Rel.App.A933:3-15. Relators tried to fill that gap by having another expert, John Bertko, testify that, on average, seventy-two cents of every dollar a pharmacy receives for a prescription covered by a government health plan comes from the plan, not the patient. But Mr. Bertko admitted that neither

he nor Mr. Dew performed any analysis to determine whether Medicare Part D's payments to Part D plan sponsors on a capitated basis actually went up as a result of SuperValu's alleged overcharges. Rel.App.A744:16-745:16. Mr. Bertko confirmed that the same was true of FEHB programs—neither expert analyzed the effect of any alleged overcharge on government payments. Rel.App.A745:15-746:15.

The court instructed the jury that, to establish liability on their FCA claim, Relators had to prove by a preponderance of the evidence that "false or fraudulent claims caused the federal government to suffer damages." Rel.App.A179. Further, if the jury "decide[d] for defendants on the question of liability," they "should not consider the question of damages." Rel.App.A176. The verdict form did not require the jury to specify the total number of false claims submitted or determine the amount of damages if it did not first find that Relators proved SuperValu both submitted false claims *knowingly* and that it *caused* the government at least some harm. Rel.App.A153.

The jury returned a verdict for SuperValu. In response to the specific questions on the verdict form, the jury answered that SuperValu knowingly submitted false claims but did not cause the United States or Illinois any

injury. Rel.App.A153. The jury therefore did not determine the number of false claims submitted or an amount of damages. The district court entered judgment for SuperValu. App.305-06.

5. Both parties submitted post-trial briefing. Relators, who had not moved for judgment as a matter of law pursuant to Rule 50(a) at trial, and therefore could not move post-trial under Rule 50(b), moved under Rule 59 to amend the judgment and for a new trial on damages. App.307-57. Relators argued the verdict form and jury instructions were defective because they did not require the jury to find a number of false claims after finding no liability. App.310-19. Relators requested that the district court amend the judgment to reflect the number of false claims that Relators' expert put forth because Relators proved that Defendants knowingly presented false claims for reimbursement, and causation is not an element of liability for civil penalties. App.319-27. SuperValu moved for judgment as a matter of law on scienter. App.358-68. The district court denied both motions.

Relators appealed. SuperValu filed this cross-appeal to challenge the district court's grants of summary judgment to Relators on falsity and materiality, if the Court agrees with Relators on the merits of their appeal.

## SUMMARY OF ARGUMENT

I. The district court correctly instructed the jury that causation is an element of an FCA claim.

A. This Court has made clear, in a series of published decisions, that causation is an element of liability. *See United States ex rel. Calderon v. Carrington Mortg. Servs., LLC*, 70 F.4th 968 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 331 (2023); *United States v. Molina Healthcare, Inc.*, 17 F.4th 732 (7th Cir. 2021), *cert. denied*, 143 S. Ct. 352; *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017). Those decisions comport with the FCA's text, which identifies "damages" as an "essential element[]" of an FCA claim. 31 U.S.C. § 3731(d). And they are consistent with common-law principles requiring a showing of damages for the tort of deceit, the FCA's common-law analogue. Relators ignore the FCA's "essential element" language. And the authorities they cite do not address whether causation is an element of an FCA claim, come from outside of this Circuit, or both.

B. Relators' request for judgment as a matter of law and tens of billions of dollars in penalties based on supposedly undisputed false claims is a non-starter. Relators never sought judgment as a matter of law under Rule 50 below, so they cannot do so now on appeal. And, in any event, the record

comfortably supports a finding that Relators failed to prove the number of claims. Relators' only evidence on the number of claims came from its expert, Ian Dew. But, as SuperValu established, Mr. Dew's methodology relied on obviously flawed assumptions about the relevant time and geography for calculating U&C prices. The jury was entitled to disregard Mr. Dew's evidence, leaving Relators with no proof of how many claims were submitted.

II. Relators' request for a new trial on damages also fails.

A. Relators contend that the Court should grant a new trial on damages because the jury's no-injury verdict was against the weight of the evidence. But Relators preserved that argument only for claims submitted to Illinois Medicaid. And, again, Relators' only evidence about the number of Illinois Medicaid claims and the amount of payments associated with them was Mr. Dew's analysis—which the jury had every right and reason to disregard.

B. Relators argue the district court should have instructed the jury that damages need not be calculated with absolute certainty. But the district court's instruction that the jury should determine the amount of damages to the best of its ability both accurately reflected this Court's precedent and conveyed Relators' message. And, regardless, any instructional error

pertaining to the amount of damages was harmless because the jury found for SuperValu on the element of causation.

C. Relators also insist the district court should have told the jury not only that falsity was not for it to decide, but also that falsity had already been decided against SuperValu by the Court. The district court's falsity instruction was accurate, adequate, and avoided the prejudice inherent in discussing a prior ruling during trial. And regardless, Relators repeatedly—and improperly—informed the jury during trial that falsity had previously been decided in their favor by "a judge."

D. Finally, Relators claim the district court should have read the jury their cherry-picked excerpts from the court's decision granting summary judgment to Relators on the issue of falsity. Any such instruction would have been highly improper and unfairly prejudicial to SuperValu—reversible error in its own right.

III. The Court may also affirm on the alternative ground that the district court should have granted summary judgment to SuperValu on the element of materiality, as explained below in SuperValu's cross-appeal.

IV. In the event of any reversal and remand for a new trial, the retrial should include all issues, including scienter.

## ARGUMENT

### I. SuperValu Is Not Liable Under the FCA Because It Caused No Injury.

Relators challenge the district court's instruction that causation is an element of liability under the FCA. That challenge fails. The Court reviews jury instructions "with deference, analyzing them as a whole to determine if they accurately state the law and do not confuse the jury." *Cruz v. Safford*, 579 F.3d 840, 843 (7th Cir. 2009) (quotation omitted). The district court's instructions comfortably pass muster under that standard. This Court's precedents and the plain text of the FCA both make clear that causation is an "essential element[]" of an FCA claim. 31 U.S.C. § 3731(d). Because the jury specifically found Relators did not establish that element, Relators did not prove their FCA claims and the district court correctly denied their post-trial motions for a new trial and an amended judgment.

Relators' further request that the Court enter judgment *in their favor*, direct the district court to impose penalties for more than a million claims, and direct the district court (not the jury) to determine which other claims were false is baseless. Relators did not preserve their request for judgment as a matter of law below. And it is fatally flawed on the merits because the number

of claims is a jury issue and the evidence on the number of claims was hotly contested.

### A. Causation Is an Element of Liability Under the FCA.

1. This Court has repeatedly held that causation is an element of FCA liability. *Calderon* held that a relator must "ultimately prove *four elements*," including that "*the false statement caused the government's loss* (*causation*)." 70 F.4th at 973 (emphasis added). Likewise, *Molina Healthcare* emphasized that "causation … too is an element of an FCA claim." 17 F.4th at 745 (citing *Luce*, 873 F.3d at 1012). And in *Luce*, the Court held for "the imposition *of liability and damages* under the FCA," "proximate[] causation" is required. 873 F.3d at 1014 (emphasis added); *accord* John T. Boese & Douglas W. Baruch, *Civil False Claims and Qui Tam Actions* § 2.05 (5th ed., 2025-1 Supp. 2020) (explaining that "causation clearly is an element of FCA *liability* and damages" (emphasis added)).

The rule these cases establish is not mere dicta. In *Calderon*, the district court had granted summary judgment on liability because the plaintiff could not show defendant's false representations "caused HUD to suffer a monetary loss." 70 F.4th at 971. This Court agreed, affirming the grant of summary judgment to the defendant on that basis. *Id.* at 971, 980-81. Similarly, in

*Molina*, this Court considered whether a *qui tam* complaint could survive a motion to dismiss. A failure to plead any one element would be dispositive. In that context, the Court held that the plaintiff had pled "causation"—"an element of an FCA claim"—because he alleged that the defendant submitted "enrollment forms requesting payment for services Molina could not provide." 17 F.4th at 745. The Court's ruling on the required element of causation was necessary to the outcome in both cases. This binding precedent should be the start and the end of this Court's inquiry. *See McClain v. Retail Food Emps. Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005).

2. But were the Court to consider on a blank slate whether causation is an element of an FCA claim, its prior conclusions are correct.

Start with the language of the statute. Section 3731(d) provides that, in any action brought under section 3730, the "United States shall be required to prove all *essential elements* of the cause of action, *including damages*, by a preponderance of the evidence." 31 U.S.C. § 3731(d) (emphases added). An "essential element" is a "constituent part of a claim that must be proved for the claim to succeed." *Element*, *Black's Law Dictionary* (12th ed. 2024). Thus, when a party "has failed to make a sufficient showing on an essential element," the opposing party "is entitled to a judgment" in its favor. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986) (quotation omitted); *see also Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265 (7th Cir. 1996).

Precisely so here. Under the plain text of the FCA, evidence that the defendant caused the government some damages is an "essential element[]." 31 U.S.C. § 3731(d). It "must be proved for the claim to succeed." *Element*, *Black's Law Dictionary* (12th ed. 2024); *see Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (explaining that when the text is clear, that is where "the inquiry should end" (quotation omitted)).

The FCA's common-law background confirms that straightforward interpretation. The FCA "point[s] directly to the common-law meaning of fraud," *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2016) (quotation omitted), so courts "presume that Congress retained … elements of common-law fraud that are consistent with the statutory text," *Escobar*, 579 U.S. at 187 n.2. To analyze the FCA, the Supreme Court looks to the common law tort of deceit. *Schutte*, 598 U.S. at 750-51 (citing Restatement (Second) of Torts § 526 (1976)); *Escobar*, 579 U.S. at 190 n.4 (citing Restatement (Second) of Torts § 529 (1976)). And, as the Supreme Court recently explained: "To have a complete cause of action" for the tort of deceit, "the plaintiff must have 'suffered substantial damage'; in other words,

economic loss" caused by the defendant's act of deception. *Kousisis v. United States*, 605 U.S. 114, 128 (2025) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* § 110, at 765 (5th ed. 1984)). Congress explicitly codified that causation requirement by making damages an "essential element[]" of a "cause of action" under the FCA. 31 U.S.C. § 3731(d).

That causation is an element of an FCA claim is also consistent with the "elementary rule" that courts should construe statutes to avoid constitutional concerns. *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). Imposing steep penalties absent damages would create Eighth Amendment Excessive Fines Clause concerns. *See United States v. Bajakajian*, 524 U.S. 321, 336-37 (1998); *Grant ex rel. United States v. Zorn*, 107 F.4th 782, 797-98 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2816 (2025); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021). This case proves the point: had the district court granted Relators' post-trial motion and imposed penalties for 17,630,692 claims, the minimum statutory penalty—at $5,000 a claim, without even adjusting for inflation—would have been $88,153,460,000 (over 88 billion dollars), despite an express jury finding

that Defendants caused *zero* damages. That would be unconstitutional by any measure. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425-26 (2003).

3. Relators ignore section 3731(d), the common-law background of the FCA, and the plainly unconstitutional (not to mention absurd) results of their interpretation. They emphasize instead (at 53-54) that Congress subjected defendants who violate the FCA to civil penalties, "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). That argument conflates the *existence* of damages with the *quantum* of damages. Section 3731(d) makes clear that the existence of damages is an "essential element" of an FCA claim. Section 3729(a)(1) addresses the specific "amount of damages" available to a successful FCA plaintiff. Whether damages exist and how much plaintiffs can recover are separate issues.

The structure of the statute confirms that interpretation. The Court's "duty … is 'to construe statutes, not isolated provisions.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)). SuperValu's interpretation of the FCA harmonizes sections 3729(a)(1) and 3731(d).

Relators' interpretation reads the "essential element" language out of the statute. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quotation omitted)).

Relators' reliance on legislative history is similarly flawed. "[L]egislative history can never defeat unambiguous statutory text." *United States v. Chaoqun*, 107 F.4th 715, 726 (7th Cir. 2024) (quoting *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020)), *cert. denied*, 145 S. Ct. 551 (2024). And, in any event, the 1986 Senate Report Relators cite (at 54-55 (citing S. Rep. No. 99-345 (1986))) does not support their position. The language Relators cite, from the "History of the False Claims Act and Court Interpretations," does not explain the language of section 3731(d). S. Rep. No. 99-345, at 8. It notes that some courts had previously allowed penalties without proof of damages. *Id.* Even if legislative history were relevant—and, given the plain language of the statute, it is not—the Report's high-level description of prior rulings does not suggest that Congress meant something

other than what it said in section 3731(d). *See Bostock*, 590 U.S. at 674; *Chaoqun*, 107 F.4th at 726.

4. Relators' responses to this Circuit's binding authority, and their reliance on out-of-circuit cases, are unpersuasive.

a. Relators (at 53 (quoting *Calderon*, 70 F.4th at 978)) first insist that this Court's most recent decision, "[left] for another day" "the possibility of [an FCA] claim limited to civil penalties." But Relators ignore this Court's published decisions in *Molina* and *Luce*, which define causation as an element of FCA liability. And Relators ignore *Calderon*'s ultimate holding: that the district court properly granted summary judgment because the relator failed to establish causation. 70 F.4th at 980-81. *Calderon*, *Molina*, and *Luce* firmly establish that causation is an element of an FCA claim.

Relators next suggest (at 56-57) that the district court was "confus[ed]" by "slippery nomenclature" because a defendant may be liable for "caus[ing]" the submission of a false claim under the FCA under section 3729(a)(1)(A), and is liable for "3 times the amount of damages which the Government sustains because of the act of that person," 31 U.S.C. § 3729(a)(1).

But those species of causation are not what *Calderon* discussed when it concluded that a relator must prove "the false statement caused the

government's loss" in a reasonably foreseeable way. 70 F.4th at 973. Nor was the district court confused. The district court acknowledged that *Calderon* "discussed … at length" the distinction championed by Relators "between liability for the purpose of civil penalties versus liability for the purpose of actual damages" and concluded this Court had declined to adopt it. Rel.App.A259-61. Relying on *Calderon* and *Molina*, the district court appropriately determined that Relators had to prove that the defendants caused some loss to the government. Rel.App.A261-62.

Finally, Relators point to *United States v. Hughes*, 585 F.2d 284 (7th Cir. 1978), and *United States ex rel. Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005). Neither changes the analysis. In *Hughes*, Relators focus on a footnote: "A false claim is actionable under the Act even though the United States has suffered no measurable damages from the claim." 585 F.2d at 286 n.1. But *Hughes* involved an earlier version of the FCA, which did not include section 3731(d). *See* Pub. L. No. 99-562, § 5, 100 Stat. 3153, 3158 (1986) (adding § 3731(d)). The Court provided no reasoning for its assertion, simply citing out-of-circuit cases from the 1950s and 1960s. *Hughes*, 585 F.2d at 286 n.1. And the *Hughes* footnote was dicta. The question in *Hughes* was whether to impose penalties when a jury concluded defendants caused *some* harm but

the government did not quantify how much. This case presents a fundamentally different scenario: a jury finding that the plaintiff established no harm at all.

*Main* is inapposite for the same reason. The issue there, as in *Hughes*, was whether penalties are recoverable even if "actual loss is hard to quantify." 426 F.3d at 917. This Court explained that the relator adequately alleged the existence of *some harm*—which was enough for the complaint to survive a motion to dismiss. Like *Hughes*, *Main* merely suggests that statutory penalties may still be recoverable if the precise amount of damages is hard to quantify. Neither case addresses the question presented here.[5]

b. Relators' reliance on out-of-circuit precedent does not change the outcome. At the threshold, out-of-circuit authority is beside the point when this Court has already spoken to an issue. *See Lange v. City of Oconto*, 28 F.4th 825, 847-48 (7th Cir. 2022).

In any event, Relators' out-of-circuit cases either do not address the question presented, do not address the plain language of the FCA, or both.

---

[5] Relators cite in a footnote (at 52 n.5) several district court cases from this Circuit. Not one was decided after *Calderon*, or squarely rejects the argument that causation is required for liability.

For example, in *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390 (4th Cir. 2013), the Fourth Circuit considered whether imposing millions of dollars of statutory penalties is constitutionally permissible when the relator did not seek or prove damages. *Id.* at 409, 411. No party raised, and the Court did not address, the antecedent question whether penalties are available under the FCA when the government suffered no harm at all. *See id.* And the Court in *United States v. Killough*, 848 F.2d 1523 (11th Cir. 1988), merely indicated that penalties were available even if damages were not proven precisely. *Id.* at 1533-34. Again, the Court did not discuss a scenario, like this one, where a jury finds the defendant caused no injury at all.

Of the cases that do consider the issue before this Court, none of their reasoning is persuasive because they do not address the text of section 3731(d).[6] *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), stated that the FCA "lacks the elements of reliance and damages." *Id.* at 189. But *Grubbs* did not acknowledge that the FCA characterizes damages as an "essential element[]" of the cause of action, 31 U.S.C. § 3731(d),

[6] The Third Circuit decided *United States v. Tieger*, 234 F.2d 589 (3d Cir. 1956), before Congress added § 3731(d) to the FCA.

consistent with settled common-law precedent. *See supra* Part I.A.2-3. Nor did the parties brief the issue: The Fifth Circuit's comment was an aside as it considered whether the relator's complaint satisfied the particularity requirement of Federal Rule of Civil Procedure 9(b). *Varljen v. Cleveland Gear Co.*, 250 F.3d 426 (6th Cir. 2001), relies on a misreading of Senate Report No. 99-345 discussed above, *see supra* pp.30-31, and ignores the statutory text and common law history. *Id.* at 430-31. And *United States v. Science Applications International Corp.*, 626 F.3d 1257, 1277 (D.C. Cir. 2010), *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1371 (Fed. Cir. 1998), and *United States v. Tieger*, 234 F.2d 589, 590 n.4 (3d Cir. 1956), have no reasoning at all.[7]

Relators' out-of-circuit authorities, at most, show that the law in other circuits is confused. But this Court's cases are clear: causation of loss is an element of FCA liability. The judgment should be affirmed.

[7] *Hendrix ex rel. United States v. J-M Manufacturing Co.*, 76 F.4th 1164 (9th Cir. 2023), cites § 3731(d) in a section separate from the footnote Relators cite. *See id.* at 1174; Rels.' Br. 55 (citing *Hendrix*, 76 F.4th at 1173 n.5). The footnote cited by Relators makes no reference to § 3731(d) at all and offers no reasoning for its conclusion, aside from citations to earlier Ninth Circuit cases and a Supreme Court case about a statute other than the FCA.

### B. Relators Cannot Obtain Judgment as a Matter of Law.

Although the jury never determined the number of false claims, Relators (at 57-61) ask the Court (1) to enter judgment in their favor, (2) to instruct the district court to award a civil penalty for 1,297,037 claims submitted to Illinois Medicaid, and (3) to instruct the district court (not a jury) to decide how many claims were submitted to Medicare, FEHB, and TRICARE. Even were Relators correct that they did not need to prove causation to establish liability, their requested remedy is procedurally and substantively improper.

*First*, procedure. Relators do not seek vacatur and remand for a new trial. Instead, they ask this Court to enter judgment in their favor and remand for the district court to impose penalties. But Relators did not seek judgment as a matter of law under Rule 50 at any point. They may not do so now. *See Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 804 (7th Cir. 2016). For that reason alone, Relators' requested remedy fails.

*Second*, and even setting aside that dispositive flaw, Relators' requested remedy is unwarranted. To start, Relators suggest (at 59) that the district court could impose penalties based on "unrebutted evidence (Mr. Dew's testimony) that defendants presented 1,297,037 false claims to Illinois

Medicaid." But SuperValu contested Mr. Dew's testimony sharply. For example, SuperValu established on cross-examination that Mr. Dew's methodology for measuring the number of supposedly false claims was fundamentally unreliable. *See* Rel.App.A934:24-935:4; App.537:13-538:4. That is because Mr. Dew, adopting definitions provided by Relators' counsel, calculated the U&C prices he claimed SuperValu should have charged on a statewide (not store-by-store) basis, and applied those prices across an entire month (not day-by-day). Rel.App.A937:17-20, A939:3-6. There was no basis in the parties' agreements or industry practice for Mr. Dew's statewide, month-long approach. Rel.App.A939:7-940:17, A942:19-944:3; App.529:6-536:2. The jury had ample basis to discredit Mr. Dew's testimony based on that gaping methodological flaw—just as it discredited his and Mr. Bertko's testimony in finding that SuperValu did not cause any loss. *See United States v. Brown*, 911 F.2d 736 (7th Cir. 1990) (unpublished table decision), 1990 WL 116864, *1 ("The jury's credibility determinations and its decision to credit some testimony and to discredit other testimony was well within its province and cannot be disturbed on appeal.").

*Third*, if the number of false claims is an issue at all (and it is not, because of the jury's causation finding), it is an issue for the jury, not the Court.

Relators repeatedly acknowledged that the jury should be "task[ed] … with determining … the number of false claims." Rel.App.A100-01; App.311-12. Courts consistently agree. *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 2007 WL 851868, *2 (D.D.C. Mar. 14, 2007); *United States ex rel. Laymon v. Bombardier Transp. (Holdings) USA, Inc.*, 656 F. Supp. 2d 540, 547 (W.D. Pa. 2009) ("The jury's role in this case will be to determine the number of violations."); *see also United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 404-05 (4th Cir. 2012). That only makes sense: each false claim is a separate statutory violation. If the Court believes further proceedings are necessary—and they are not—the proper procedure would be to vacate and remand for a new trial.

## II. Relators Are Not Entitled to a New Trial on Damages.

Relators argue that the Court should order a new trial on damages because the jury's no-harm finding was against the weight of the evidence and the district court made instructional errors. Here too, Relators' arguments do not pass muster. The jury's verdict was completely consistent with the evidence. And the district court's jury instructions correctly reflected the law and avoided imposing unfair prejudice on SuperValu. The Court should reject Relators' new-trial arguments and affirm the verdict below.

### A. The Jury's Verdict Did Not "Shock the Conscience."

Relators (at 61-63) argue that the Court should set aside the jury's "finding that plaintiffs failed to prove damages" because it was "against the weight of the evidence." Relators do not cite a single case to support that argument. And the argument clearly fails.

To start, Relators' Rule 59(a) motion only challenged the weight of the evidence supporting the jury's determination that SuperValu's submission of claims to *Illinois Medicaid* caused no harm. App.339-40. Relators therefore waived any claim that the weight of the evidence did not support a finding of no damages with respect to the *other government healthcare programs* at issue. *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012). The most they could seek is a new trial limited to Illinois Medicaid.

That lone preserved weight-of-the-evidence argument fails. For the district court to grant a new trial under Rule 59(a), the jury's Illinois Medicaid causation verdict must have been so "contrary to the manifest weight of the evidence" that "no rational jury could have rendered the verdict." *Id.* (quotation omitted). And the Court reviews the district court's ruling on a Rule 59(a) motion for abuse of discretion. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). This Court's review, in other words, is doubly

deferential. The Court "will not set aside [the Illinois Medicaid causation] verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to [SuperValu], and leaving issues of credibility and weight of evidence to the jury." *Id.* The verdict must "shock[] [the Court's] conscience." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (quotation omitted).

Relators come nowhere close to carrying that heavy burden. Relators (at 63) assert that "all of the money paid by Illinois Medicaid came from the federal government and the state—with no intervening plan sponsor or PBM." Thus, Relators continue, the federal and state governments must have "suffered damages in the amount of the overpayment."

But the record reflected that state Medicaid programs, as a general matter, "use commercially available [PBMs] to manage benefits. App.392:25-393:5 (Dimos); *see also* Rel.App.A974:1-3 (Compton) (explaining that PBM Express Scripts "administer[s] prescription benefits for some state Medicaid programs"). Relators' counsel even told the jury in his opening statement that the "Medicaid" dollars at issue went "through … the [PBMs] down to SuperValu." App.371:16-19. Relators' only evidence that Illinois operated differently was testimony by its expert, Kenneth Schafermeyer, that

pharmacies submitted claims directly to Illinois Medicaid. Rel.App.A598:25-599:7. But Schafermeyer never testified that, in fact, Illinois Medicaid reimbursed SuperValu dollar-for-dollar for every claim SuperValu submitted from 2006 to 2016. *See* Rel.App.A598:25-599:7. And John Bertko, the expert Relators tasked with addressing the expenditure of government funds, was silent on Illinois Medicaid's funding streams. Rel.App.A726:9-727:5.

Even if Relators established that Illinois Medicaid paid for every claim SuperValu submitted, the jury still had ample basis to find that Relators proved no harm. That is because Relators' only evidence of the amount Illinois Medicaid paid, and on how many claims, came from Mr. Dew. But like all of his testimony, Mr. Dew's testimony about Illinois Medicaid relied on his fundamentally flawed assumptions about the geographic and temporal scope of U&C prices. *See supra* pp.36-37; Rel.App.A940:2-11. The jury, therefore, had ample reason to discredit Mr. Dew's Illinois Medicaid analysis in its entirety—leaving Relators with *zero* evidence of which claims had incorrect U&C prices and were, therefore, false. *See United States v. Griffin*, 84 F.3d 912, 927 (7th Cir. 1996) ("It is for the jury—not the court of appeals—to judge the credibility of witnesses."). Because a rational jury could comfortably have disbelieved Mr. Dew, *Kapelanski*, 390 F.3d at 530, the record supports a

finding of no damages as to all of the claims at issue, including claims submitted to Illinois Medicaid.

### B. The District Court Correctly Instructed the Jury.

Relators (at 61-70) also claim the Court should grant a new trial based on supposed instructional errors. This Court reviews challenges to jury instructions "with deference, analyzing them as a whole to determine if they accurately state the law and do not confuse the jury." *Cruz*, 579 F.3d at 843 (quotation omitted). Instructional error warrants a new trial only if Relators establish that "the instructions in their entirety so thoroughly misled the jury that they prejudiced [Relators]." *Clarett*, 657 F.3d at 672.

Relators come nowhere close to making that showing. The district court's instructions were correct, not misleading, and Relators cannot begin to establish prejudice. The Court should affirm.

#### *a. The Damages Instruction Was Correct.*

If the jury found liability (it did not), the Court instructed the jury to determine the amount of damages "to the best of [its] ability … based on evidence and not speculation or guesswork." Rel.App.A185.

Relators' challenge to this instruction is moot because the jury never had occasion to consider the amount of damages; it decided there was no proof of causation of any damages. Because the jury "had no occasion to consider

damages," *Burford v. Acct. Prac. Sales, Inc.*, 2016 WL 1086660, *4 (S.D. Ill. Mar. 21, 2016), *aff'd*, 851 F.3d 641 (7th Cir. 2017), "any evidentiary or jury instruction error relating to damages was harmless and would not justify a new trial." *Id.*

In any event, the challenged instruction was entirely correct under the settled law of this Circuit, *see Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 879 (7th Cir. 1970) ("Damages may not be awarded on the basis of mere conjecture or speculation."), and of other courts across the Nation, *see, e.g.*, *Hendrix ex rel. United States v. J-M Mfg. Co.*, 76 F.4th 1164, 1175 (9th Cir. 2023) (similar).

Relators (at 29, 64-66) nevertheless argue the district court should have instructed that damages "may be fixed by a just and reasonable estimate" and need not be calculated "with mathematical precision or absolute certainty." *See* Rel.App.A67-68. That principle ordinarily comes into play when "defendants' misconduct prevented the plaintiffs from calculating damages accurately." *BCS Servs., Inc. v. BG Invs., Inc.*, 728 F.3d 633, 639 (7th Cir. 2013). In that scenario, "damages can be estimated by methods that would be deemed impermissibly speculative in other contexts." *Id.* at 639-40. Relators have not argued, and cannot argue, that this is such a case. But, even assuming

Relators' proposed language applied, the district court's instruction conveyed the same concept. The district court told the jury to determine damages "to the best of your ability," and emphasized that Relators must prove damages "by a preponderance of the evidence, that is, what is more likely true than not." Rel.App.A185, A188. Considered "as a whole," those instructions conveyed the concept that the jury did not need to determine the amount of damages, if any, with absolute certainty. *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 433 (7th Cir. 2009).

***b. The Falsity Instruction Was Correct.***

After the district court explained Relators' burden regarding scienter and causation, it told the jury: "Whether the claims were false or fraudulent is not for you to decide." Rel.App.A179, A183; *see* App.422:14-16. That instruction accurately stated the law of the case because falsity had been decided. And it appropriately "direct[ed]" the jury toward "the legal and factual issues involved"—namely, scienter and causation. 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2556 (3d ed. 2025).

Relators (at 69-70) respond that the district court should have told the jury that "the court" found SuperValu's claims false. Such an instruction

would have been both unnecessary and improper. "The jury can be instructed"—as it was here—"that it must accept certain facts … without being told why [it] must do so." *Beech Acceptance Corp. v. Connell*, 1990 WL 171000, *2 (D. Kan. Oct. 31, 1990). Whether *the court* had decided falsity was irrelevant to the jury's determination of scienter or causation. *Cf. id.* at *1-2; *Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1127 (11th Cir. 1993) ("The district court should not give an instruction which deals with an issue that is not properly before the jury.").

The only effect of telling the jury that "the court" had decided falsity, rather than using the more neutral formula the district court adopted, would have been unfair prejudice to SuperValu. As this Circuit and others have recognized, "[j]uries are likely to give disproportionate weight to [prior judgments] because of the imprimatur that has been stamped upon them by the judicial system." *Herrick v. Garvey*, 298 F.3d 1184, 1192 (10th Cir. 2002); *accord Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567 (7th Cir. 1987); *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993). Courts therefore routinely prohibit any mention of prior rulings at trial—even by parties to the case. *E.g.*, *Century Wrecker Corp. v. E.R. Buske Mfg. Co.*, 898 F. Supp. 1344, 1345 (N.D. Iowa 1995) ("[T]he prejudicial value of the court's prior ruling upon the jury's

decisions on the remaining issues is excessive."); *Hairston v. Wash. Metro. Area Transit Auth.*, 1997 WL 411946, *2 (D.D.C. Apr. 10, 1997); *Clipco, Ltd. v. Ignite Design, LLC*, 2005 WL 2861032, *2 (N.D. Ill. Oct. 28, 2005); *SEC v. Retail Pro, Inc.*, 2011 WL 589828, *4 (S.D. Cal. Feb. 10, 2011); *Beech Acceptance*, 1990 WL 171000, *2; *Mlsna v. Union Pac. R.R. Co.*, 2021 WL 2461733, *9 (W.D. Wis. June 16, 2021).

A jury instruction highlighting a prior adverse ruling by the very court overseeing the trial would have been even more prejudicial, as it would have suggested that the presiding judge agreed with Relators' position. The district court avoided that unfair prejudice by instructing the jury that falsity "is not for you to decide." Rel.App.A179, A183; App.422:14-16.

And in any event, as with the district court's damages instruction, any error in the falsity instruction was harmless. Relators themselves told the jury (over and over) about the district court's falsity ruling—in violation of the district court's pre-trial *in limine* ruling—including by saying that falsity had "been decided in this case" by "a judge." *See* Rel.App.A270-71; App.374:22-375:5; App.414:20-22; App.417:13-20; App.436:11-437:10; App.503:20-504:15; App.547:9-19; App.572:4-10; App.607:6-24; App.612:2-613:25; App.618:23-24. Having "put the issue before the jury anyway," Relators "can hardly claim to

have been harmed by the district court's [instructional] ruling." *Clarett*, 657 F.3d at 672.

#### *c. The Decision Not to Instruct on the Meaning of "Usual and Customary" Was Correct.*

Relators requested a preliminary instruction (a) informing the jury that "I found that the Defendants' electronic claims for prescription payments were false claims under the False Claims Act," and (b) quoting eight sentences from the district court's opinion explaining the summary-judgment ruling's rationale. App.262-64. Relators also requested mid- and post-trial instructions consisting of six sentences from the summary-judgment ruling defining the phrase "usual and customary," and stating explicitly that price-matched prices were U&C prices. App.291-92; App.300-01; Rel.App.A123. In other words, Relators wanted the court to read the jury fourteen sentences of factual and legal findings cherry-picked from an opinion that resolved an FCA element that was not before the jury.

The district court correctly rejected Relators' proffered instructions. This Court reviews the refusal to give an instruction for abuse of discretion. *United States v. Villegas*, 655 F.3d 662, 669-70 (7th Cir. 2011). Relators come nowhere close to meeting that demanding standard. Quite the contrary: giving

Relators' instructions would have been improper, enormously prejudicial, and, indeed, reversible error.

Again, juries are "apt to give exaggerated weight" to prior judicial decisions, risking unfair prejudice. *Greycas*, 826 F.2d at 1567; *supra* pp.45-46. That prejudice would be amplified exponentially if the court "*explain[ed]* [its] … earlier orders and rationale to the jury." *Beech Acceptance*, 1990 WL 171000, *2 (emphasis added). The district court correctly avoided that prejudice by focusing the jury on the FCA elements it needed to decide.

Neither case Relators (at 67-68) rely on is persuasive. In *Schmitz v. Canadian Pacific Railway Co.*, 454 F.3d 678 (7th Cir. 2006), the district failed to instruct the jury about a *federal law* governing an issue that was "up to the jury to decide," *id.* at 684. This Court ordered a new trial because a violation of that law would *per se* satisfy the "breach" and "duty" elements of the plaintiff's claim. *Id.* at 683-84. *Schmitz* does not resemble this case. Relators sought to tell the jury about a *judicial opinion* resolving an issue that was "not for [it] to decide," Rel.App.A179, A183.

*Guzman v. City of Chicago*, 689 F.3d 740 (7th Cir. 2012), is similarly inapt. In *Guzman*, this Court ordered a new trial after the district court instructed the jury on liability and admitted liability-specific evidence during

a damages-only trial. *Id.* at 745. But this trial *did* involve liability, and the district court carefully directed the jury's attention to the only remaining elements—scienter and causation. *See* Rel.App.A179, A183.

In any event, Relators cannot establish prejudice. Relators (at 26, 68) claim that SuperValu was able to relitigate the "usual and customary" definition "under the guise of disputing their scienter." But the jury ultimately *agreed* with Relators that SuperValu "knowingly presented … false or fraudulent claims." Rel.App.A153-54. Having prevailed on the element of scienter, Relators cannot complain that the jury was confused about the definition of "usual and customary." *Compare* Rel.App.A266-69 & n.7, *with* Rels.' Br. 26; *see Alloy Int'l Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222, 1228 (7th Cir. 1980).

Relators (at 66-69) also assert that SuperValu leveraged the jury's ignorance of the falsity opinion to ask Relators' expert, Mr. Dew, unfair cross-examination questions. Specifically, Relators (at 26-27) say Dew calculated "overpayments" using the falsity opinion's definition of "usual and customary," yet SuperValu's counsel "insinuated that plaintiffs' counsel had simply made up the definition." Relators' evidence of prejudice is several juror questions. Rels.' Br. 27-28, 68-69.

But jurors asked those questions *during Relator's counsel's direct examination*, before SuperValu's lawyer had asked a single question. *Compare* Rels.' Br. 28, 68 (quoting Jury Questions 29 and 33),[8] *with* Rel.App.A922:5-924:2 (trial judge noting that it received Jury Questions 28 to 33 before continuing with Dew's direct examination). The jury's questions reflect skepticism about the rigor of Dew's analysis—nothing more. And, as explained above, the jury was right to be skeptical of Mr. Dew's gerrymandered analysis. *See supra* pp.36-37, 41-42.

* * *

The evidence at trial more than amply justified the jury's verdict. *Kapelanski*, 390 F.3d at 530. The district court's instructions "accurately state the law." *Cruz*, 579 F. 3d at 843. And the district court acted well within its "discretion" by declining to read Relators' cherry-picked excerpts of the falsity opinion to the jury. *Villegas*, 655 F.3d at 669. The Court should reject Relators' request for a new trial.

---

[8] Relators also say (at 68) jurors "asked whether the expert was calculating overpayments 'in the real world' or just 'based on parameters from relators' counsel." SuperValu's counsel—not the jury—asked those questions. *See* Rel.App.A935:22-24, A936:13-17.

## III. The District Court Should Have Awarded Summary Judgment to SuperValu on Materiality.

As discussed in more detail, *infra* Cross-Appeal Part II, the judgment should be affirmed on the alternative ground that Relators could not prove the element of materiality as a matter of law.

## IV. A Partial Retrial Would Be Unjust.

If the Court orders a retrial to determine the number of false claims or damages, that retrial should include the question of scienter. A partial retrial is appropriate only when "the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931). But here, "the question of damages is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter." *Cont'l Cas. Co. v. Howard*, 775 F.2d 876, 883 (7th Cir. 1985) (quotation omitted).

SuperValu was accused of a scheme to use price matching to overcharge the government. The jury's consideration of SuperValu's intent was entwined with the question whether the government in fact was overcharged. It is impossible to know how the jury would have decided the element of scienter if it had known that by doing so it would be imposing liability on SuperValu instead of rendering a verdict in SuperValu's favor as it did. *Cf. F.E.L.*

*Publ'ns, Ltd. v. Cath. Bishop of Chi.*, 1987 WL 15409, *4-5 (N.D. Ill. Aug. 3, 1987) (holding that "because it was impossible to tell from the general verdict why the jury" ruled the way it did, liability and damages were not "so distinct and separate … that trial of [one] alone may be had without injustice" (quotation omitted)).

Additionally, a jury could not determine the number of false claims without also considering scienter. That is because each false claim is a separate statutory violation, and SuperValu can be held liable for submitting each claim only if it did so knowingly. As Relators (at 60) acknowledge, however, the jury never specified *how many* claims were submitted knowingly—only that "*some* of them were." *See* Rel.App.A153. The verdict on scienter, in other words, could encompass as few as one claim or as many as all claims; we simply do not know the scope of the scienter finding from the verdict form. Thus, to determine the number of false claims, a jury must also consider the scope of SuperValu's scienter. Otherwise, "a partial trial on the issue of damages would amount to a denial of a fair trial." *Howard*, 775 F.2d at 883.

## STATEMENT OF THE ISSUES ON CROSS-APPEAL

1. Whether the district court erred in granting summary judgment to Relators on falsity without considering the meaning of "usual and customary" under the applicable contracts and regulations.

2. Whether the district court erred in granting summary judgment to Relators on materiality by adopting a categorical rule that money is *per se* material, applying the wrong legal standard, and shifting the burden of proof to Defendants.

## SUMMARY OF THE ARGUMENT ON CROSS-APPEAL

If this Court reverses on any of the grounds raised by Relators, it should also reverse the district court's erroneous decisions to grant summary judgment to Relators on falsity and materiality.

I. In determining whether SuperValu's reported U&C prices were false, the district court should have evaluated the contracts and regulations that set the terms for SuperValu's submissions of claims to government healthcare programs. The district court ignored those agreements and regulations completely, instead applying a definition of U&C price based on *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016).

That was error. *Garbe* did not establish and could not have established a universal definition of "usual and customary." Federal law prohibits the

government from interfering in Medicare Part D plans' pricing arrangements with pharmacies. *See* 42 U.S.C. § 1395w-111(i). It is therefore up to PBMs and pharmacies to set their own pricing terms—including the definition of U&C price. Those definitions, which are in the contracts and regulations the district court ignored, are the relevant measure of falsity in this case.

But even accepting *Garbe*'s definition, Relators were not entitled to summary judgment. *Garbe* treated the U&C price as the lowest price offered to the general public when other definitions did not control. 824 F.3d at 645. But SuperValu's price-matched prices were customer-service exceptions used in less than 2% of all transactions. At a minimum, whether price-matched prices were U&C prices under *Garbe* was a disputed issue of fact.

Finally, and all else aside, *Garbe* was wrongly decided. *Garbe* ignored the structure of the federal healthcare statutes, and it applied inapposite regulations from *Medicaid* to a case concerning *Medicare*. The Court should take this opportunity to correct *Garbe*'s plainly incorrect analysis. *See* Circuit Rule 40(e).

II. The district court granted Relators' motion for summary judgment on materiality based on a *per se* rule: money is material. That bright-line rule is irreconcilable with the "demanding," "holistic" multi-factor analysis the

Supreme Court described in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016), and this Court applied in *United States ex rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816, 846 (7th Cir. 2025).

Even setting that fundamental error aside, the district court erred in two additional ways. First, the district court characterized materiality as assessing whether payors knew SuperValu submitted *false* U&C prices. But the proper analysis focuses on the underlying facts: namely, whether payors knew SuperValu did not submit price-matched prices as "usual and customary." Materiality does not turn on whether the government payors subjectively concluded those facts made the claims legally "false."

Further, the district court wrongly shifted the burden of proof from Relators to SuperValu. The district court granted summary judgment to Relators because SuperValu did not *disprove* materiality. That error independently requires reversal of the materiality ruling if the Court vacates the jury's verdict.

## I. The District Court Erred in Granting Relators Summary Judgment on Falsity Based on a Misreading of *Garbe*.

The FCA creates liability for knowingly making a "false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Although the statute does not define "false," this Court has held that a "claim

may be false for purposes of the FCA if it is made in contravention of a statute, regulation, or contract." *Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994, 998 (7th Cir. 2014). In assessing falsity, courts employ "well-worn tools of statutory and contract interpretation." *Streck*, 152 F.4th at 840.

SuperValu's contracts with PBMs and state regulations set the terms for SuperValu's submission of claims to government healthcare programs. Those contracts and statutes, therefore, are the relevant measuring stick for falsity. The district court should have evaluated the meaning of "usual and customary" in those sources to assess whether SuperValu's claim submissions were false.

The district court failed to do so. Ignoring the contracts and regulations that defined SuperValu's claims-submission obligations, the district court looked to a description of "usual and customary" this Court articulated in *Garbe*, 824 F.3d at 635, and granted Relators' motion for summary judgment on falsity.

That was error for two reasons. First, *Garbe* did not establish a universal definition of "usual and customary" that overrides contractual provisions and state regulations. Indeed, such a result would be directly contrary to the plain text of the Medicare Prescription Drug, Improvement,

and Modernization Act of 2003. Second, even accepting *Garbe*'s articulation, the district court still erred by ignoring key distinctions between the membership program at issue in *Garbe* and price matching here. Those distinctions, at a minimum, created a fact issue for the jury to decide.

This Court reviews grants of summary judgment *de novo*, "viewing all evidence and drawing all reasonable inferences in the non-moving party's favor." *EEOC v. Charter Commc'ns, LLC*, 75 F.4th 729, 732 (7th Cir. 2023). The Court "may affirm summary judgment only if the record shows 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). If this Court reverses and remands on causation, it should also vacate the district court's grant of summary judgment to Relators on falsity.

### A. *Garbe* Did Not Establish a Universal Definition of "Usual and Customary." Nor Does One Exist.

1. Federal law does not provide a generally applicable definition of "usual and customary." The law instead delegates the role of defining reimbursement terms and conditions to plan sponsors, PBMs, and state Medicaid programs—the entities that administer pharmacy benefits for Medicare Part D and Medicaid, respectively.

Start with Medicare Part D. Congress prohibited the Centers for Medicare & Medicaid Services ("CMS") from regulating the mechanisms of reimbursement between pharmacies and plan sponsors or PBMs. *See* 42 U.S.C. § 1395w-111(i). Specifically, section 1395w-111(i) bars CMS from interfering with negotiations, requiring any particular formulary, or "institut[ing] a price structure for the reimbursement of covered part D drugs." *Id.* CMS therefore does not and cannot dictate what U&C price pharmacies must report to PBMs. The Medicare Part D plan sponsor and/or its PBM set the terms of reimbursement—including the meaning of U&C price—in their pharmacy contracts. *See supra* p.9.

When a Medicare Part D beneficiary gets a drug *from an out-of-network pharmacy*—meaning there is no operative contract—CMS regulations say that "usual and customary" is what "an out-of-network pharmacy or a physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug." 42 C.F.R. § 423.100. But that explanation does not apply to claims submitted under Pharmacy–PBM contracts. *See* 42 U.S.C. § 1395w-111(i). And it does not constrain the terms PBMs may ask pharmacies to report or how PBMs define any of those terms.

Regarding Medicaid, CMS has instructed states to develop Medicaid-reimbursement plans that define their state Medicaid agency's "payment methodology for prescription drugs." 42 C.F.R. § 447.518(a); *see also id.* § 447.502(4)(ii)(C). As with Medicare Part D, CMS does not dictate that methodology. And although the Medicaid regulations reference "usual and customary," they do not define the term. *Id.* § 447.512(b)(2) (mandating that agency payments for certain drugs shall not exceed "[p]roviders' usual and customary charges to the general public"). Instead, the definition of "usual and customary" for state Medicaid plans appears in PBM contracts (for managed Medicaid plans) or in state Medicaid regulations (for non-managed Medicaid plans). *See supra* p.9.

2. *Garbe* did not and could not upend that regime. *Garbe* by its terms simply resolved the meaning of the phrase "cash price offered to the general public." 824 F.3d at 644. To be sure, *Garbe* referred to 42 C.F.R. § 423.100, which discusses the phrase "usual and customary" in the context of out-of-network pharmacy reimbursement, and to 42 C.F.R. § 447.512(b), a Medicaid regulation. *Id.* at 635, 644. But those provisions do not mandate a universal definition of usual-and-customary price; *Garbe* explicitly recognized that parties could define "usual and customary" for themselves. *See id.* at 643-44.

Any other interpretation of *Garbe* would run headlong into section 1395w-111(i). Under that provision, CMS cannot "institute a price structure for the reimbursement of covered part D drugs." Although *Garbe* gestured to 42 C.F.R. § 423.100, which as discussed above refers to U&C pricing for *out-of-network* pharmacy reimbursements, *see* 824 F.3d at 644, interpreting it to impose a particular definition on all payors in all transactions would violate section 1395w-111(i)'s plain terms.

Consistent with that straightforward logic, other courts have recognized that U&C price has no universal, fixed definition. As one district court explained, "there *is no* fixed definition of [U&C] in the Seventh Circuit, since the Seventh Circuit made clear in *Garbe* that usual and customary definitions could differ when state regulations provide otherwise." *Forth v. Walgreen Co.*, 2019 WL 10255628, *5 (N.D. Ill. July 10, 2019) (quotation omitted); *see also California ex rel. Omlansky v. Save Mart Supermarkets*, 251 Cal. Rptr. 3d 868, 870-73 (Ct. App. 2019) (noting the Medicaid "state plan" controlled the definition of U&C price). Likewise, in *Envolve Pharmacy Solutions, Inc. v. Rite Aid Headquarters Corp.*, the court declined to apply *Garbe*'s articulation or other industry standards, recognizing that the contractual language defining U&C price controlled. 2023 WL 2547994, *11-19 (Del. Sup. Ct. Mar.

17, 2023). Finally, in *Humana Health Plan, Inc. v. CVS Pharmacy, Inc.*, an arbitral tribunal determined that *Garbe*'s definition was "based on the facts before the Court in that case on a summary judgment motion," so it had no bearing on the definition of "usual and customary" in the arbitration. Comm. Arb. Trib., No. 01-19-0000-6924, at 29-32 (Henry L. Parr, arb.) (D. Minn. May 24, 2022), 23-mc-00077-DJF, Dkt. No. 4-4; *see also Humana Health Plan, Inc. v. Rite Aid Headquarters Corp.*, 2023 WL 5002875, *10-11 (W.D. Ky. Aug. 4, 2023).

3. The district court nevertheless held that *Garbe* established a universal definition of "usual and customary." The district court then applied that definition without considering SuperValu's PBM contracts or applicable state regulations. And the district court concluded that every claim for which the price to the payor exceeded the price-matched price was false as a matter of law.

That ruling was error. SuperValu's contracts and state law defined "usual and customary" price. SuperValu was entitled to argue those contracts and state laws required a different outcome than *Garbe*. Consider Defendants' post-2009 contract with ESI. That agreement expressly "exclude[d]" "matched price discounts" from the U&C price. Rels.App.A576. The district

court's summary-judgment ruling effectively erased that provision and replaced it with the definition of "usual and customary" CMS articulated for out-of-network claims. That kind of interference is precisely what Congress forbade in section 1395w-111(i).

Relators respond (at 39-40) that analyzing Defendants' PBM contracts would not have changed the outcome. That, Relators say (at 40), is because even under contractual provisions like SuperValu's agreement with ESI, price matching was too "widespread" and "routine" to qualify as anything but usual and customary. But whether a price qualifies as "usual and customary" because of its frequency is a classic issue of fact. It turns on both the language of the parties' agreements and the parties' contemporaneous understanding. And on the issue of contemporaneous understanding, the evidence, albeit in the context of scienter, uniformly supported SuperValu. *Supra* pp.16-17. Every SuperValu employee and every third-party PBM who testified at trial had the same understanding: price-matched prices are not usual and customary prices.

This Court should remand for the district court to consider all the PBM contracts in the first instance.

### B. Even if *Garbe* Had Defined "Usual and Customary" for All Purposes, the District Court's Grant of Summary Judgment Was Error.

Even assuming *Garbe* established a universally applicable definition of U&C price, the district court erred by granting Relators' motion for summary judgment.

*Garbe* held that Kmart's membership program prices were U&C prices because they were "offered to the general public." 824 F.3d at 643-45. The district court reasoned that because "Defendants' price match program was available to anyone who requested a price match," it met that definition as a matter of law. Rel.App.A24. In particular, the district court observed that "[a]ny individual could ask for a price match as long as the programs were available at the particular pharmacy" and could receive a price-matched price "as long as the lower price was verified" as available at a local pharmacy. Rel.App.A24, A26.

What it means for a price to be "offered to the general public," however, is an issue of fact. And there is a "genuine dispute" about the answer. *Charter Commc'ns*, 75 F.4th at 732. SuperValu's price matches were available only if, on a given day, the customer initiated a request for the price match, and the pharmacist was able to confirm that the requested price was offered at a

competitor pharmacy nearby. App.195-98. If the local competitor changed its prices the next day, the price match would not be available. If the local pharmacy did not pick up the phone the next day to verify their price, the price match would not be available. The data confirms that price matching was an exception, not the rule: only 2% of SuperValu's prescriptions during the relevant period were price matched. Rel.App.A302-04. Price-matched prices, in other words, were not offered to the general public by any measure—much less "as a matter of law." *Charter Commc'ns*, 75 F.4th at 732.

Relators respond (at 38-39) that the quantity or percentage of transactions that were price matched—only 2%—is not dispositive of whether a price is offered to the general public. But Relators miss the point: the frequency of price matching is evidence that undercuts their argument about its general availability. The same is true of the individualized nature of price matching and the conditions customers had to satisfy before receiving a price-matched price. Even if *Garbe* had stated a universal rule of what "usual and customary" means (and it did not), whether price-matched prices qualified as "usual and customary" is a disputed factual question.

### C. *Garbe* Was Wrongly Decided.

Even on its own terms, and setting the district court's errors aside, *Garbe* was wrongly decided, and the Court should revisit it. *See* Cir. R. 40(e).

*Garbe* began from the clearly incorrect premise that CMS "control[s] prices … insofar as it requires retail pharmacies to charge Medicare Part D beneficiaries the 'usual and customary' price, an administratively defined term, for each prescription." 824 F.3d at 635-36 (citing 42 C.F.R. §§ 423.100, 447.512(b)). But Congress explicitly prohibited CMS from "institut[ing] a price structure for the reimbursement of covered part D drugs." 42 U.S.C. § 1395w-111(i)(3). Thus, the CMS regulation *Garbe* relies on only implicates the phrase "usual and customary" for *out-of-network* transactions. *See* 42 C.F.R. § 423.100. PBMs or plan sponsors are separately granted authority by statute to define the structure of their reimbursements and thus, necessarily, the meaning of those reimbursement terms. 42 U.S.C. § 1395w-111(i). The second provision the Court cited, *id.* § 447.512(b), applies to *Medicaid*, not Medicare Part D. It does not and could not support the Court's conclusion that CMS controls prices for Medicare.

*Garbe* cited three other regulations, supposedly "related to 'usual and customary' price" to support the proposition that "where the pharmacy

regularly offers a price to its cash purchasers of a particular drug, Medicare receives the benefit of that deal." 824 F.3d at 644 (citing 42 C.F.R. §§ 447.512(b), 447.502, and 50.503). None of those regulations has anything to do with Medicare or U&C prices. Sections 447.200 and 447.512 establish and implement priorities of "efficiency, economy, and quality of care" for *Medicaid*. And section 50.503 pronounces a broad purpose of economy and efficiency for the Public Health Service—a subset of HHS that is independent from CMS (and thus from Medicare and Medicaid). *Garbe* also cites *Arkansas Pharmacists Association v. Harris*, 627 F.2d 867, 869 n.4 (8th Cir. 1980), for its conclusion that Medicare should get the benefit of low prices, 824 F.3d at 644. But that opinion was issued 26 years before Medicare Part D went into effect; it could not possibly inform the meaning of the statute or any of its terms.

Finally, *Garbe* pointed to the CMS Manual, which explains that "'where a pharmacy offers a lower price to its customers throughout a benefit year' the lower price is considered the 'usual and customary' price rather than 'a one-time "lower cash" price.'" *Id.* (quoting CMS, *Medicare Prescription Drug Benefit Manual*: Chapter 14—Coordination of Benefits 19 n.1 (2006)). But, again, CMS cannot dictate or interfere with PBM negotiations, so that

language has no bearing on the meaning of "usual and customary" in private Medicare Part D contracts. 42 U.S.C. § 1395w-111(i); App.596:17-598:18. Indeed, this Court considered that very Manual and determined it "did not put SuperValu on notice that" price matching "fell within the definition of U&C price." *United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 472 (7th Cir. 2021), *vacated on other grounds*, 598 U.S. 739 (2023). The Manual plainly did not set a definition of "usual and customary" that could be dispositive in this case. And in the Medicaid context, the Manual at most informs whatever language states adopt in their regulations and state plans; it does not set the relevant terms of reimbursement.

In sum, *Garbe*'s discussion of U&C price rests on a misreading of federal regulations. "Usual and customary" is defined by contract and state regulation, not by the courts.

## II. The District Court Incorrectly Applied a *Per Se* Materiality Rule and Impermissibly Shifted the Burden to Defendants.

The district court granted summary judgment to Relators on the element of materiality because, the court held, the existence of a "misstatement regarding the collection of … money" was "sufficient to establish materiality" as a matter of law. Rel.App.A53. The court further reasoned that summary judgment was warranted because *SuperValu* had not

established that payors who were aware of price matching not being reported as "usual and customary" by SuperValu "knew claims submitted were false, in that the usual and customary price was inflated." Rel.App.A53.

That reasoning is flawed in three ways. First, the court did not conduct the requisite holistic evaluation of the facts and instead relied on a *per se* rule that representations about amounts of money owed are always material. Second, the Court applied the wrong legal standard, focusing on whether payors knew claims were false (which turns on a legal analysis), as opposed to whether payors knew the underlying facts that allegedly made the claims false. Third, the court improperly shifted the burden of proof from Relators to Defendants on Relators' motion. Each of these errors is an independent basis to reverse the district court's grant of summary judgment. *See Charter Commc'ns*, 75 F.4th at 732 (explaining that the Court reviews the grant of summary judgment *de novo*).

### A. A *Per Se* "Money Is Material" Rule Conflicts with Supreme Court and Circuit Precedent.

1. A misrepresentation must be "material" to the government's decision to pay to be actionable under the FCA. 31 U.S.C. § 3729. Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States ex*

*rel. Escobar*, 579 U.S. 176, 193 (2016) (quotation omitted); 31 U.S.C. § 3729(b)(4) (describing a "material" representation as having a "natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property"). The inquiry, in other words, is whether "the government's decision to pay … likely or actually [would] have been different had it known of" the "alleged noncompliance." *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

The Supreme Court has emphasized that the materiality inquiry is fact-specific and requires a holistic analysis not susceptible to categorical rules. *Escobar*, 579 U.S. at 191. "[M]ateriality," put simply, "cannot rest on 'a single fact or occurrence as always determinative.'" *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). For example, a "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 579 U.S. at 194. "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* Where the government "pays *a particular claim* in full despite its actual knowledge that certain requirements were violated, that is very strong

evidence that those requirements are not material." *Id.* at 195 (emphasis added).

This materiality standard is intentionally "demanding." *Id.* at 194. The FCA is not a "vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* And the materiality inquiry ensures that defendants receive "fair notice" before incurring "open-ended liability." *Escobar*, 579 U.S. at 192.

2. The district court eschewed this demanding and holistic inquiry in favor of a categorical rule: a "misstatement regarding the collection of more money than actually owed" is automatically "sufficient to establish materiality." Rel.App.A53. Relators (at 43) readily admit as much, but argue that a "holistic deep-dive is superfluous" when "a legal requirement goes *directly* to how much government programs pay, or counterparties receive." Relators, in other words, would limit *Escobar*'s instruction to cases involving implied false certifications, where the defendant "violated a legal requirement that … may or may not have been germane to payments," *id.*, and embrace a

simplistic "money-is-material" rule for misrepresentations directly involving reimbursement amounts.

That argument misunderstands *Escobar*. "Although *Escobar* involved an implied false certification claim, nothing in the opinion suggests that its materiality requirement was intended to be limited to that specific theory of liability." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 105 (2d Cir. 2021); *see also Escobar*, 579 U.S. at 192. And this Court has already explicitly applied *Escobar*'s holistic inquiry in cases involving statements about the amount of money owed, just like this one. In *United States ex rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816 (7th Cir. 2025), this Court considered the materiality of misrepresentations about a pharmaceutical manufacturer's "Average Manufacturer Price (AMP)." *Id.* at 826. Manufacturers must pay the government an amount equivalent to a percentage of that price times the quantity of drugs sold for the privilege of participating in Medicaid. *Id.* at 827. The AMP therefore "directly affects the amount a manufacturer pays" and the government receives. *Id.* That did not make the alleged misrepresentations

of AMP material as a matter of law, however. The issue of materiality there went to a jury, whose finding this Court reviewed deferentially on appeal.

The Court explained the "materiality question is holistic" and "whether the misrepresentation cuts to the 'very essence of the bargain' at issue" is, contrary to Relators' suggestion (at 44), just one of multiple "non-dispositive factors to consider," *Streck*, 152 F.4th at 846 (quoting *Escobar*, 579 U.S. at 193 n.5). *Streck* reiterated that the "'inherently fact-specific' nature of materiality eschews bright-line rules in favor of a particularized examination as to whether the misrepresented information could affect a decisionmaker." *Id.* at 846 (quoting *Matrixx*, 563 U.S. at 39). The Court recognized that "[n]oncompliance with the law resulting in large price differentials in how much the government owes" offered "strong support for a finding of materiality," but the impact on how much the government owed was not dispositive to its analysis. *Id.* at 847 (second passage quoting *United States v. Molina Healthcare, Inc.*, 17 F.4th 732, 743 (7th Cir. 2021)). The Court also weighed, for instance, the "government's inaction" after learning of the AMP misreporting. *Id.* at 847-48.

That the Court in that case ultimately concluded the jury's finding about the materiality of misrepresenting the AMP was supported by evidence does

not mean the district court here should have taken the issue away from the jury entirely. Whether Relators established materiality should have at least been left to the jury to decide.

Other cases reinforce that no *per se* rule is appropriate, even when a misrepresentation "inflat[es] the amount charged to the government." *United States ex rel. Lisitza v. Par Pharms. Cos.*, 276 F. Supp. 3d 779, 802 (N.D. Ill. 2017). In *Lisitza*, the court expressly rejected the argument Relators make here: "Although the mere fact of overpayment boosts the case for materiality, post-*Escobar* this kind of *per se* conclusion is untenable; the Supreme Court expressly prescribed a holistic, fact-based approach to determining materiality." *Id.*; *see also Foreman*, 19 F.4th at 110 ("No one factor is dispositive, and our inquiry is holistic." (quoting *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019))); *see also United States v. Corp. Mgmt., Inc.*, 78 F.4th 727, 737 (5th Cir. 2023) (invoking "holistic" nature of inquiry and citing list of "non-exhaustive" factors to consider (quotation omitted)). The Third Circuit rejected a similar argument in *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017). The Court there explained that materiality could not be established merely by proving the alleged fraud was the reason for the submitted claim, which caused

the government to pay out more money than it should have. *See id.* at 491. That would "conflate[] materiality with causation," assuming a misrepresentation is material when it causes financial loss. *Id.*

3. No case Relators cite conflicts with that approach, and none affirms a grant of summary judgment to an FCA plaintiff. *See* Rels.' Br. 41-44. In fact, some of Relators' authorities affirm denials of summary judgment to defendants. *See Garbe*, 824 F.3d at 639; *cf. United States ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 657 (7th Cir. 2024) (declining to affirm grant of summary judgment to defendants on alternative ground of materiality), *aff'd on other grounds*, 604 U.S. 140 (2025). Others affirm jury verdicts or deny motions to dismiss. *See Corp. Mgmt., Inc.*, 78 F.4th at 737-38 (affirming jury verdict); *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020) (same); *United States v. Bourseau*, 531 F.3d 1159, 1164, 1171 (9th Cir. 2008) (affirming bench trial ruling); *United States v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 230 (D.N.J. 2021) (denying motion to dismiss); *United States ex rel. Campbell v. KIC Dev., LLC*, 2019 WL 6884485, *12 (W.D. Tex. Dec. 10, 2019) (same); *United States ex rel. Strauser v. Stephen L. LaFrance Holdings,*

2019 WL 1086363, *14 (N.D. Okla. Mar. 7, 2019) (same); *United States ex rel. Ubl v. IIF Data Sols.*, 2007 WL 2220586, *4 (E.D. Va. Aug. 1, 2007) (same).

The most those cases establish is that a factfinder may *consider* how a misrepresentation impacts the amount of money paid or received. Not one states that a representation involving an amount of money is *per se* material. *See, e.g.*, *Heath*, 92 F.4th at 665 (evaluating and rejecting argument that express certification of compliance with a requirement is necessary for a finding of materiality).

*Garbe* also does not establish Relators' *per se* "money-is-material" rule. Rels.' Br. 41. *Garbe* merely affirmed a district court's denial of defendants' summary-judgment motion on materiality and thus gave no indication of what might be *sufficient* for plaintiffs to establish materiality as a matter of law. 824 F.3d at 639. The discussion Relators cite addresses a totally separate issue: whether the relator sufficiently traced the defendants' misrepresentation to the government's payment decision. *Id.* As to that issue, *Garbe* simply concluded that the relator did not have to prove that defendants actually presented a false claim to the *government* and not a private entity. *Id.* (describing argument as "presentment in materiality clothing"). Subsequent

cases have cited *Garbe* for that exact point. *See Harris v. New Rez, LLC*, 2022 WL 184000, *3 (E.D. Cal. Jan. 20, 2022).[9]

Relators' "money-is-material" rule would eviscerate the materiality element altogether. In any case involving a representation about an amount of money owed, materiality would be subsumed in the question of falsity: If a representation was false, it would automatically be material. *Escobar*'s "demanding" inquiry does not permit writing materiality out of the FCA, and turning the FCA into a "vehicle for punishing garden-variety breaches of contract." *Escobar*, 579 U.S. at 194.

4. Under the correct materiality standard, Relators did not meet their burden to prove materiality as a matter of law. At the summary-judgment stage, SuperValu "provide[d] evidence that at least some payors were aware of SuperValu's price matching throughout the relevant ten-year period" and payors "never refused to pay a claim on the ground that price matches were not included in the calculation of usual and customary prices." Rel.App.A52-53. And the evidence at trial uniformly established that PBMs

---

[9] *Garbe* predated *Escobar* and *Streck*, so even if Relators were correct that *Garbe* endorsed a *per se* rule that statements about amounts of money owed are always material, more recent precedent reinforcing the holistic inquiry controls.

would not have expected price-matched prices to be submitted as U&C prices. *Supra* p.17. On that record, the Court could enter judgment in SuperValu's favor—meaning that materiality is an alternative ground for affirmance. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 465 (7th Cir. 1997). At the very least, the Court should reverse the district court's grant of summary judgment and remand for further proceedings on materiality. *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 660 (7th Cir. 2010).

### B. The District Court Applied the Wrong Standard for Government Knowledge.

Independently, the district court erred by asking the wrong question in its materiality analysis. The district court framed the materiality question as whether government payors knew that SuperValu's representations about its U&C prices were "false, in that the usual and customary price was inflated." Rel.App.A53. But whether SuperValu's "usual and customary price was *inflated*," Rel.App.A53 (emphasis added), is a legal issue, the very issue the parties litigated in this case. The proper question, for materiality purposes, was whether payors knew SuperValu price matched and did not submit its price-matched prices as "usual and customary." In other words, it does not matter whether the government "knew" the claims were "false" in the sense that the government shared the district court's (later) view that SuperValu's

U&C price reporting was legally incorrect. What matters is that the government knew the relevant facts – that SuperValu price-matched and did not treat its price matched prices as U&C prices – yet took no action to deny payment.

The Supreme Court agrees. In *Kungys v. United States*, 485 U.S. 759 (1988), a plurality explained that "what is relevant" is "what would have ensued from official knowledge of the misrepresented fact … not what would have ensued from official knowledge of [an] inconsistency." *Id.* at 775. Although the Court there addressed materiality under immigration laws, the same principle applies under the FCA. *See Escobar*, 579 U.S. at 193 (citing *Kungys*, 485 U.S. at 770). The materiality inquiry focuses on the effect of *specific* alleged misrepresentation, not the effect of a false statement.

### C. The Court Improperly Shifted the Burden of Proof to SuperValu.

Apart from applying an improper *per se* rule and an incorrect standard on government knowledge, the district court separately erred by shifting the burden of proof from Relators to Defendants in evaluating materiality. That error equally warrants reversal and remand.

On Relators' motion for summary judgment, the burden was squarely on Relators. *See United States ex rel. Absher v. Momence Meadows Nursing*

*Ctr., Inc.*, 764 F.3d 699, 714 (7th Cir. 2014) (noting relators must prove all "elements of the cause of action" (quotation omitted)). Relators alone bore the burden of providing conclusive proof such that "no reasonable jury could find for the other party." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

The district court reversed the burden. It summarized the evidence both sides presented and identified conflicting possible inferences. "Relators have offered *some evidence* from which a factfinder could infer that the false or inflated claims are ones that Government entities would have considered so important to 'likely or actually' change its decision to reimburse SuperValu." Rel.App.A52 (emphasis added). And Defendants showed that "some payors were aware of SuperValu's price matching throughout the relevant ten-year time period" and that "payors conducted 12,433 audits of SuperValu pharmacies and never refused to pay a claim on the ground that price matches were not included in the calculation" of U&C price. Rel.App.A52-53.

Faced with what it believed were genuine factual disputes, the district court should have denied both parties' motions for summary judgment. But the court instead emphasized that Defendants did not conclusively *disprove* materiality: "Although some payors may have known about the Defendants['] price matching, there is *no evidence* they knew claims submitted were false, in

that the usual and customary price was inflated, and continued to pay the Defendants." Rel.App.A53 (emphasis added). On that basis, and applying its *per se* rule, the district court granted summary judgment to Relators. Rel.App.A53. That clear error requires reversal. *See, e.g.*, *Trinity*, 629 F.3d at 660.

SuperValu's failure to *disprove* materiality is not reason enough to deny SuperValu summary judgment—let alone grant summary judgment to Relators. Relators must provide affirmative evidence in their favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Yet, even in the district court's opinion on Defendants' motion for reconsideration, the court focused on deficiencies in evidence supporting Defendants: "Relators met their burden because there was no evidence that payors knew claims submitted were false and continued to pay Defendants." Rel.App.A59. The court did not cite a single piece of evidence in favor of Relators. A plaintiff-movant cannot prevail on summary judgment because the non-moving party failed to present evidence contradicting the movant's claim. *See Celotex*, 477 U.S. at 322. The district court independently erred by shifting the burden of establishing materiality to SuperValu.

If this Court reverses the district court on either of Relators' issues, as addressed in Parts I and II of our response, the Court should also reverse the district court's grant of summary judgment on materiality and remand for a jury to evaluate whether Relators have proven that Defendants' exclusion of price matching from "usual and customary" was material.

## CONCLUSION

The judgment should be affirmed. If the judgment is reversed and the case remanded, the district court's summary-judgment decisions on falsity and materiality should be vacated and those issues likewise remanded for further consideration. Any retrial on remand should be on all issues, including scienter.

Respectfully submitted,

/s/ Enu Mainigi
ENU MAINIGI
*Counsel of Record*
CRAIG SINGER
JENNIFER WICHT
A. JOSHUA PODOLL
ANNIE SHOWALTER
WILLIAMS & CONNOLLY LLP
*680 Maine Ave., S.W.*
*Washington, D.C. 20024*
*(202) 434-5000*

March 6, 2026

## CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATIONS

I hereby certify that this brief complies with the type-volume limitation of Cir. R. App. P. 28.1 because it contains 16,493 words, which is less than the 16,500-word limit.

/s/ Enu Mainigi
ENU MAINIGI

## CERTIFICATE OF SERVICE

I, Enu Mainigi, counsel for cross-appellant and appellee SuperValu and a member of the Bar of this Court, certify that, on March 6, 2026, a copy of the Brief of Defendant-Appellee-Cross-Appellant was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/ Enu Mainigi
ENU MAINIGI